Anson B. Frelinghuysen
Marc A. Weinstein
Dustin P. Smith
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000

*Counsel to Gemini Trust Company, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Genesis Global Holdco, LLC, et al.,<br><br>    Debtors. | Case No. 23-10063 (SHL) |
| GEMINI TRUST COMPANY, LLC, for itself<br>and as agent on behalf of the Gemini Lenders,<br><br>    Plaintiff,<br><br>    v.<br><br>GENESIS GLOBAL CAPITAL, LLC,<br>GENESIS GLOBAL HOLDCO, LLC, and<br>GENESIS ASIA PACIFIC PTE. LTD.,<br><br>    Defendants. | Adversary No. 23- _____ |

**ADVERSARY COMPLAINT**

Plaintiff Gemini Trust Company, LLC ("Gemini"), for itself and acting as agent on behalf of the Gemini Lenders (defined below), as and for its Complaint against Defendants Genesis Global Capital, LLC ("GGC"), Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd. (collectively, "Genesis" or the "Debtors"), alleges as follows:

## NATURE OF THE ACTION

1.      Amidst the broad market turmoil in the summer of 2022, Gemini worked tirelessly to evaluate Genesis's financial condition in order to manage risk related to the Gemini Earn Program (defined below). Gemini did this by entering into a security agreement (the "Security Agreement") (and subsequent amendments) pursuant to which Genesis promised to deliver to Gemini 62,086,586 shares of Grayscale Bitcoin Trust ("GBTC") in two tranches (the "Collateral") to secure all of the loans made by 232,000 Gemini users (the "Earn Users" or "Gemini Lenders") to Genesis through the Gemini Earn Program. Today, the Collateral is worth nearly $1.6 billion, an amount that would completely secure and satisfy the claims of every single Earn User.[1] Despite the unprecedented market turmoil, through these efforts Gemini managed the risk of the Gemini Earn Program. However, Gemini's efforts have been undermined by Genesis's actions prior to and following the commencement of its bankruptcy proceeding. Through this Complaint, Gemini honors its commitment as agent on behalf of Earn Users.

---

1. Gemini's risk management efforts worked despite fraud on the part of Genesis and its parent company, Digital Currency Group, Inc. ("DCG"), as alleged by both Gemini, *see Gemini Tr. Co., LLC v. Dig. Currency Grp.*, No. 1:23-cv-06864 (S.D.N.Y.), and the New York Attorney General, *see People v. Gemini Tr. Co., LLC*, Index No. 452784/2023 (N.Y. Sup. Ct.). As part of that fraud, Genesis and DCG systematically lied to Gemini for months regarding GGC's true health and financial condition. Not only did DCG and GGC conspire to make false statements and misrepresentations to Gemini to mislead Gemini into believing that DCG had absorbed massive losses that GGC had incurred in connection with the Three Arrows Capital Ltd. ("3AC") collapse in the summer of 2022, DCG and GGC also knowingly and intentionally furnished Gemini with falsified balance sheets and other financial reports, which falsely indicated that GGC was solvent when in reality it was not. *See generally People v. Gemini Tr. Co., LLC*, Index No. 452784/2023 (N.Y. Sup. Ct.); *Gemini Tr. Co., LLC v. Dig. Currency Grp.*, No. 1:23-cv-06864 (S.D.N.Y.).

2.        Starting in the summer of 2022 and continuing to the present day, Genesis has repeatedly taken actions to harm Earn Users and to hinder and delay Earn Users' recovery of their digital assets.  Genesis has deprived Earn Users of the benefit of the Collateral through a series of pre- and post-petition decisions, including: (1) challenging the validity of Gemini's foreclosure on a portion of the Collateral, putting application of the foreclosure proceeds in limbo for nearly a year; (2) halting delivery of the other portion of the Collateral to Gemini for the benefit of Earn Users; and (3) proposing a plan of reorganization that would funnel value *away* from Earn Users to other creditors.  More specifically, Genesis's plan of reorganization improperly and artificially suppresses Earn Users' deficiency claim.  And it provides for the distribution of a portion of the Collateral to other creditors that was specifically earmarked and provided for the benefit of Earn Users.

3.        To address and ameliorate this harm and protect the interests of Earn Users, Gemini brings the instant action requesting a determination of the Earn Users' rights to the Collateral and the value of Earn Users' deficiency claim.[2]

4.        Prior to the suspension of the Gemini Earn Program and Genesis's subsequent collapse, Gemini insisted that Genesis post, in two stages, the Collateral to secure Earn Users' loans to Genesis.  Genesis agreed, as did its parent, DCG.  Genesis's agreement to pledge the

---

2.  On May 22, 2023, Gemini, acting in accordance with the Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief (Bankr. Dkt. ECF No. 200), asserted on behalf of the Gemini Lenders Claims 356, 369, and 400 (collectively, the "Master Claim") against the Debtors to recover digital assets that the Gemini Lenders had loaned to GGC, but that GGC had not repaid as of the Petition Date, plus loan fees, late fees, and new tokens, as applicable.  Those digital assets were worth more than $1 billion as of the Petition Date.  The Master Claim raised the issues central to this Complaint, putting all parties on notice of Gemini's and the Gemini Lenders' claims.

Collateral to Gemini for the benefit of Earn Users through two transactions should have *over-collateralized* Earn Users' previously unsecured loans.

5.      <u>First</u>, on August 15, 2022, pursuant to the terms of the Security Agreement, GGC pledged 30,905,782 shares of GBTC as collateral for Earn Users' loans (the "<u>Initial Collateral</u>"). On November 16, 2022, following GGC's default under the terms of certain master loan agreements (the "<u>MLAs</u>") of the Gemini Earn Program, and pursuant to the terms of the Security Agreement and in accordance with the requirements of the Uniform Commercial Code, Gemini foreclosed on the Initial Collateral.  Gemini is currently holding $284.3 million in proceeds from that foreclosure for the benefit of Earn Users (the "<u>Foreclosure Value</u>").  However, Genesis has consistently asserted in filings and in discussions with counsel that Genesis disputes that Gemini's foreclosure "satisfied applicable law."[3]  Despite recognizing that the treatment of the Collateral is a significant issue, Genesis has taken no steps to address this dispute with the Court.  As a result, Gemini has been prevented from distributing the proceeds of the Initial Collateral to Earn Users.

6.      Now, Genesis wants to use the current value of the Initial Collateral—more than $800 million—instead of the Foreclosure Value to determine the Earn Users' deficiency claim. The net effect will be tantamount to Genesis taking hundreds of millions of dollars of value *away* from Earn Users and redistributing it to Genesis's creditors.  But it was Gemini who bore the market risk related to the Initial Collateral for the benefit of Earn Users following the foreclosure; so it follows that **only Earn Users are entitled to any gain resulting from Gemini taking on that risk.**  Had the value of the Initial Collateral *decreased* since November 16, 2022, Genesis surely would not be offering Earn Users any additional value to make up for the loss.  As a matter

---

3.   *See* Declaration of Michael Leto in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2 ¶ 12 (Bankr. Dkt. ECF No. 28) ("<u>Leto Decl.</u>").

of law and equity, the appropriate set off amount was established by Gemini's foreclosure in November 2022.

7.    <u>Second</u>, on November 10, 2022, in an amendment to the Security Agreement, Genesis pledged an additional 31,180,804 shares of GBTC (the "<u>Additional Collateral</u>")[4] to Gemini for the benefit of Earn Users.  Pursuant to the amended Security Agreement, GGC's parent, DCG, was to transfer the Additional Collateral to GGC for the sole purpose of immediate onward distribution to Gemini for the benefit of Earn Users.  However, although Genesis concedes that DCG transferred the Additional Collateral to GGC for the benefit of Earn Users, GGC refused to then transfer the Additional Collateral to Gemini.  Inexplicably, despite "absolute[ly] and unconditional[ly]" pledging the Additional Collateral to Gemini, and therefore holding no equitable interest in the Additional Collateral, Genesis's proposed plan of reorganization provides for the distribution of the liquidated value of the Additional Collateral to Genesis's other general unsecured creditors.[5]  Genesis again proposes to sacrifice the interest of Earn Users for the benefit of Genesis's other creditors.

8.    The treatment of the Collateral has significant implications for all of Genesis's creditors, including Earn Users who by number comprise more than 99% of those creditors, and whose claims by value comprise more than 28% of all claims.  It is time to resolve these issues so that Genesis may move forward with a reasonable plan of reorganization and Gemini may distribute the proceeds of the Collateral to Earn Users.  Given the dispute over the Collateral and

---

4.    Based on the value of GBTC as of October 26, 2023, the Additional Collateral has a current value of more than $800 million.

5.    *See* Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC, et al., Under Chapter 11 of the Bankruptcy Code, at 33, 52, 241-42 (Bankr. Dkt. ECF No. 839) ("<u>Amended Disclosure Statement</u>").

the substantial effect that the resolution of that dispute will have on distributions under any plan of reorganization, the determination of the Earn Users' deficiency claim and the Earn Users' right to the Additional Collateral is critical to Genesis's ability to present a confirmable plan of reorganization.  The importance of the determination of these issues is further demonstrated by the fact that Genesis's proposed plan and projected recoveries to unsecured creditors are premised on (1) the distribution of the Additional Collateral to other creditors—not Earn Users—and (2) the setoff of the Initial Collateral at the value as of the Effective Date of the plan of reorganization (as opposed to the Foreclosure Value) against the Master Claim.

9.       Genesis's proposed plan ignores Gemini's foreclosure on the Initial Collateral and transfers the appreciation of the value of that collateral *away* from Earn Users to Genesis's other creditors (who can vote to confirm a plan of reorganization that is against the interests of Earn Users).  And the proposed plan completely diverts the Additional Collateral to all of Genesis's creditors.  Basic math confirms that Genesis's approach reduces Earn Users' absolute recoveries. This sits in sharp contrast to Genesis's statement that "nobody's trying to take value from the Earn Users."[6]

10.       Accordingly, Gemini seeks judgments from the Court declaring that: (i) Gemini properly foreclosed on the Initial Collateral and, for the purposes of calculating its deficiency claim, the amount to be set off against the Master Claim is the Foreclosure Value; and (ii) the Additional Collateral is not property of any of the Debtors' estates, or, if the Additional Collateral is property of one of the estates, Gemini has a secured interest in the Additional Collateral; or

---

6.  Oct. 24, 2023 Hearing Transcript pp. 52:14-15, *In re Genesis Global Holdco, LLC*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.).

(iii) in the alternative, that Genesis hold the Additional Collateral in constructive trust for the benefit of Earn Users.[7]

11.     A determination giving effect to the terms of the Security Agreement, confirming Gemini's proper foreclosure on the Initial Collateral, and recognizing the Earn Users' rights to the Additional Collateral would **facilitate the return of more than $1 billion in digital assets** that Genesis has wrongfully withheld from Earn Users for nearly a year.  Following a determination that Earn Users are entitled to the proceeds of the Initial Collateral and the current value of the Additional Collateral, Gemini is prepared to immediately distribute the proceeds of the Collateral to restore assets to Earn Users in kind and to the greatest extent possible.

12.     For the entirety of these chapter 11 cases, Gemini has sought to reach a consensual resolution regarding the value of the Earn Users' deficiency claim and Earn Users' entitlement to the proceeds of the Collateral.  But despite Gemini's substantial effort, Gemini and Genesis have been unable to resolve these issues.  Accordingly, Gemini seeks the relief set forth herein.

## JURISDICTION AND VENUE

13.     This adversary proceeding arises in and relates to the chapter 11 cases pending before the United States Bankruptcy Court for the Southern District of New York in *In re Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL), commenced on January 19, 2023 (the "Petition Date") under chapter 11 of Title 11 of the United States Bankruptcy Code.

14.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Gemini consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

---

7.   The Earn Users' deficiency claim would be further reduced by the value of the realized proceeds of sale of the Additional Collateral.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**PARTIES**

16.     Plaintiff Gemini Trust Company, LLC is a trust company organized under the laws of New York with its principal place of business in New York, New York.  Gemini operates a cryptocurrency platform that enables its users to buy, sell, and store cryptocurrencies.  With respect to the transactions at issue here, Gemini acts as custodian and authorized agent on behalf of the Gemini Lenders.

17.     Defendant Genesis Global Capital, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Jersey City, New Jersey.  GGC was a provider of lending and borrowing services for digital assets and fiat currency primarily to and from institutional and high net worth individual customers.  GGC is owned entirely by Defendant Genesis Global Holdco, LLC ("Holdco").[8]

18.     Defendant Genesis Global Holdco, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York.  Holdco provided lending and borrowing, spot trading, derivatives, and custody services for digital assets and fiat currency.  Holdco is entirely owned by DCG.  Holdco's lending and borrowing service was offered primarily through Defendants GGC and Genesis Asia Pacific Pte. Ltd. ("Genesis Asia") as a means of serving customers located in different parts of the world.

19.     Defendant Genesis Asia Pacific Pte. Ltd. is a private limited company organized under the laws of Singapore with its principal place of business in Singapore.  Genesis Asia offered

---

8.  Gemini does not have complete knowledge and information as to the corporate relationship among Defendants Genesis Global Capital, LLC, Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd., including which entity may actually be holding the Additional Collateral, and which entity or entities were responsible for the decision to not transfer the Additional Collateral to Gemini.  Gemini therefore brings this adversary proceeding against all of the Debtors in the underlying chapter 11 cases.

a single point of access for digital asset trading, derivatives, borrowing, lending, and prime brokerage services.  Genesis Asia is owned entirely by Holdco.

## FACTUAL ALLEGATIONS

### A.   The Earn Program

20.     The Debtors are three of several companies owned by DCG, a cryptocurrency conglomerate.  GGC was a provider of lending and borrowing services for digital assets and fiat currency and was among the largest lenders in the cryptocurrency industry.  In November 2021— at the height of its lending business—GGC had more than $16 billion in active loans outstanding.

21.     GGC obtained capital to fund its lending by borrowing from lenders via loans denominated in various cryptocurrency assets or in U.S. dollars.

22.     In February 2021, Gemini began offering a new program, Gemini Earn (the "Gemini Earn Program"), through its cryptocurrency platform.  Gemini users who chose to participate in the Gemini Earn Program—each, an Earn User—could choose to loan their digital assets to GGC.  The MLAs governed Earn Users' lending.  Each MLA was executed by three parties: (i) an individual Earn User, (ii) GGC, as borrower, and (iii) Gemini, as custodian and authorized agent on behalf of an Earn User.  Under the MLAs, upon request or at the expiration of a specified period, each Earn User was entitled to the return of any digital assets that they had loaned to GGC.

### B.   GGC's Financial Condition Deteriorates

23.     In late spring 2022, Singapore-based hedge fund 3AC collapsed and entered liquidation proceedings.  At the time, GGC had outstanding loans to 3AC totaling $2.3 billion.

24.     In light of this, DCG and GGC sought to reassure Gemini to keep the Gemini Earn Program in place.  Specifically, DCG and GGC represented that DCG had absorbed the losses on

the 3AC loans at the parent level and that GGC was not at risk.  In truth, DCG did not actually absorb those losses and GGC was massively insolvent.

25.    Throughout July and August 2022, Gemini sought information from GGC regarding GGC's financial condition, including the viability of GGC's loans to counterparties, and information regarding (among other things) the weighted average duration of GGC's outstanding portfolio of loans.  Unbeknownst to Gemini, GGC responded with fictitious financial reports and false and misleading statements about the financial support that DCG had supposedly provided to GGC.

**C.    The Security Agreement**

26.    In August 2022, following its inquiries to GGC and amidst broad market turmoil at that time, Gemini sought collateral from GGC as security for Earn Users' loans to GGC.

27.    On August 15, 2022, Gemini, as agent on behalf of Earn Users, entered into the Security Agreement with GGC, pursuant to which GGC pledged the Initial Collateral—30,905,782 shares of GBTC—to secure GGC's obligations to Earn Users under the MLAs.  (*See* Ex. 1, Security Agreement.)

28.    The Security Agreement provides that, "in consideration of the outstanding and future transactions under the [MLAs], and for other good and sufficient consideration, [GGC] has agreed to pledge to [Gemini], for the benefit of [Gemini] and the [Earn Users], certain collateral to secure [GGC's] obligations under the [MLAs]." (Ex. 1, Security Agreement at 1.)

29.    Section 1 of the Security Agreement required that GGC pledge as collateral 30,905,782 shares of GBTC to Gemini for the benefit of Earn Users.  (*See* Ex. 1, Security Agreement § 1.)

10

30.     Section 2 of the Security Agreement, titled "The Pledge," provides:

> As security for the prompt payment and performance in full when due
> (whether at stated maturity, by acceleration, or otherwise) of all liabilities
> and obligations of [GGC] under the [MLAs], whether now existing or
> hereafter arising, whether or not mature or contingent (the "Secured
> Obligations"), [GGC] hereby pledges, assigns, and grants to [Gemini], for
> the benefit of [Gemini] and the [Earn Users], a security interest in all of
> [GGC's] right, title, and interest in and to all property from time to time
> transferred by or on behalf of [GGC] to or for the benefit of [Gemini] or the
> [Earn Users] in connection with this Agreement or any [MLAs].

(Ex. 1, Security Agreement § 2.)

31.     Section 3 of the Security Agreement, titled "Remedies," provided Gemini with
certain rights and remedies in the event that GGC were to default under any MLA or if GGC failed
to comply with certain obligations.  Under the MLAs, GGC was obligated, for any digital assets
that an Earn User requested be returned, to "return such Digital Assets within three Business Days
to a Digital Asset Address provided by Custodian."  (*See* Ex. 2, MLA § II(b).)  The MLAs also
provided that GGC's failure "to return any and all Loaned Assets upon termination of any Loan"
would be an event of default if not cured within two business days.  (*See* Ex. 2, MLA § VI(a).)
Neither the Security Agreement nor the MLAs provided GGC with the right to suspend Earn User
redemptions or otherwise decline to return digital assets to Earn Users.  Any suspension of
redemptions by GGC therefore constituted a violation of GGC's obligation to return digital assets
to Earn Users and was a default under the MLAs and the Security Agreement.

32.     Section 3 of the Security Agreement therefore provided Gemini with the following
rights and remedies:

> To liquidate any or all Collateral through one or more public or private sales
> or other dispositions, free from any claim or right of any nature whatsoever
> of [GGC], including any equity or right of redemption by [GGC] (with
> [Gemini] having the right to purchase any such Collateral) and apply the
> proceeds of such liquidation to the Secured Obligations; and

> To exercise any rights and remedies available to [Gemini] or the [Earn Users] under applicable law, including the UCC as in effect in any relevant jurisdiction.

(Ex. 1, Security Agreement § 3(a).)  Such rights and remedies were explicitly "in addition to any other right or remedy [Gemini] or any [Earn User] may have at law, contract, or equity (including under the Uniform Commercial Code . . . as in effect in any relevant jurisdiction)." (Ex. 1, Security Agreement § 3(a).)  The Security Agreement therefore provided Gemini the right to foreclose on the Initial Collateral through "any collection, sale, liquidation, or other realization" process.  (Ex. 1, Security Agreement § 3(b).)  In addition to the rights and remedies provided to Gemini under the Security Agreement, the MLAs permitted Gemini to, *inter alia*, "transfer any Collateral for a Loan from the collateral account to [Gemini's] operating account to hold on behalf of itself and the [Earn User], to the extent necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan" as a remedy to GGC's default.  (*See* Ex. 2, MLA § VII.)

33.     Section 4 of the Security Agreement, titled "Security Interest Absolute," provides:

> All rights of [Gemini] hereunder and the grant of a security interest in the Collateral shall be absolute and unconditional irrespective of any circumstance, including without limitation the authority of [Gemini] to act on behalf of the [Earn Users].

(Ex. 1, Security Agreement § 4.)

34.     In Section 5(a) of the Security Agreement, GGC represented and warranted that the Security Agreement:

> creates a legal and valid security interest in the Collateral in favor of [Gemini], for its benefit and the benefit of the [Earn Users], which is enforceable against [GGC], subject to applicable bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally and subject to general principles of equity.

(Ex. 1, Security Agreement § 5(a).)

35.     On or about August 18, 2022, GGC transferred the Initial Collateral to Gemini.

**D.    The First Amendment to the Security Agreement**

36.    On October 13, 2022, Gemini provided GGC 30 days' notice of its intention to terminate the Gemini Earn Program.

37.    After receiving the notice of termination, GGC contacted Gemini in an attempt to allay Gemini's concerns regarding GGC's financial state.  However, in doing so, GGC again falsely represented its financial health and stability.   In reliance on DCG's and GGC's representations during those discussions, Gemini elected to delay termination of the Gemini Earn Program rather than explore more rapid termination or other relief, which Gemini would have done had it known the truth about GGC's financial condition.  Gemini agreed to extend the termination date from November 12, 2022 until November 22, 2022.

38.    Because the terms of the Security Agreement were set to expire on November 15, 2022, Gemini requested that GGC also extend the Security Agreement expiration date to November 22, 2022, such that the terms of the Security Agreement would terminate concomitant with the Gemini Earn Program.  GGC agreed and, on November 7, 2022, GGC and Gemini entered into an amendment to the Security Agreement that extended the Security Agreement's term to November 22, 2022 (the "First Amendment to the Security Agreement").  (*See* Ex. 3, First Amendment to the Security Agreement.)

**E.    The Second Amendment to the Security Agreement**

39.    To further protect Earn Users, on November 10, 2022, GGC, Gemini, and DCG entered into a second amendment to the Security Agreement (the "Second Amendment to the Security Agreement").  (*See* Ex. 4, Second Amendment to the Security Agreement.)  Under the Second Amendment to the Security Agreement, the parties amended, among other things, Section 1 of the Security Agreement such that DCG agreed to deliver an *additional* 31,180,804 shares of

GBTC—*i.e.*, the Additional Collateral—to GGC for the sole purpose of having GGC, in turn, provide those shares to Gemini to serve as additional collateral for loans that Earn Users had made to GGC. DCG thus agreed to transfer the Additional Collateral to GGC for the benefit of Gemini and Earn Users, and GGC agreed to further transfer the Additional Collateral as promptly as possible to Gemini following transfer by DCG.

40.     Specifically, the Second Amendment to the Security Agreement, among other things, added the following provision to Section 1 of the Security Agreement:

> As promptly as practicable after the execution of this Second Amendment, [DCG] shall assign, sell, convey, transfer, and deliver to [GGC], or a controlled subsidiary of [GGC], all right, title and interest in and to **31,180,804** shares of [GBTC], free and clear of all liens, claims, charges and encumbrances. As promptly as practicable after such assignment, conveyance, transfer, and delivery, [GGC] shall transfer or cause to be transferred such **31,180,804** shares of [GBTC] to the GTC Account; provided, that, for the avoidance of doubt, [GGC] shall have no obligation to transfer, cause to be transferred or otherwise deposit additional shares of [GBTC] or any other shares into the GTC Account after such date except as required under and in accordance with Section 6(b) of this Agreement.

(Ex. 4, Second Amendment to Security Agreement § 1 (emphasis in original).)[9]

41.     The parties entered into the Second Amendment to the Security Agreement in connection with the Security Agreement. The Second Amendment to the Security Agreement formed "a part of, incorporate[d] by reference, and [was] subject to the terms and conditions in the Security Agreement," including Section 4 of the Security Agreement (the "Security Interest Absolute" provision). The Security Agreement otherwise remained in full force and effect. (*See* Ex. 4, Second Amendment to the Security Agreement at 1.)

---

9.   The "GTC Account" referenced in the Second Amendment to the Security Agreement was an account at a financial institution held in Gemini's name for the benefit of Earn Users in which Gemini received the Initial Collateral (and likely would have held the Additional Collateral had GGC transferred that collateral as required under the Second Amendment to the Security Agreement). (*See* Ex. 4, Second Amendment to the Security Agreement § 1.)

42.     In reliance on the Second Amendment to the Security Agreement, Gemini continued to act as custodian and agent on behalf of Earn Users who had outstanding loans of digital assets to GGC through the Gemini Earn Program.

**F.    Gemini Forecloses on the Initial Collateral**

43.     On November 16, 2022, GGC announced that it was suspending redemptions by Earn Users under the Gemini Earn Program.  This and other events in the market made it likely that the value of the Initial Collateral, which consisted of shares of GBTC, would rapidly decline. The announcement also constituted default by GGC under the terms of the MLAs and the Security Agreement, as detailed above.  Therefore, on the same day, Gemini foreclosed on the Initial Collateral in accordance with the terms of the Security Agreement and the requirements of the Uniform Commercial Code.  Specifically, Gemini sold the Initial Collateral in a private sale to itself for a total of $284,333,194.40 (*i.e.*, the Foreclosure Value).

44.     In connection with Gemini's foreclosure of the Initial Collateral, Niels Gjertson, Gemini's then-general counsel, provided GGC the following foreclosure notice:

> This is to inform you that due to one or more events of default under the [MLAs] and/or failures to comply with the terms of the Security Agreement, dated as of August 15, 2022, as amended to date (the "Security Agreement"), we have today foreclosed upon the 30,905,782 shares of [GBTC] pledged by you to us pursuant to the Security Agreement.  The method of foreclosure was a private sale to us in accordance with Section 9-610 of the Uniform Commercial Code at the market price of $9.20 per share as of 4:00 PM EST for total proceeds of $284,333,194.40.  Such amount, less the cost and expenses of foreclosure, will be applied as set forth in Section 3(b) of the Security Agreement to the Secured Obligations (as defined in the Security Agreement).  As the net proceeds of the collateral is less than the secured obligations, you remain liable for any deficiency.

45.     Gemini foreclosed on the Initial Collateral at the then-OTCQX market price of $9.20 per share.  Gemini's foreclosure of the Initial Collateral was commercially reasonable given that OTCQX—the exchange on which GBTC is customarily traded—is a recognized market.[10]

46.     At the time of the foreclosure, Earn Users' outstanding loans to GGC totaled $940,438,643.12.

## G.   GGC Fails to Transfer the Additional Collateral to Gemini

47.     The Debtors concede that DCG transferred the Additional Collateral to GGC on November 10, 2022.[11]

48.     After entering into the Second Amendment to the Security Agreement on November 10, 2022, between November 11, 2022 and November 17, 2022, Gemini repeatedly sought confirmation that GGC was transferring the Additional Collateral to Gemini as required. But GGC refused to transfer the Additional Collateral, obfuscating and outright ignoring Gemini in the process.

49.     Specifically, on November 11, 2022, Gemini contacted GGC asking when GGC planned to transfer the Additional Collateral, expressing its expectation that it would receive the Additional Collateral before markets closed, and seeking confirmation that GGC had initiated the transfer.  On November 12, 2022, GGC responded, explaining that the "shares take quite a long time to transfer" because the "mechanics are complex."   In response, Gemini requested confirmation that GGC was holding the Additional Collateral in certain brokerage accounts and

---

10.  Following the sale, Gemini held the 30,905,782 GBTC shares in a new account.

11.  *See* Amended Disclosure Statement at 19-20.

requested confirmation that GGC had initiated the transfer of the Additional Collateral the day before.  GGC did not respond to Gemini's requests.

50.    On November 13, 2022, Gemini contacted GGC and again requested confirmation that GGC had initiated the transfer of the Additional Collateral.  GGC did not respond to Gemini's request.

51.    On November 15, 2022, Gemini contacted GGC and again requested confirmation that GGC had transferred the Additional Collateral.  GGC did not immediately respond to Gemini's request.

52.    On November 15, 2022, in a separate email chain, GGC notified Gemini in writing that DCG had transferred 19,239,627 shares of GBTC—a portion of the Additional Collateral— to GGC.  GGC provided Gemini with a copy of DCG's letter of instruction to its broker regarding the transfer.

53.    On November 17, 2022, GGC finally responded to Gemini's repeated requests for information regarding the transfer of the Additional Collateral.  GGC claimed that it had been "work[ing] diligently to understand all of the mechanics of a transfer of shares, which are very complex."  GGC made this claim despite having previously transferred GBTC shares to Gemini without any issue or delay.  GGC further noted that its restructuring counsel had advised GGC "that any share transfers be considered within the context of [GGC's] announcement" that it was suspending redemptions by Earn Users under the Earn Program.  GGC never delivered the Additional Collateral to Gemini.

17

**H.**    <u>Negotiations</u>

54.     Since November 2022, Gemini and the Debtors have been in ongoing discussions regarding potential out-of-court or in-court restructuring of the Debtors' liabilities, including the prompt return of the amounts that Earn Users loaned to GGC.

55.     On the Petition Date, the Debtors asserted that they "dispute[d] whether Gemini's foreclosure satisfied applicable law."[12]

56.     A month after the Petition Date, in February 2023, the Debtors filed a term sheet indicating an agreement in principle among the Debtors, DCG, Gemini, and certain other creditors.[13] The term sheet provided for a resolution regarding the Initial Collateral. However, in March 2023, the term sheet was abandoned.

57.     From the date of Gemini's foreclosure on the Initial Collateral through the date of this Complaint, the Debtors and Gemini have been discussing how the Collateral should be treated. Because of the looming threat of litigation regarding whether Gemini's foreclosure on the Initial Collateral satisfied applicable law, Gemini was effectively unable to distribute any proceeds of the foreclosure (*i.e.*, the Foreclosure Value) to Earn Users or take any other action with respect to the Initial Collateral. Accordingly, following Gemini's foreclosure upon the Initial Collateral for the benefit of Earn Users, Gemini has held the GBTC shares in a separate account pending a determination of the Earn Users' rights to the Initial Collateral.

---

12. Leto Decl. ¶ 12.

13. *See* Notice of Filing of the Restructuring Term Sheet (Bankr. Dkt. ECF No. 80).

I.    **Gemini's Deficiency Claim**

58.    On May 22, 2023, Gemini filed the Master Claim for $1,122,467,217.65, plus certain other unliquidated amounts, based on the Petition Date value of the assets Earn Users had lent GGC under the Gemini Earn Program, but that GGC had not repaid.

59.    In the Master Claim, Gemini asserted that it has secured party and/or setoff rights with respect to, among other things, the proceeds of foreclosure of the Initial Collateral and the value of the Additional Collateral.

60.    The Debtors have not filed any objection to the Master Claim.

61.    The proceeds of the Initial Collateral and the Additional Collateral may be insufficient to satisfy the Master Claim, and Gemini therefore would have an unsecured deficiency claim.

**COUNT I**

**Declaratory Judgment – Gemini Is Entitled to Set Off the Proceeds of its Foreclosure of the Initial Collateral**

62.    Gemini repeats and realleges paragraphs 1 through 61 as if fully set forth herein.

63.    This matter constitutes an actual case in controversy between Gemini and the Debtors.

64.    Gemini filed the Master Claim for the digital assets set forth therein valued at approximately $1,122,467,217.65 as of the Petition Date, and for certain other unliquidated amounts, based on the Petition Date value of the assets Earn Users had lent to GGC, but that GGC had not repaid.

65.    Section 506(a)(1) of the Bankruptcy Code provides that "[a]n allowed claim of a creditor . . . that is subject to setoff under section 553 of this title, is a secured claim . . . to the extent of the amount subject to setoff . . . and is an unsecured claim to the extent that the . . .

19

amount so subject to setoff is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1).

66.    Gemini conducted a valid foreclosure on the Initial Collateral, and as a result is holding the proceeds of the foreclosure of the Initial Collateral for the benefit of Earn Users in the amount of $284,333,194.40 (*i.e.*, the Foreclosure Value).

67.    Gemini is therefore entitled to a judgment declaring that, for purposes of calculating the Earn Users' unsecured deficiency claim, the amount pertaining to the Initial Collateral that should be set off on a *pro rata* basis against the Master Claim is the Foreclosure Value—*i.e.*, the amount that Gemini obtained through the foreclosure of the Initial Collateral ($284,333,194.40).

## COUNT II

**Declaratory Judgment – Gemini has a Secured Interest in the Additional Collateral**

68.    Gemini repeats and realleges paragraphs 1 through 67 as if fully set forth herein.

69.    This matter constitutes an actual case in controversy between Gemini and the Debtors.

70.    The Security Agreement provided that GGC "pledge[d], assign[ed], and grant[ed] to [Gemini], for the benefit of [Gemini] and [Earn Users], a security interest in all of [GGC's] right, title, and interest in and to all property from time to time transferred by or on behalf of [GGC] to or for the benefit of [Gemini] or [Earn Users] in connection with [the Security] Agreement or any [MLA]."

71.    DCG transferred the Additional Collateral to GGC for the benefit of Gemini and Earn Users.

72.     The Security Agreement and Second Amendment to the Security Agreement thus granted Gemini an "absolute and unconditional" security interest in the Additional Collateral.

73.     Despite obtaining the Additional Collateral from DCG for the sole purpose of delivering the Additional Collateral to Gemini for the benefit of Earn Users, GGC failed to deliver the Additional Collateral to Gemini.

74.     Section 506(a)(1) of the Bankruptcy Code provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim."  11 U.S.C. § 506(a)(1).

75.     Gemini is therefore entitled to a judgment declaring the validity, priority, and extent of Gemini's secured interest in the Additional Collateral.

## COUNT III

**Declaratory Judgment – The Additional Collateral is Not Property of Any Debtor's Estate**

76.     Gemini repeats and realleges paragraphs 1 through 75 as if fully set forth herein.

77.     This matter constitutes an actual case in controversy between Gemini and the Debtors.

78.     Because GGC obtained the Additional Collateral from DCG for the sole purpose of delivering the Additional Collateral to Gemini and possesses the Additional Collateral solely to secure Earn Users' loans, none of the Debtors have any equitable interest in the Additional Collateral.

79.     Gemini is therefore entitled to a judgment declaring that the Additional Collateral is not property of any of the Debtors' estates.

21

## COUNT IV

### Constructive Trust

80.     Gemini repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.     The relationship among Gemini, Earn Users, and GGC constitutes a confidential and/or fiduciary relationship.

82.     GGC made an express promise to deliver the Additional Collateral to Gemini and that Gemini had an "absolute and unconditional" security interest in the Additional Collateral.

83.     In reliance on GGC's promise to pledge and deliver the Additional Collateral to Gemini, Gemini continued to facilitate the transfer of digital assets from Earn Users to GGC.

84.     GGC obtained the Additional Collateral from its parent, DCG, for the sole purpose of delivering the Additional Collateral to Gemini for the benefit of Earn Users, but GGC failed to deliver the Additional Collateral to Gemini.  As a result, the Debtors were unjustly enriched by their wrongful retention of the Additional Collateral.

85.     The imposition of a constructive trust over the Additional Collateral for the benefit of Gemini and for the benefit of Earn Users is therefore warranted as a matter of equity.

### PRAYER FOR RELIEF

WHEREFORE, Gemini respectfully requests that this Court enter judgment against the Debtors:

(i)     declaring that, for purposes of calculating Gemini's deficiency claim, the amount to be set off against the Master Claim on account of the Initial Collateral should be the proceeds of Gemini's foreclosure of the Initial Collateral;

(ii)    declaring the validity, priority, and extent of Gemini's secured interest in the Additional Collateral;

(iii)   declaring that the Additional Collateral is not property of any of the Debtors' estates;

22

(iv)    imposing a constructive trust over the Additional Collateral for the benefit of Gemini and for the benefit of Earn Users; and

(v)    granting such other and further relief as this Court deems just and proper under the circumstances.

Dated: October 27, 2023
New York, New York

HUGHES HUBBARD & REED LLP

 */s/ Anson B. Frelinghuysen*
 Anson B. Frelinghuysen
 Marc A. Weinstein
 Dustin P. Smith
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
Email: anson.frelinghuysen@hugheshubbard.com
        marc.weinstein@hugheshubbard.com
        dustin.smith@hugheshubbard.com


*Counsel to Gemini Trust Company, LLC*

# Exhibit 1

CONFIDENTIAL
*Genesis 8-15-22 Draft*

# SECURITY AGREEMENT

---

This **SECURITY AGREEMENT** (as amended, restated, supplemented, waived, extended or otherwise modified from time to time, this "Agreement") dated as of August 15, 2022, by and between Genesis Global Capital, LLC (the "Pledgor"), and Gemini Trust Company LLC, solely in its capacity as agent for the Principal Lenders (as defined below) (in such capacity and any successor or assign in such capacity, the "Agent"), for the benefit of the Agent and the Principal Lenders.

**WHEREAS**, the Pledgor has entered into or will enter into Loans of Digital Assets under certain Master Digital Asset Loan Agreements (collectively, as amended, restated, supplemented, waived, extended or otherwise modified from time to time, the "Master Loan Agreements"), by and among:

- The Agent, as Custodian;

- A specified Lender (each, in such capacity, a "Principal Lender"), acting through the Agent as agent for such Principal Lender; and

- The Pledgor, as borrower.

All capitalized terms not otherwise defined herein shall have the respective meanings assigned to them in the Master Loan Agreements;

**WHEREAS**, in consideration of the outstanding and future transactions under the Master Loan Agreements, and for other good and sufficient consideration, the Pledgor has agreed to pledge to the Agent, for the benefit of the Agent and the Principal Lenders, certain collateral to secure the Pledgor's obligations under the Master Loan Agreements;

**NOW, THEREFORE,** the parties hereby agree as follows:

## Section 1. Transfer of Collateral

As promptly as practicable after the execution of this Agreement, the Pledgor shall transfer or cause to be transferred 30,905,782 shares of Grayscale Bitcoin Trust to the account held in the name of the Agent "for the benefit of" ("FBO") the Principal Lenders at Morgan Stanley Smith Barney LLC with account number ending in -6250 (the "GTC Account"); provided that, for the avoidance of doubt, the Pledgor shall have no obligation to transfer, cause to be transferred or otherwise deposit additional shares of Grayscale

DocuSign Envelope ID: 5368D708-0B24-471B-A7B4-8696B2C9B6B5

CONFIDENTIAL
*Genesis 8-15-22 Draft*

Bitcoin Trust or any other shares into the GTC Account after such date except as required under and in accordance with Section 6(b) of this Agreement.

## Section 2. The Pledge.

As security for the prompt payment and performance in full when due (whether at stated maturity, by acceleration, or otherwise) of all liabilities and obligations of the Pledgor under the Master Loan Agreements, whether now existing or hereafter arising, whether or not mature or contingent (the "Secured Obligations"), the Pledgor hereby pledges, assigns, and grants to the Agent, for the benefit of the Agent and the Principal Lenders, a security interest in all of the Pledgor's right, title, and interest in and to all property from time to time transferred by or on behalf of the Pledgor to or for the benefit of the Agent or the Principal Lenders in connection with this Agreement or any Master Loan Agreement, including without limitation all shares of and interests in Grayscale Bitcoin Trust credited to the GTC Account (collectively, the "Collateral").

## Section 3. Remedies.

(a) Upon an event of default (or similar term) under any Master Loan Agreement or the failure of the Pledgor to comply with its obligations in Section 1 or Section 6(b) of this Agreement in accordance with the terms thereof, in addition to any other right or remedy the Agent or any Principal Lender may have at law, contract, or equity (including under the Uniform Commercial Code ("UCC") as in effect in any relevant jurisdiction), the Agent shall have the following rights and remedies, all such rights and remedies being cumulative, not exclusive, and enforceable alternatively, successively or concurrently, at such time or times as the Agent deems expedient without any notice and without compliance with any other condition precedent now or hereunder imposed by statute, rule of law, or otherwise (all of which are hereby expressly waived by the Pledgor, to the fullest extent permitted by law):

  (i)  To liquidate any or all Collateral through one or more public or private sales or other dispositions, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Agent having the right to purchase any such Collateral) and apply the proceeds of such liquidation to the Secured Obligations; and

  (ii)  To exercise any rights and remedies available to the Agent or the Principal Lenders under applicable law, including the UCC as in effect in any relevant jurisdiction.

(b) The proceeds of any collection, sale, liquidation, or other realization of all or any part of the Collateral pursuant hereto shall be applied:

**CONFIDENTIAL**
*Genesis 8-15-22 Draft*

    (i)    <u>First</u>, to the payment of the costs and expenses of such collection, sale, or other realization, including reasonable out-of-pocket costs and expenses of the Agent and the reasonable fees and expenses of its agents and counsel;

    (ii)    <u>Next</u>, to the payment and satisfaction in full of the Secured Obligations; and

    (iii)    <u>Finally</u>, to the Pledgor, its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining. The Pledgor shall be liable for all Secured Obligations that remain unsatisfied after the exercise of rights and remedies by the Agent.

(c)  The Pledgor hereby irrevocably appoints the Agent (such appointment being coupled with an interest) as the Pledgor's attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor, the Agent, or otherwise during event of default, default, or similar circumstance to take any action and to execute any instrument as it may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including without limitation to take any of the actions set forth in clause (a) above. The powers conferred on the Agent hereunder are solely to protect the interests of the Agent and the Principal Lenders in the Collateral and shall not impose any duty upon the Agent to exercise any such powers. The Agent and the Principal Lenders shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees, or agents shall be responsible to the Pledgor for any act or failure to act hereunder, except for their own gross negligence, willful misconduct or fraud.

(d)  Until the occurrence of an event described in Section 3(a) of this Agreement, the Agent shall not sell, rehypothecate, transfer or assign any of the shares transferred by Pledgor into the GTC Account pursuant to Section 2 of this Agreement, except in accordance with Section 6(a) or Section 7(b) hereof.

## Section 4. Security Interest Absolute.

All rights of the Agent hereunder and the grant of a security interest in the Collateral shall be absolute and unconditional irrespective of any circumstance, including without limitation the authority of the Agent to act on behalf of the Principal Lenders.

## Section 5. Representations and Warranties.

The Pledgor represents and warrants to the Agent as of the date hereof and on each day that any Loan remains outstanding that:

DocuSign Envelope ID: 5368D708-0B24-471B-A7B4-8698B3C9B93F5

CONFIDENTIAL
*Genesis 8-15-22 Draft*

(a) This Agreement creates a legal and valid security interest in the Collateral in favor of the Agent, for its benefit and the benefit of the Principal Lenders, which is enforceable against Pledgor, subject to applicable bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally and subject to general principles of equity;

(b) The Pledgor is the sole owner of the Collateral or otherwise has the right to transfer the Collateral, free and clear of any security interest, lien, encumbrance, or other restrictions; and

(c) The execution and delivery of this Agreement do not contravene any law, rule, regulation, judgment, order, agreement, or instrument to which the Pledgor or any of its property is subject, and would not constitute a default or similar condition thereunder.

**Section 6. Adjustment of Collateral.**

(a) <u>Collateral Release</u>. During the term of this Agreement, if the aggregate value of the Collateral (as calculated based on the price reported on the OTCQX exchange at 4pm New York time on a day the OTCQX market is open for trading (such aggregate value, the "<u>Collateral Value</u>")) exceeds 32.5% of the notional USD value of the aggregate loaned amounts (the "<u>Loaned Assets</u>") under the Master Loan Agreements (as calculated based on the price reported on the Agent's cryptocurrency exchange, the Gemini exchange, for the relevant Loaned Asset at 4pm New York time (the "<u>Gemini Closing Price</u>")), then the Agent shall, upon the Pledgor's written request (which may be by e-mail or other electronic transmission) (such request, a "<u>Collateral Return Request</u>"), be required to return an amount of Collateral such that the remaining Collateral Value is no greater than 30.0% of the notional USD value of the Loaned Assets (such amount, the "<u>Collateral Return Amount</u>"). The Agent shall deliver the Collateral Return Amount to the Pledgor's brokerage account at such account as the Pledgor may direct in writing no later than two (2) business days after the date of the Collateral Return Request.

(b) <u>Collateral Posting</u>. During the term of this Agreement, if the Collateral Value falls below 27.5% of the notional USD value of the aggregate Loaned Assets under the Master Loan Agreements (as calculated based on the Gemini Closing Price) then the Pledgor shall, upon the Agent's written request (which may be by e-mail or other electronic transmission) (such request, a "<u>Collateral Top-Up Request</u>"), be required to post an amount of Collateral to the GTC Account such that the Collateral Value in the GTC Account is no less than 30.0% of the notional USD value of the Loaned Assets under the Master Loan Agreements (such amount, the "<u>Collateral Top-Up Amount</u>"); <u>provided that</u>, notwithstanding the foregoing, in

**CONFIDENTIAL**
*Genesis 8-15-22 Draft*

no event shall the aggregate number of shares of Grayscale Bitcoin Trust in the GTC Account be required to exceed 30,905,782 shares at any time. The Pledgor shall deliver the Collateral Top-Up Amount to the GTC Account no later than two (2) business days after the date of the Collateral Top-Up Request.

### Section 7. Miscellaneous.

(a) <u>Control</u>. The Pledgor and the Agent acknowledge and agree that the Agent holds any Collateral as agent and bailee for the Principal Lenders.

(b) <u>Termination</u>. Upon the earlier of (i) November 15, 2022 and (ii) the date on which all Secured Obligations shall have been paid in full, this Agreement shall automatically terminate, and Agent shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of the Pledgor, and the security interest, lien, pledge and assignment of the Collateral hereunder, together with all rights and powers of the Agent hereunder, shall immediately be released and deemed to be void.

(c) <u>Applicable Law</u>. This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

(d) <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records

DocuSign Envelope ID: 5368B708-0B24-471B-A7B4-8696BC9B6895

**CONFIDENTIAL**
*Genesis 8-15-22 Draft*

Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

*[Remainder of Page Intentionally Blank; Signature Page Follows.]*

<span style="color:red">**CONFIDENTIAL**</span>
<span style="color:red">***Genesis 8-15-22 Draft***</span>

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**Genesis Global Capital, LLC**

By: *Andrew Sullivan*
     EB257421D624490...    _____
Name: Andrew Sullivan
Title:   General Counsel, Lending

**Gemini Trust Company, LLC**

By: *Noah Perlman*
     39FF769C13B746E...    _____
Name: Noah Perlman
Title:   Chief Executive Officer

# Exhibit 2

# MASTER DIGITAL ASSET LOAN AGREEMENT

This Master Digital Asset Loan Agreement ("Agreement") is made on this [date of Lender onboarding] by and between Genesis Global Capital, LLC ("Genesis" or "Borrower"), a corporation organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 Gemini Trust Company, LLC ("Gemini" or "Custodian") a trust company organized and existing under the laws of the State of New York with its principal place of business at 315 Park Avenue South, 18th Floor, New York, NY 10010, acting as the authorized agent of a customer of Custodian which accepts the terms of this Agreement and direct Custodian to lend their assets hereunder (the "Lender" and, together with Genesis and Gemini, the "Parties").

## RECITALS

**WHEREAS**, Gemini serves as custodian of Digital Assets for Lender, and Lender have appointed Gemini as its agent to facilitate Loans of its Digital Assets;

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Custodian will facilitate the lending of Digital Assets on behalf of Lender to Borrower, and Borrower will pay a Loan Fee and return such Digital Assets to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Asset lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## I.  Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Asset held at a specified time.  A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Asset, or a distribution that depends on a wallet of the relevant Digital Asset meeting a threshold requirement.

"*Borrower*" means Genesis Global Capital, LLC.

"*Borrower Email*" means lend@genesiscap.co.

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

1

"***Call Option***" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"***Digital Asset***" means Digital Asset that the Borrower includes in any Offered Loan Terms, and that is available for trading on the Gemini Exchange.

"***Digital Asset Address***" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Asset.

"***Fixed Term Loan***" means a Loan with a pre-determined Maturity Date.

"***Gemini Earn Platform***" means a service and accompanying user interface offered by Custodian whereby a Lender may authorize Custodian, as custodian of Lender's Digital Assets, to negotiate one or more loan agreements on the Lender's behalf for the purpose of lending certain of Lender's Digital Assets to one or more borrowers at Lender's direction.

"***Hard Fork***" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"***Loan***" means a loan of Digital Assets made pursuant to and in accordance with this Agreement.

"***Loan Balance***" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees and Late Fees, and for a particular Loan, as defined in Section III.

"***Loaned Assets***" means any Digital Asset amount transferred in a Loan hereunder until such Digital Asset (or identical Digital Asset) is transferred back to Lender hereunder, except that, if any new or different Digital Asset is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Asset shall be deemed to become Loaned Assets in addition to the former Digital Asset for which such exchange is made.  For purposes of return of Loaned Assets by Borrower or purchase or sale of Digital Currencies pursuant to Section X, such term shall include Digital Asset of the same quantity and type as the Digital Asset, as adjusted pursuant to the preceding sentence.

"***Maturity Date***" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"***Open Term Loan***" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"***Term***" means the period from the date Loaned Assets are delivered to Borrower through the date such Loan's Loaned Assets are repaid in full.

2

## II.    **General Loan Terms.**

### (a) Offers of Loans to Lender

Custodian will provide to Lender on the Gemini Earn Platform the current terms on which Borrower has offered to enter into Loans (the "Offered Loan Terms"), which shall be delivered by Borrower to Custodian. Offered Loan Terms may include the types of Digital Assets which the Borrower will borrow, the rates and Loan types of such Digital Assets it will borrow, and maximum amounts it will borrow from all lenders on the Gemini Earn Platform. Custodian will promptly update the Gemini Earn Platform to reflect any change in the Offered Loan Terms communicated by Borrower to Custodian. For the avoidance of doubt, no erroneous or contrary information provided by Custodian to Lender, whether on the Gemini Earn Platform or otherwise, shall obligate Borrower to enter into Loans on terms other than those specified in the Offered Loan Terms then in effect.

### (b) Loan Procedure

During the Term of this Agreement, on any Business Day Lender may direct Custodian, via the Gemini Earn Platform to notify Borrower on its behalf for each Digital Asset and Loan type listed in the applicable Offered Loan Terms whether it will lend additional Digital Assets at the current Loan Fee or whether it requests a return of Digital Assets (if applicable). For any Digital Assets Lender will lend, it shall deliver such Digital Assets according to the time and manner specified, and to a Digital Asset Address provided by, Custodian. For any Digital Assets Lender requests to be returned, Borrower shall return such Digital Assets within three Business Days to a Digital Asset Address provided by Custodian.  Upon receipt of the Loaned Assets, Custodian shall include a record of the Loan, including all the terms of the Loan, in a log of all Lender's Loans accessible to Lender and Borrower.

### (c) Loan Repayment Procedure

Loans will be Open Term Loans unless otherwise specified. For Open Term Loans, the Loaned Assets shall be repaid to a Digital Asset Address provided by Custodian within three Business Days after the request by Lender pursuant to Section II(b) above. For Fixed Term Loans, the Loaned Assets shall be repaid to a Digital Asset Address provided by Custodian at the time indicated in the Offered Loan Terms, unless Borrower and Lender agree to extend the Fixed Term Loan for another Fixed Term Loan under the then-current Offered Loan Terms, or an Open Term Loan.  If Custodian has not provided to Borrower a Digital Asset Address for receiving the repayment of a Loan by 5:00 p.m. New York time on the day prior to the earlier of the Maturity Date or the Recall Delivery Day (defined below), then such Loan will become an Open Term Loan on said Maturity Date or Recall Delivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Recall Delivery Day.

Custodian shall notify Borrower to the extent Custodian determines in its sole discretion that it shall no longer support custody, trading or ancillary services for a particular Digital Asset.  The date of such notice will be deemed the Recall Request Day for any Loan Balance comprised of such Digital Assets.

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

    (i)     the Maturity Date;

    (ii)     for an Open Term Loan, the repayment of the Loan Balance by Borrower prior to the Maturity Date;

    (iii)    the occurrence of an Event of Default as defined in Section VIII; however, Lender, or Custodian on behalf of Lender, shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan.  In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

    (iv)    in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIV.

In the event of a termination of a Loan, any Loaned Assets
shall be redelivered immediately to a Digital Asset Address provided by Custodian and any fees or owed shall be payable by Borrower immediately to a Digital Asset Address provided by Custodian. In the event of a termination of a Loan pursuant to Section II(d)(iv), Borrower shall pay an additional Loan Fee until (i) the end of the then-current monthly loan period or (ii) the Maturity Date of such Loan (whichever is shorter) at the then-current interest rate on the amount of the Loan terminated.

(e) <u>Redelivery in an Illiquid Market</u>

If Gemini and each of the three other highest-volume Digital Asset exchanges that report prices for the applicable Digital Asset (as measured by the 30-day average daily trading volume of the applicable Digital Asset on the Loan Date) (these such exchanges, the "<u>Liquidity Exchanges</u>") cease or suspend trading as of in the Loaned Assets on the Maturity Date or the Recall Delivery Day, whichever applicable, Borrower and Custodian will engage in good faith negotiations to reach agreement on a substitute form of repayment for the affected loans or to otherwise temporarily suspend the requirement for Borrower to return the Loaned Assets, and such negotiation shall be binding on Lender.

### III.    **Loan Fees and Transaction Fees.**

(a) <u>Loan Fee</u>

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "<u>Loan Fee</u>"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as set forth in the Offered Loan Terms. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from and include the date on which the Loaned Assets are transferred to Borrower to the date on which such Loaned Assets are repaid in their entirety to Lender.

Unless otherwise specified in the Offered Loan Terms, (i) Loan Fees shall be based on a monthly interest rate, which may be updated on the first day of each calendar month upon at least five (5) days advance notice by Borrower to Custodian; (ii) no minimum amount of Loaned Assets shall be required for a Loan to accrue a Loan Fee; (iii) Loan Fees shall be calculated using the "daily balance method", meaning the applicable monthly interest rate shall be applied to the principal and interest that has accrued on the Loaned Assets each day; (iv) Loan Fees shall at all times be greater than 0% APY; and (v) Loan Fees shall be paid monthly by Borrower to a Digital Asset Address provided by Custodian as agent for Lender.  Upon receipt, Custodian shall be solely responsible for paying Loan Fees to Lenders, and Lender will have no recourse to Borrower for such Loan Fees.

Borrower shall calculate any Loan Fees (which may be aggregated across all outstanding Loans from Lender) owed on a daily basis and provide Custodian with the calculation, and information relied upon to support the calculation, upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Assets. If Custodian believes any Loan Fee was calculated in error, Custodian shall present its own Loan Fee calculation and the Borrower and Custodian shall cooperate in good faith to decide a mutually agreeable calculation. The calculation of any Loan Fees accepted by Custodian shall be final and binding upon Lender.

(b) <u>Late Fee</u>

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "<u>Late Fee</u>") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Assets.

(c) <u>Payment of Loan Fees and Late Fees</u>

Unless otherwise agreed, any accrued but unpaid Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) promptly following the end of the calendar month in which the Loan was outstanding, but in any even no later than three (3) Business Days after the end of such month or (ii) the termination of all Loans hereunder (the "<u>Payment Due Date</u>").   The Loan Fee and Late Fees shall be payable, unless otherwise agreed by the Borrower and Lender in writing, in the same Loaned Assets that were borrowed, on the same blockchain and of the same type that was loaned by the Lender during the Loan.

## IV.    **Hard Fork**

(a) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated.  Borrower and Custodian, in behalf of Lender, may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Custodian to manage the Hard Fork on the behalf of Borrower. Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Asset to Custodian and Custodian transfers said Digital Asset back to Borrower pursuant to this section.

(b) Lender's Right to New Tokens

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Asset protocol or an Applicable Airdrop (such tokens that meet the following conditions, the "New Tokens") if the following two conditions are met:

- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the Digital Asset market capitalization and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender.  If sending the New Tokens to Lender is burdensome in Borrower's reasonable discretion, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate reasonably selected by Borrower at the time of repayment, or (ii) returning the borrowed Digital Asset so that Lender can manage the split of the underlying digital tokens as described in Section IV(b) above.  Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this

Section V shall continue for any New Tokens that meet the criteria in this subsection (b) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## V.  **Representations and Warranties.**

The Parties hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Assets or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account unless it expressly specifies otherwise in writing and complies with Section VI.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of Loaned Assets and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Each Party represents and warrants that it has all necessary governmental and other consents, approvals and licenses to perform its obligations hereunder.

(i) Each Party represents and warrants that it has made its own independent decisions to enter into any Loan and as to whether the Loan is appropriate or proper for it based upon its own judgement and upon advice from such advisers (other than another Party) as it has deemed necessary. It is not relying on any communication (written or oral) of the other Parties as investment advice or as a recommendation to enter into any Loan, it being understood that information and explanations related to the terms and conditions of a Loan will not be considered investment advice or a recommendation to enter into that Loan.

(j) Each Party represents and warrants that it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of any Loan. It is also capable of assuming, and assumes, the risks of that Loan. The other Parties are not acting as a fiduciary for or an adviser to it in respect of any Loan.

(k) Lender represents and warrants that it has, or will have at the time of the transfer of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(l) Lender represents and warrants that the Loaned Assets have not been or will not be obtained, directly or indirectly, from or using the assets of any: (i) "employee benefit plan" as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974 which is subject to Part 4 of Subtitle B of Title I of such Act; (ii) any "plan" as defined in Section 4975(e)(1) of the U.S. Internal Revenue Code of 1986; or (iii) any entity the assets of which are deemed to be assets of any such "employee benefit plan" or "plan" by reason of the U.S. Department of Labor's plan asset regulation, Title 29 of the Code of Federal Regulations, Section 2510.3-101.

(m) Lender represents and warrants that it is in compliance with applicable laws and regulations, except where Lender's failure to so comply would not have a material effect on Borrower.

(n) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(o) Borrower has furnished to Lender, or will furnish to Lender within seven (7) Business Days after demand by Lender, its most recent statement required to be furnished to customers pursuant to Rule 17a-5(c) under the Securities Exchange Act of 1934.

(p) Custodian represents and warrants that it has been duly authorized by Lender to (i) enter into this Agreement and the Loans contemplated by this Agreement; and (ii) perform the obligations set forth herein on behalf of Lender.

8

## I.      Appointment of Custodian as Agent

a.   Borrower and Custodian agree to execute and comply fully with the provisions of Exhibit A (the terms and conditions of which Exhibit are incorporated herein and made a part hereof).

b.   Lender represents, which representation shall continue during the term of this Agreement and any Loan hereunder, that it:
   (i)   has received and reviewed a copy of this Agreement;
   (ii)  has duly appointed Custodian as its agent to act on Lender's behalf for all purposes under this Agreement;
   (iii) has duly authorized Custodian to enter into the Loans contemplated by the Agreement on its behalf and to perform the obligations of Lender under such Loans;
   (iv)  is a Principal referred to in Exhibit A and will be liable as principal with respect to Loans entered into by Custodian on its behalf and its related obligations hereunder; and
   (v)   has taken all necessary action to authorize such appointment of Custodian and such performance by it.

c.   Custodian represents and warrants that it is in compliance with applicable laws and regulations, except where Custodian's failure to so comply would not have a material effect on the other Parties.

d.   Lender agrees and acknowledges that Borrower's delivery to Custodian of any Loaned Assets in accordance with the terms of this Agreement and Exhibit A will fully discharge Borrower's obligations with respect to such Loaned Assets and that, thereafter, Custodian will be the only Party to which Lender may have recourse for such Loaned Assets. Subject to the terms of the Gemini Earn Platform and any other applicable agreements between Lender and Custodian, Custodian agrees to promptly deliver to Lender all Loaned Assets so received from Borrower.

## VI.     Default

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a)   the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have two Business Days to cure such default;

(b)   the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens in accordance with Section V, however, Borrower shall have three Business Days to cure such default;

(c)   a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including

without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(d) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(e) any representation or warranty made by either Party in this Agreement that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

(f) any representation or warranty of Custodian in Exhibit A proves to be incorrect or untrue in any material respect as of the date of making thereof or during the term of any Loan, or Custodian shall fail to perform in any material respect Custodian's covenants in Exhibit A, which shall be deemed an Event of Default by Lender, provided, however, Custodian shall have ten Business Days to cure such default.

## VII.   **Remedies**

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Custodian acting on behalf of the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Custodian's operating account to hold on behalf of itself and the Lender, to the extent necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a) or (b), persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(c) or (d), the Custodian acting on behalf of the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender or Custodian, the Borrower may, at its option  exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Section VII (e) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (c) or (d), the Borrower may, at its option, terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

10

**VIII.    Rights and Remedies Cumulative.**

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

**IX.    Survival of Rights and Remedies**

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets, and termination of this Agreement.

**X.    Governing Law; Dispute Resolution.**

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  The parties agree to waive their rights to a jury trial.  If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

**XI.    Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information").  Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XII, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a

11

Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XII.   Notices.

Any notices or right exercisable by Lender(s) hereunder may also be exercised by Custodian in its capacity as authorized agent for Lender(s). Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth below:

Custodian, as authorized agent for Lender:
Gemini Trust Company, LLC
315 Park Avenue South, 18th Floor
New York, NY 10010
Attn: Gemini Earn
Email: legal@gemini.com

Borrower:
Genesis Global Capital, LLC

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Attn: General Counsel
Email: legal@genesiscap.co

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

### XIII.   **Modifications.**

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XIV.   **Single Agreement**

The Parties acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, the Parties hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, the Parties acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

### XV.   **Entire Agreement.**

This Agreement, each exhibit referenced herein, and all applicable Offered Loan Terms constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVII shall be construed to conflict with or negate Section XV above.

### XVI.   **Successors and Assigns.**

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that no Party may assign this Agreement or any rights or duties hereunder without the prior written consent of each of Custodian and Borrower. Notwithstanding the foregoing, in the event of a change of control of Custodian or Borrower, prior written consent shall not be required so long as such Party provides the other Party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party.  Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns.  For the avoidance of doubt, any and all claims and liabilities against Genesis arising in

any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVII.  Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XVIII. Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XIX.  Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationships of Borrower, Custodian and Lender.

## XX.  No Waiver.

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXI.  Indemnification.

(a) *By Custodian*. Custodian hereby agrees to indemnify, defend and hold harmless Borrower, its affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all liabilities, losses, costs, damages, expenses or causes of action, of whatever character, including but not limited to

14

reasonable attorneys' fees (collectively, "Liabilities"), to the extent arising out of or relating to any pending or threatened claim, action, proceeding or suit (each, a "Claim") by any third party based on, arising out of or relating to Custodian breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Custodian's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Borrower in any material respect of its obligations under this Agreement.

(b) *By Borrower.* Borrower hereby agrees to indemnify, defend and hold harmless Lender, Custodian, and their respective affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all Liabilities, to the extent arising out of or relating to any Claim by any third party based on, arising out of or relating to Borrower's breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Borrower's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Lender or Custodian in any material respect of their obligations under this Agreement.

(c) *By Lender.* Lender hereby agrees to indemnify, defend and hold harmless Borrower, Custodian, and their respective affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all Liabilities, to the extent arising out of or relating to any Claim by any third party based on, arising out of or relating to Lender's breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Lender's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Borrower or Custodian in any material respect of their obligations under this Agreement.

## XXII.  **Term and Termination.**

This Agreement may be terminated by any Party by providing thirty days' written notice to the other Parties.

In the event of a termination of this Agreement, any Loaned Assets shall be redelivered immediately and any fees owed shall be payable immediately.

## XXIII. **Miscellaneous.**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

I.       **Intent.**

Each Party agrees that the Loans are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:


By: _____
Name:
Title:

CUSTODIAN:

GEMINI TRUST COMPANY, LLC


By: _____
Name:
Title:

BORROWER:

GENESIS GLOBAL CAPITAL, LLC


By: _____
Name: Kristopher Johnson
Title: Senior Risk Officer

17

## EXHIBIT A

### Gemini Trust Company, LLC Acting as Agent

This Exhibit sets forth the terms and conditions governing all Loans in which Gemini Trust Company, LLC is acting as agent ("Agent") for a third party ("Principal"). Unless otherwise defined, capitalized terms used but not defined in this Exhibit shall have the meanings assigned in the Master Digital Asset Loan Agreement of which it forms a part (such agreement, together with all exhibits thereto, the "Agreement").

1. **Additional Representations, Warranties and Covenants.** In addition to the representations and warranties set forth in the Agreement, Agent hereby makes the following representations, warranties and covenants, which shall continue during the term of any Loan:

   (a) Principal (i) acknowledged electronically or in writing receiving a counterpart of the Agreement, (ii) has duly authorized Agent to deliver Digital Assets comprising any Loaned Assets for the Loans contemplated by the Agreement and to perform the obligations of Lender under such Loans, and (iii) has taken all necessary action to authorize such execution and delivery by Agent and such performance by it;

   (b) Principal has specifically directed Agent, through the Gemini Earn Platform, to deliver Digital Assets comprising any Loaned Assets for each Loan and to request the return of any Loaned Assets, and has not authorized Agent to exercise discretion in the determining the amount, timing or selection of any Loan on Principal's behalf;

   (c) Agent will provide in a timely manner with a written confirmation or other notification of each Loan and, upon a Principal's request, promptly provide Principal with any records of the Loans made on its behalf;

   (d) Agent will provide Principal with a statement, at least quarterly, containing a description of all lending activity on Principal's behalf during the preceding period, including all Loans made on behalf of Principal, all Digital Assets returned and Loan Fees paid to Principal (net fees and expenses charged to Principal), and the amount of Loans outstanding at the beginning and end of the period; and

   (e) Agent will assist Borrower in obtaining from Principal such information regarding Principal as Borrower may reasonably request; provided, however, that Agent shall not have any obligation to provide Borrower with confidential information regarding Principal.

2. **Identification of Principal.** Agent agrees to provide Borrower, prior to any Loan under the Agreement, with the ability to access the name of the specific Principal for which it will act as Agent under the Agreement. If Agent fails to provide access to the identify of such Principal prior to any Loan under the Agreement,, or Borrower shall determine in its reasonable discretion that any Principal identified by Agent is not acceptable to it, Borrower may reject and rescind any Loan with such Principal, return to Agent any Loaned Assets previously transferred to Borrower and refuse any further performance under such Loan;

provided, however, that (A) Borrower shall promptly (and in any event within one Business Day of notice of the specific Principal) notify Agent of its determination to reject and rescind such Loan and (B) to the extent that any performance was rendered by Lender under any Loan rejected by Borrower, Lender shall remain entitled to any fees or other amounts that would have been payable to it with respect to such performance if such Loan had not been rejected.

3.  **Netting of Deliveries.** On each Business Day, at such times and in such manner as may be mutually agreed by Agent and Borrower, Agent will sum together the aggregate amount of each Digital Asset to be delivered to Borrower, and subtract therefrom the aggregate amount of such Digital Asset to be delivered by Borrower to Agent, in each case on behalf of Agent's Principals in accordance with the Agreement (the "**Net Settlement Amount**"). If the Net Settlement Amount for a Digital Asset is: (i) positive, Agent will deliver the Net Settlement Amount of such Digital Asset to Borrower or, (ii) negative, Borrower will deliver the Net Settlement Amount to Agent, in each case in accordance with the Agreement. Upon delivery of the Net Settlement Amount, Borrower and each Principal shall be fully discharged from liability for the obligations, if any, corresponding to such Net Settlement Amount and Agent shall be solely responsible and liable for delivering to each Principal the amount of such Digital Asset to which such Principal is entitled to under the Agreement.

4.  **Limitation of Agent's Liability.** The Parties expressly acknowledge that if the representations and warranties of Agent under the Agreement, including this Exhibit, are true and correct in all material respects during the term of any Loan and Agent otherwise complies with the provisions of this Exhibit, then:

    (a) Agent's obligations under the Agreement shall not include a guarantee of performance by its Principal;

    (b) Borrower's remedies shall not include a right of setoff against obligations, if any, of Agent arising in other transactions in which Agent is acting as principal; and

    (c) Following an Event of Default by Borrower, the Principal to the Loan(s) subject to such Event of Default may proceed directly as Lender against Borrower and not be obligated to join Agent or any other Principal as a condition precedent to initiating such proceeding.

**4. Interpretation of Terms.** All references to "Lender" or "Borrower," as the case may be, in the Agreement shall, subject to the provisions of this Exhibit (including, among other provisions, the limitations on Agent's liability in Section 3 of this Exhibit), be construed to reflect that (i) Principal shall have, in connection with any Loan or Loans entered into by Agent on its behalf, the rights, responsibilities, privileges and obligations of a "Lender" directly entering into such Loan or Loans with Borrower under the Agreement, and (ii) Principal has designated Agent as its sole agent for performance of Lender's obligations to Borrower and for receipt of performance by Borrower of its obligations to Lender in connection with any Loan or Loans under the Agreement (including, among other things, as Agent for Principal in connection with transfers of Loaned Assets and as agent for giving and receiving all notices under the Agreement). Both Agent and its Principal shall be deemed "Parties" to the Agreement and all

19

references to a "Party" or "either Party" in the Agreement shall be deemed revised accordingly (and any Default by Agent under the Agreement shall be deemed a Default by Lender).

# Exhibit 3

CONFIDENTIAL

## FIRST AMENDMENT TO SECURITY AGREEMENT

This **FIRST AMENDMENT TO SECURITY AGREEMENT** (the "Amendment") dated as of November 7, 2022, by and between Genesis Global Capital, LLC (the "Pledgor"), and Gemini Trust Company LLC, solely in its capacity as agent for the Principal Lenders (as defined below) (in such capacity and any successor or assign in such capacity, the "Agent"), for the benefit of the Agent and the Principal Lenders.

This Amendment is entered into by the Parties in connection with the Security Agreement, dated as of August 15, 2022, entered into by and between Pledgor and Agent (as may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"). This Amendment forms a part of, incorporates by reference, and is subject to the terms and conditions in the Security Agreement and except as set forth in this Amendment, the Security Agreement shall continue in full force and effect in accordance with its terms. Capitalized terms used in this Amendment but not otherwise defined herein shall have the same meanings as in the Security Agreement.

## RECITALS

**WHEREAS:**

A.    Pledgor and Agent have entered into the Security Agreement, pursuant to which the Pledgor agreed to pledge to the Agent, for the benefit of the Agent and the Principal Lenders, certain collateral to secure the Pledgor's obligations under the Master Loan Agreements.

B.    This Amendment is intended to modify certain terms of the Security Agreement.

**NOW THEREFORE**, in consideration of the mutual promises herein contained, the Parties hereby agree:

1.    **Amendment to Term/Termination**. Section 7(b) of the Security Agreement shall be amended and restated in its entirety as follows:

"Termination. Upon the date on which all Secured Obligations shall have been paid in full and the Master Loan Agreements are terminated in accordance with their terms, this Agreement shall automatically terminate, and Agent shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of the Pledgor, and the security interest, lien, pledge and assignment of the Collateral hereunder, together with all rights and powers of the Agent hereunder, shall immediately be released and deemed to be void."

2.    *Entire Agreement*. This Amendment, the Security Agreement and the Master Loan Agreements embody the entire agreement and understanding among the Parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter of this Amendment.

DocuSign Envelope ID: DCBA48BB-1EE3-48E6-BBF5-4FCAF863735A

CONFIDENTIAL

*[Remainder of Page Intentionally Blank; Signature Page Follows.]*

DocuSign Envelope ID: DCBA48BB-1EE3-48E6-BBF5-4FCAF863735A

CONFIDENTIAL

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed and delivered as of the day and year first above written.

**Genesis Global Capital, LLC**

By: _Arianna Pretto-Sakmann_

Name: Arianna Pretto-Sakmann

Title:  Chief Legal Officer

**Gemini Trust Company, LLC**

By: _Noah B. P_

Name: Noah Perlman

Title:    Chief Executive Officer

# Exhibit 4

CONFIDENTIAL

## SECOND AMENDMENT TO SECURITY AGREEMENT

This **SECOND AMENDMENT TO SECURITY AGREEMENT** (the "Second Amendment") dated as of November 10, 2022, by and among Genesis Global Capital, LLC (the "Pledgor"), Digital Currency Group, Inc. (the "Parent"), solely with respect to Sections 1, 7(c), and 7(d) of the Security Agreement (as defined below), as amended by this Second Amendment, and Gemini Trust Company, LLC, solely in its capacity as agent for the Principal Lenders (as defined below) (in such capacity and any successor or assign in such capacity, the "Agent"), for the benefit of the Agent and the Principal Lenders.

This Second Amendment is entered into by the parties hereto in connection with the Security Agreement, dated as of August 15, 2022, entered into by and between Pledgor and Agent (as amended by the First Amendment to Security Agreement and as may be further amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"). This Second Amendment forms a part of, incorporates by reference, and is subject to the terms and conditions in the Security Agreement and except as set forth in this Second Amendment, the Security Agreement shall continue in full force and effect in accordance with its terms. Capitalized terms used in this Second Amendment but not otherwise defined herein shall have the same meanings as in the Security Agreement.

## RECITALS

**WHEREAS,** Pledgor and Agent have entered into the Security Agreement, pursuant to which the Pledgor agreed to pledge to the Agent, for the benefit of the Agent and the Principal Lenders, certain collateral to secure the Pledgor's obligations under the Master Loan Agreements.

**WHEREAS,** This Second Amendment is intended to modify certain terms of the Security Agreement.

**NOW THEREFORE**, in consideration of the mutual promises herein contained, the Parties hereby agree:

1. **Amendment to Collateral Amount**. Section 1 of the Security Agreement shall be amended and restated in its entirety as follows:

    "As promptly as practicable after the execution of this Agreement, the Pledgor shall transfer or cause to be transferred **30,905,782** shares of Grayscale Bitcoin Trust to the account held in the name of the Agent "for the benefit of" ("FBO") the Principal Lenders at Morgan Stanley Smith Barneys LLC with account number ending in -6250 (the "GTC Account"); provided, that, for the avoidance of doubt, the Pledgor shall have no obligation to transfer, cause to be transferred or otherwise deposit additional shares of Grayscale Bitcoin Trust or any other shares into the GTC Account after such date except

DocuSign Envelope ID: 5F6B1E80-353B-4E8B-4E7D-4A1C87C6CA2F

CONFIDENTIAL

as required under and in accordance with the Second Amendment or Section 6(b) of this Agreement.

As promptly as practicable after the execution of this Second Amendment, the Parent shall assign, sell, convey, transfer, and deliver to the Pledgor, or a controlled subsidiary of the Pledgor, all right, title and interest in and to **31,180,804** shares of Grayscale Bitcoin Trust, free and clear of all liens, claims, charges and encumbrances. As promptly as practicable after such assignment, conveyance, transfer, and delivery, the Pledgor shall transfer or cause to be transferred such **31,180,804** shares of Grayscale Bitcoin Trust to the GTC Account; provided, that, for the avoidance of doubt, the Pledgor shall have no obligation to transfer, cause to be transferred or otherwise deposit additional shares of Grayscale Bitcoin Trust or any other shares into the GTC Account after such date except as required under and in accordance with Section 6(b) of this Agreement."

2.  **Amendment to Remedies.** Section 3(a) of the Security Agreement shall be amended and restated in its entirety as follows:

"(a) Upon an event of default (or similar term) under any Master Loan Agreement, the failure of the Pledgor or the Parent to comply with its respective obligations in Section 1 of this Agreement, the failure of the Pledgor to comply with its obligations under Section 6(b) of this Agreement, or the failure of the Pledgor to comply with any other right or remedy the Agent or any Principal Lender may have at law, contract, or equity (including under the Uniform Commercial Code ("UCC") as in effect in any relevant jurisdiction), the Agent shall have the following rights and remedies, all such rights and remedies being cumulative, not exclusive, and enforceable alternatively, successively or concurrently, at such time or times as the Agent deems expedient without any notice and without compliance with any other condition precedent now or hereunder imposed by statute, rule of law, or otherwise (all of which are hereby expressly waived by the Pledgor, to the fullest extent permitted by law):

(i) To liquidate any or all Collateral through one or more public or private sales or other dispositions, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Agent having the right to purchase any such Collateral) and apply the proceeds of such liquidation to the Secured Obligations; and

(ii) To exercise any rights and remedies available to the Agent or the Principal Lenders under applicable law, including the UCC as in effect in any relevant jurisdiction."

3.  **Amendment to Adjustment of Collateral**. Section 6 of the Security Agreement shall be amended and restated in its entirety as follows:

CONFIDENTIAL

"(a) <u>Collateral Release</u>. During the term of this Agreement, if the aggregate value of the Collateral (as calculated based on the price reported on the OTCQX exchange at 4pm New York time on a day the OTCQX market is open for trading (such aggregate value, the "<u>Collateral Value</u>")) exceeds 120% of the notional USD value of the aggregate loaned amounts (the "<u>Loaned Assets</u>") under the Master Loan Agreements (as calculated based on the price reported on the Agent's cryptocurrency exchange, the Gemini exchange, for the relevant Loaned Asset at 4pm New York time (the "<u>Gemini Closing Price</u>")), then the Agent shall, upon the Pledgor's written request (which may be by e-mail or other electronic transmission) (such request, a "<u>Collateral Return Request</u>"), be required to return an amount of Collateral such that the remaining Collateral Value is no greater than 110% of the notional USD value of the Loaned Assets (such amount, the "<u>Collateral Return Amount</u>"). The Agent shall deliver the Collateral Return Amount to the Pledgor's brokerage account at such account as the Pledgor may direct in writing no later than two (2) business days after the date of the Collateral Return Request.

(b) <u>Collateral Posting</u>. During the term of this Agreement, if the Collateral Value falls below 30% of the notional USD value of the aggregate Loaned Assets under the Master Loan Agreements (as calculated based on the Gemini Closing Price) then the Pledgor shall, upon the Agent's written request (which may be by e-mail or other electronic transmission) (such request, a "<u>Collateral Top-Up Request</u>"), be required to post an amount of Collateral to the GTC Account such that the Collateral Value in the GTC Account is no less than 35% of the notional USD value of the Loaned Assets under the Master Loan Agreements (such amount, the "<u>Collateral Top-Up Amount</u>"); <u>provided, that</u>, notwithstanding the foregoing, in no event shall the aggregate number of shares of Grayscale Bitcoin Trust in the GTC Account be required to exceed **62,086,586** shares at any time. The Pledgor shall deliver the Collateral Top-Up Amount to the GTC Account no later than two (2) business days after the date of the Collateral Top-Up Request."

4. **Entire Agreement**. This Second Amendment, the Security Agreement and the Master Loan Agreements embody the entire agreement and understanding among the Parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter of this Second Amendment.

*[Remainder of Page Intentionally Blank; Signature Page Follows.]*

**CONFIDENTIAL**

**IN WITNESS WHEREOF**, the parties hereto have caused this Second Amendment to be duly executed and delivered as of the day and year first above written.

**Genesis Global Capital, LLC**

By: _Derar Islim_ _____

Name: Derar Islim

Title:   CEO

**Digital Currency Group, Inc.**

solely with respect to <u>Sections 1</u>, <u>7(c)</u>, and <u>7(d)</u> of the Security Agreement

By: _Mark Murphy_ _____

Name: Mark Murphy

Title:   Account Owner

**Gemini Trust Company, LLC**

By: _Noah Perlman_ _____

Name: Noah Perlman

Title:   Chief Executive Officer