Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL) |
| GEMINI TRUST COMPANY, LLC, for itself and as agent on behalf of the Gemini Lenders,<br><br>        Plaintiff,<br><br>    v.<br><br>GENESIS GLOBAL CAPITAL, LLC, GENESIS GLOBAL HOLDCO, LLC, and GENESIS ASIA PACIFIC PTE. LTD.<br><br>        Defendants. | Adv. Proc. No. 23-01192 (SHL) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS COUNTS II, III, AND IV OF THE**
**COMPLAINT AS TO GENESIS GLOBAL CAPITAL, LLC AND ALL COUNTS**
**AS TO GENESIS GLOBAL HOLDCO, LLC, AND GENESIS ASIA PACIFIC PTE. LTD.**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, 38th Floor, New York, NY 10007.

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

TABLE OF AUTHORITIES ............................................................................... iv

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ............................................................................. 3

    A.    The Gemini Earn Program ....................................................... 3

    B.    The Security Agreement Between GGC and Gemini ................. 4

    C.    First Amendment to the Security Agreement ............................ 6

    D.    Second Amendment to the Security Agreement ........................ 7

    E.    Purported Foreclosure of the August 2022 Collateral ............... 9

    F.    Events Following Gemini's Purported Foreclosure ................... 9

ARGUMENT ..................................................................................................... 9

I.    The Complaint should be dismissed in its entirety as to Holdco and
GAP ............................................................................................................ 10

II.    Gemini's claims for declaratory judgment with respect to the
Additional GBTC Shares (Counts II and III) are precluded by the
terms of the agreements. ......................................................................... 11

    A.    Count II should be dismissed because the Additional GBTC
Shares were never pledged and thus were not "Collateral"
under the terms of the Security Agreement. ............................. 12

    B.    Count III should be dismissed because the Additional
GBTC Shares are GGC's property. .......................................... 14

III.    Gemini fails to state a claim for constructive trust. ............................. 16

    A.    The existence of a contract between the parties precludes a
finding of unjust enrichment and the remedy of
constructive trust. ...................................................................... 16

    B.    The Debtors were not unjustly enriched. .................................. 17

    C.    There was no fiduciary or confidential relationship between
Gemini and the Debtors. ........................................................... 21

D.      There was no transfer of the property at issue in reliance on
        a promise. ................................................................................................. 22

CONCLUSION ................................................................................................................ 23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abraham v. Am. Home Mortg. Servicing, Inc.*,
    947 F. Supp. 2d 222 (E.D.N.Y. 2013) ........................................................... 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 10

*Blank v. TriPoint Glob. Equities, LLC*,
    338 F. Supp. 3d 194 (S.D.N.Y. 2018) ........................................................... 16

*Fairfield Fin. Mortg. Grp., Inc. v. Luca*,
    584 F. Supp. 2d 479 (E.D.N.Y. 2008) ........................................................... 22

*First Cent. Ins. Co. v. Ochs (In re First Cent. Fin. Corp.)*,
    377 F.3d 209 (2d Cir. 2004) ................................................... 17, 18, 19, 20

*Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ........................................................... 10

*Greenfield v. Philles Recs.*,
    98 N.Y.2d 562 (2002) ............................................................... 12, 14, 15

*In re Ades & Berg Grp. Inv'rs*,
    550 F.3d 240 (2d Cir. 2008) ............................................................... 19, 20

*In re Dreier LLP*,
    429 B.R. 112 (Bankr. S.D.N.Y. 2010) ................................................... 16, 19, 20

*In re Hydrogen, LLC*,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ................................................... 18, 20

*In re Rickel & Assocs., Inc.*,
    272 B.R. 74 (Bankr. S.D.N.Y. 2002) ........................................................... 19

*In re Waypoint Leasing Holdings Ltd.*,
    607 B.R. 143 (Bankr. S.D.N.Y. 2019) ........................................................... 10

*Malmsteen v. Berdon, LLP*,
    477 F. Supp. 2d 655 (S.D.N.Y. 2007) ............................................................ 22

*Mfrs. Hanover Tr. Co. v. Yanakas*,
    7 F.3d 310 (2d Cir. 1993) ............................................................................. 22

*Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In re
    Motors Liquidation Co.)*,
    563 B.R. 498 (Bankr. S.D.N.Y. 2016) ........................................................... 10

*New York v. Gemini Tr. Co., LLC et al.*,
    No. 452784/2023 (N.Y. Sup. Ct. Oct. 19, 2023)............................................... 2

*New York v. Matamoros (In re Matamoros)*,
    605 B.R. 600 (S.D.N.Y. 2019) ....................................................................... 21

*Reiss v. Fin. Performance Corp.*,
    97 N.Y.2d 195 (2001)............................................................................... 12, 15

*Rosen v. Chowaiki & Co. Fine Art Ltd. (In re Chowaiki & Co. Fine Art Ltd.)*,
    593 B.R. 699 (Bankr. S.D.N.Y. 2018) ........................................................... 16

*Schron v. Troutman Sanders LLP*,
    20 N.Y.3d 430 (2013)............................................................................... 12, 15

*Sharp v. Kosmalski*,
    40 N.Y.2d 119 (1976)..................................................................................... 22

*Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*,
    842 F. Supp. 2d 502 (S.D.N.Y. 2012) ............................................................ 17

*Vintage, LLC v. Laws Const. Corp.*,
    13 N.Y.3d 847 (2009)..................................................................................... 12

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*,
    554 B.R. 655 (Bankr. S.D.N.Y. 2016) ........................................................... 10

## Rules and Statutes

UCC § 9-610............................................................................................................ 9

UCC § 9-615(a)........................................................................................................ 6

## **Other Authorities**

Fed. R. Bankr. P. 544 .................................................................................................... 2, 13

Fed. R. Bankr. P. 547 .................................................................................................... 2, 3, 18

Fed. R. Bankr. P. 7012 .................................................................................................. 9, 10

Fed. R. Bankr. P. 12 ...................................................................................................... 10

Genesis Global Capital, LLC ("GGC"), Genesis Global Holdco, LLC ("Holdco"), and Genesis Asia Pacific Pte. Ltd. ("GAP," and together with GGC and Holdco, "Defendants" or "Debtors") respectfully submit this memorandum of law (the "Memorandum of Law") in support of their motion to dismiss (the "Motion") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, filed contemporaneously herewith, in which (i) GGC moves to submit Counts II, III, and IV of the Adversary Complaint (ECF No. 1) (the "Complaint") of Gemini Trust Company, LLC ("Gemini" or "Plaintiff") and (ii) Holdco and GAP move to dismiss the Complaint in its entirety.

## PRELIMINARY STATEMENT

1.      The Debtors, along with various creditor constituencies, are working hard to structure a plan that achieves the highest possible recovery for creditors, who have gone without access to their funds for more than a year.  Against this backdrop, one party—Gemini—appears to be seeking to *profit* from the bankruptcy at the direct expense of creditors, including the Earn Users[1] whom Gemini purports to represent, by claiming a legal entitlement to retain for itself certain collateral that has *tripled* during the one year that Gemini has been holding it.  While Gemini has been vague about its intentions regarding that collateral, Gemini's formal position, as set forth in Count I of the Complaint, is that Gemini foreclosed on the collateral one year ago through a sale "to itself" at a fraction of its current value, and Earn Users are therefore only legally entitled to the $284 million in "proceeds," rather than the current value of more than $800 million. *See* Compl. ¶¶ 43, 66.  The logical extension of this argument is that Gemini would be entitled to retain *for its own account* the massive appreciation in value of the collateral by virtue of having "purchased" the collateral from itself.  At a minimum, this position is inconsistent with Gemini's

---

[1]      Initially capitalized terms in this preliminary statement will have the meanings ascribed to them below.

promise to Earn Users of "the highest level of fiduciary obligations," which has recently been
called into question. *See* Compl. ¶ 4, *New York v. Gemini Tr. Co., LLC et al.*, No. 452784/2023
(N.Y. Sup. Ct. Oct. 19, 2023), ECF No. 2.

2.      As the Debtors have asserted all along, Gemini's "foreclosure" was invalid for
multiple reasons.  The Debtors recognize, however, that the resolution of Count I will require
discovery to resolve certain key factual questions, and the Debtors have therefore answered Count
I simultaneously with the filing of the Motion.  Such discovery will address, among other things,
whether Gemini's alleged foreclosure sale "to itself" actually took place, including whether, on
the date of the purported sale, Gemini actually received or held cash "proceeds" that could have
been theoretically distributed to Earn Users.

3.      On the other hand, the remaining Counts II, III and IV, by which Gemini seeks to
*reach into the Debtors' estate* to claim an entitlement to additional assets with a value of more
than $800 million, can and should be addressed now, at the pleading stage, because those counts
fail as a matter of law.  Fundamentally, Gemini's argument is that, because the Debtors breached
a promise to grant Gemini a security interest in additional assets, the Court should now, post-
petition, impose such a security interest.  That is plainly not the law.  And, even aside from the
fact that no additional assets were ever pledged and no security interest ever attached under the
plain terms of the security agreement at issue, Gemini's complaint ignores that its claimed security
interest would at best be unperfected, and thus subject to avoidance under section 544 of the
Bankruptcy Code, *and* that the claimed security interest would have been granted within the 90-
day preference window, and thus also subject to avoidance under section 547 of the Bankruptcy.

4.      Seemingly aware of the deficiencies of its "security interest" theory, Gemini tries
to circumvent the priority scheme of the Bankruptcy Code by asserting, in the alternative, a state

law constructive trust claim with respect to the assets in which it claims a security interest.  This

alternative claim fares no better.  The existence of a written contract governing the rights of the

parties with respect to the assets in question is an absolute bar to Gemini's constructive trust claim.

Independently, Gemini has not pleaded, and could never adequately plead, the elements of unjust

enrichment, as the law in this Circuit is clear that a bankruptcy estate is not unjustly enriched by

retaining assets that will be used to pay creditors on a ratable basis, rather than delivering those

assets to a single creditor at the expense of all others.  That is especially true here, where the

delivery of the assets at issue would have been a clear preference under section 547 of the

Bankruptcy Code.

5.      In short, Gemini should not be permitted to further delay distributions to creditors

by asserting claims that fail as a matter of law.  For these reasons, and as set forth in more detail

below, the Court should dismiss Counts II, III and IV against GGC.  The Court should also dismiss

all claims against GAP and Holdco, against whom Gemini has pleaded no facts that would link

them to the relevant events.

## FACTUAL BACKGROUND

### A.  The Gemini Earn Program

6.      Gemini Earn was an investment program offered to Gemini users who custodied

their digital assets on Gemini's cryptocurrency platform (the "Gemini Earn Program").  Under the

Gemini Earn Program, participants (the "Earn Users") could choose to loan the digital assets they

placed with Gemini to GGC in return for a fee, with Gemini acting as custodian and agent to the

Earn Users in certain respects.  Certain triparty Master Loan Agreements ("MLAs") between

individual Earn Users, as lenders, GGC, as the borrower, and Gemini, as custodian and authorized

agent on behalf of an Earn User, in part governed this lending.  On December 23, 2020, GGC and

Gemini also entered into a side letter agreement (the "Side Letter"), attached as Exhibit 1 to the

-3-

*Declaration of Katharine Ross in Support of Motion to Dismiss Counts II, III, and IV of the Complaint as to Genesis Global Capital, LLC, and All Counts as to Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd.* (the "Ross Declaration"), filed contemporaneously herewith. Under the MLAs and the Side Letter, GGC periodically provided Gemini with the terms of the loans it was willing to enter into as well as a maximum amount of digital assets it was willing to borrow pursuant to those terms and had an obligation to accept loans up to that maximum amount. *See* Compl. Ex. 2, MLAs; *see also* Ross Decl. Ex. 1, Side Letter. Gemini would then provide such terms to Earn Users, who could make decisions about whether to enter into loans subject to those terms.

7.      Consistent with industry practice, many of these loans were open term loans, meaning that GGC could repay a loan in full or in part and the Earn Users could "call" (i.e. demand repayment) under the loans in whole or in part at any point in time. Upon an Earn User call under a loan, GGC would have three business days during which to pay.

8.      The MLAs established that no party acted as a fiduciary to another party:

Each party represents and warrants that it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of any Loan. It is also capable of assuming, and assumes, the risk of the Loan. The other Parties are not acting as a fiduciary for or an advisor to it in respect of any Loan.

Compl. Ex. 2, MLAs § V(j).

9.      Neither the MLAs, the Side Letter, nor any other governing documents of the Gemini Earn Program required GGC to post assets as collateral to secure its obligations.

**B. The Security Agreement Between GGC and Gemini**

10.      GGC's affiliate GAP was a major lender to Singapore-based cryptocurrency hedge fund Three Arrows Capital Pte. Ltd. ("3AC"). GAP provided loans to 3AC via the extension of working capital from GGC. On June 30, 2022, 3AC commenced liquidation proceedings. At the

-4-

time, GAP had substantial outstanding loans to 3AC.

11.     Given the collapse of 3AC and general disruption in the cryptocurrency market, in August 2022, Gemini sought collateral from GGC as security for Earn Users' loans to GGC.  On August 15, 2022, GGC entered into an agreement (the "Security Agreement") with Gemini as agent for the Earn Users pursuant to which GGC transferred, and thereby pledged, 30,905,782 shares of GBTC (the "August 2022 Collateral")[2] to Gemini for the benefit of the Earn Users to secure certain of GGC's obligations under the Gemini Earn Program.  *See* Compl. Ex. 1, Security Agreement.  New York law governs the Security Agreement.  *See* Compl. Ex. 1, Security Agreement § 7(c).

12.     Section 2 of the Security Agreement is clear that the only shares of GBTC that would be pledged as collateral are those that are actually transferred:

> **Section 2. The Pledge.** As security for the prompt payment and performance in full when due (whether at stated maturity, by acceleration, or otherwise) of all liabilities and obligations of the Pledgor under the Master Loan Agreements, whether now existing or hereafter arising, whether or not mature or contingent (the "Secured Obligations"), the [GGC] hereby pledges, assigns, and grants to [Gemini], for the benefit of [Gemini] and the [Earn Users], a security interest in all of [GGC's] right, title, and interest in and to *all property from time to time transferred by or on behalf of [GGC] to or for the benefit of [Gemini] or the [Earn Users] in connection with this Agreement or any Master Loan Agreement, including without limitation all shares of and interests in Grayscale Bitcoin Trust credited to the GTC Account* (collectively, the "Collateral").

Compl. Ex. 1, Security Agreement § 2 (emphasis added).

13.     Section 3(b) of the Security Agreement meanwhile provides how the proceeds of any collateral sold by Gemini after an event of default by GGC are to be distributed:

> The proceeds of any collection, sale, liquidation, or other realization of all or any part of the Collateral pursuant hereto shall be applied:

---

[2]      The Complaint refers to these shares as the "Initial Collateral."

> (i) <u>First</u>, to the payment of the costs and expenses of such collection, sale, or other realization, including reasonable out-of-pocket costs and expenses of [Gemini] and the reasonable fees and expenses of its agents and counsel;
>
> (ii) <u>Next</u>, *to the payment and satisfaction in full of the Secured Obligations . . .*

Compl. Ex. 1, Security Agreement § 3(b) (emphasis added).  Section 3(b) of the Security Agreement mirrors how such proceeds are to be distributed under the Uniform Commercial Code (the "<u>UCC</u>").  *See* UCC § 9-615(a).

14.    Finally, Section 7(b) the Security Agreement required Gemini to return the August 2022 Collateral to GGC on or before November 15, 2022:

> **Termination**. *Upon the earlier of (i) November 15, 2022 and (ii) the date on which all Secured Obligations shall have been paid in full, this Agreement shall automatically terminate*, and [Gemini] shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of [GGC], and the security interest, lien, pledge and assignment of the Collateral hereunder, together with all rights and powers of [Gemini] hereunder, shall immediately be released and deemed to be void.

Compl. Ex. 1, Security Agreement § 7(b) (emphasis added).  This obligation to return the collateral stood independent of whether there remained obligations due as of November 15, 2022.

15.    On or about August 18, 2022, GGC transferred the August 2022 Collateral to Gemini.

## C.  First Amendment to the Security Agreement

16.    In the months following the execution of the Security Agreement, GGC faced increasing financial difficulties and demands from counterparties, including Gemini.  Specifically, following extensive back and forth, on October 13, 2022, Gemini provided GGC 30 days' notice of its intention to terminate the Gemini Earn Program.

17.    Following further negotiations between GGC and Gemini, on November 7, 2022,

GGC and Gemini entered into an amendment to the Security Agreement (the "<u>First Amendment</u>"), which extended the term of Gemini's pledge under the Security Agreement until GGC paid what it owed under the Gemini Earn Program in full.

In relevant part, the termination provision of the Security Agreement was amended as follows:

> **Termination**. *Upon the date on which all Secured Obligations shall have been paid in full and the Master Loan Agreements are terminated in accordance with their terms, this Agreement shall automatically terminate*, and [Gemini] shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of [GGC], and the security interest, lien, pledge and assignment of the Collateral hereunder, together with all rights and powers of [Gemini] hereunder, shall immediately be released and deemed to be void.

Compl. Ex. 3, First Amendment § 1 (emphasis added).

18.    The First Amendment did not alter any other relevant portions of the Security Agreement.  No consideration whatsoever was provided to GGC in exchange for eliminating Gemini's obligation to return the collateral to GGC on November 15, 2022.[3]  Further, GGC was insolvent at the time of its entry into the First Amendment.  Indeed, Gemini concedes that GGC was insolvent at this time.  *See* Compl. ¶ 24.

**D.  Second Amendment to the Security Agreement**

19.    Following the First Amendment, Gemini also requested that GGC pledge additional collateral to further secure certain of GGC's obligations under the Gemini Earn Program.  On

---

[3]    As discussed above, Gemini provided GGC 30 days' notice of its intention to terminate the Gemini Earn Program on October 13, 2022.  *See supra* ¶ 20.  Gemini alleges that its decision to delay the termination date was based solely on discussions with DCG and GGC regarding GGC's financial state.  *See* Compl. ¶ 37 ("In reliance on DCG's and GGC's representations [regarding GGC's financial state] . . . Gemini elected to delay termination of the Gemini Earn Program . . . .").  Gemini does not allege that its decision to delay the termination date related to the First Amendment.  *Id*. ¶ 38 ("Because the terms of the Security Agreement were set to expire on November 15, 2022, Gemini requested that GGC also extend the Security Agreement . . . such that the terms of the Security Agreement would terminate concomitant with the Gemini Earn Program.").  In any event, any forbearance from Gemini's exercise of its termination rights is of course not new value.

November 10, 2022, GGC, Genesis, and DCG entered into a second amendment to the Security Agreement (the "Second Amendment"), pursuant to which DCG agreed to transfer to GGC 31,180,804 shares of GBTC (the "Additional GBTC Shares"),[4] and GGC in turn agreed to pledge such shares to Gemini for the benefit of Earn Users to secure certain of GGC's obligations under the Gemini Earn Program:

> **Amendment to the Collateral Amount**. . . . As promptly as practicable after the execution of this Second Amendment, the Parent shall assign, sell, convey, transfer, and deliver to the Pledgor, or a controlled subsidiary of the Pledgor, all right, title and interest in and to **31,180,804** shares of Grayscale Bitcoin Trust, free and clear of all liens, claims, charges and encumbrances. As promptly as practicable after such assignment, conveyance, transfer, and delivery, the Pledgor shall transfer or cause to be transferred such **31,180,804** shares of Grayscale Bitcoin Trust to the GTC Account.

Compl. Ex. 4, Second Amendment § 1 (emphasis in original).

20.    The Second Amendment did not alter Section 2 of the Security Agreement, which provides that a pledge of collateral only includes those shares that are actually transferred "by or on behalf of [GGC] to or for the benefit of [Gemini] or the [Earn Users] . . . ." *See* Compl. Ex. 1, Security Agreement § 2; Compl. Ex. 4, Second Amendment at 1 (incorporating the terms of the Security Agreement unless expressly modified). Nor did the Second Amendment alter any other relevant portions of the Security Agreement. *See* Compl. Ex. 4, Second Amendment. Again, no consideration was provided to GGC in exchange for its accession to the Second Amendment. *See* Compl. Ex. 4, Second Amendment.

21.    DCG transferred its entire ownership interest in the Additional GBTC Shares to GGC in November 2022. *See* Compl. ¶ 7. However, GGC did not subsequently transfer the Additional GBTC Shares to Gemini, but instead maintained the Additional GBTC Shares. The Additional GBTC Shares were commingled with GGC's other GBTC holdings at Continental

---

[4]    The Complaint refers to these shares as the "Additional Collateral."

Stock Transfer & Trust Company such that the Additional GBTC Shares are not identifiable.

**E.  Purported Foreclosure of the August 2022 Collateral**

22.     On November 16, 2022, GGC suspended withdrawals under the Gemini Earn Program.  That same day, the General Counsel of Gemini informed GGC via e-mail, that it had allegedly "foreclosed" on the August 2022 Collateral through "a private sale to us in accordance with Section 9-610 of the Uniform Commercial Code at the market price of $9.20 per share as of 4:00 PM EST for total proceeds of $284,333,194.40" and stated that "[s]uch amount, less the cost and expenses of foreclosure, will be applied as set forth in Section 3(b) of the Security Agreement to the Secured Obligations."  *See* Ross Decl. Ex. 2, Email from N. Gjertson to A. Sullivan, et al. (Nov. 16, 2022).

23.     Upon information and belief, Gemini has not distributed any alleged proceeds of this purported foreclosure to Earn Users and has continued to hold the August 2022 Collateral, just as it did before its purported foreclosure.

**F.  Events Following Gemini's Purported Foreclosure**

24.     Since November 2022, Gemini and the Debtors have been in ongoing discussions regarding potential out-of-court or in-court restructurings of the Debtors' liabilities to Earn Users. On May 22, 2023, Gemini filed a master proof of claim for $1,122,467,217.65, plus certain other unliquidated amounts, asserting that it has secured party and/or setoff rights with respect to, among other things, the proceeds of the purported foreclosure of the August 2022 Collateral and the value of the Additional GBTC Shares.

## ARGUMENT

25.     Under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>"), made applicable in adversary proceedings through Bankruptcy Rule 7012, a bankruptcy court may dismiss a complaint if it fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P.

12(b)(6); Fed R. Bankr. P. 7012.   "To survive a motion to dismiss pursuant to Rule 12(b)(6), a
complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is
plausible on its face." *Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 406
(Bankr. S.D.N.Y. 2011) (internal quotations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662,
678 (2009).   Complaints that plead "only facts that are merely consistent with a defendant's
liability" or that offer "[t]hreadbare recitals of the elements of a cause of action, supported by mere
conclusory statements" are insufficient to satisfy the plausibility standard. *Weisfelner v. Fund 1
(In re Lyondell Chem. Co.)*, 554 B.R. 655, 673 (Bankr. S.D.N.Y. 2016) (internal quotations
omitted).   The complaint must allege facts that are sufficient "to raise a right to relief above the
speculative level," and assert more than a "formulaic recitation of the elements of a cause of
action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   Additionally, in ruling on a motion
to dismiss under Rule 12(b)(6) of the Federal Rules, this Court may also consider documents
attached to the Complaint as exhibits. *See In re Waypoint Leasing Holdings Ltd.*, 607 B.R. 143,
153 (Bankr. S.D.N.Y. 2019).   On their faces, each of Counts II, III, and IV fails to state a claim
upon which relief can be granted, and accordingly should be dismissed.   Moreover, the Complaint
fails to state any claims against Holdco and GAP and should be dismissed in its entirety as against
those two Defendants.

## I.    The Complaint should be dismissed in its entirety as to Holdco and GAP.

26.    As a threshold matter, the Complaint fails to state any plausible claim for relief
against Holdco and GAP.[5]   Indeed, the Complaint makes no allegations concerning specific

---

[5]    Further, Gemini has not properly served the Complaint on GAP, another basis for dismissing the claims
raised against it. *See* Fed. R. Civ. P. 12(b)(5); *see also Motors Liquidation Co. Avoidance Action Trust v. JPMorgan
Chase Bank, N.A. (In re Motors Liquidation Co.)*, 563 B.R. 498, 505 (Bankr. S.D.N.Y. 2016) ("If the plaintiff does
not properly serve the summons and the complaint on the defendant, the court may dismiss the case without prejudice
absent a showing of good cause.").

transactions or conduct of Holdco or GAP that governed or evidenced any such relations—nor
could it—because there are none.  Holdco and GAP did not maintain contractual or business
relationships with Gemini, and neither were parties to the MLAs, Security Agreement, First
Amendment, or Second Amendment.  Accordingly, the Complaint should be dismissed in its
entirety as to Holdco and GAP.

## II.  Gemini's claims for declaratory judgment with respect to the Additional GBTC Shares (Counts II and III) are precluded by the terms of the agreements.

27.    Both the Security Agreement and the Second Amendment are clear that, (i) because
the Additional GBTC Shares were never transferred by or on behalf of GGC, and thus were never
pledged, Gemini does not hold a security interest in the Additional GBTC Shares, and (ii) the
Additional GBTC Shares are GGC's property.  As outlined above, the Second Amendment set
forth a two-step process with respect to the Additional GBTC Shares.  *First*, DCG would transfer
to GGC the Additional GBTC Shares, which would become the property of GGC upon such
transfer.  *Second*, GGC would then pledge (via transfer) the Additional GBTC Shares to Gemini,
upon which transfer the Additional GBTC Shares would become Collateral pursuant to the
Security Agreement.  The second step indisputably never occurred.  The result is that the
Additional GBTC Shares became property of GGC but never became Collateral.  As such, the
plain text of the Security Agreement and the Second Amendment requires dismissal of Gemini's
claims for declaratory judgment with respect to the Additional GBTC Shares.

28.    Both the Security Agreement and the Second Amendment are governed by New
York law.  *See* Compl. Ex. 1, Security Agreement § 7(c) (stating New York law governs); Compl.
Ex. 4, Second Amendment at 1 (incorporating the terms of the Security Agreement, including
choice of law clause, unless expressly modified).  Under New York law, contracts are construed
in accordance with the parties' intent, and the best evidence of that intent is the parties' writing.

*Greenfield v. Philles Recs.*, 98 N.Y.2d 562, 569 (2002). Where parties set forth their agreement in clear, unambiguous terms, a court will enforce the contract in accordance with the plain meaning of its terms. *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 198 (2001). A contract is unambiguous where the contract's terms have "a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *See, e.g.*, *Vintage, LLC v. Laws Const. Corp.*, 13 N.Y.3d 847, 849 (2009). Evidence outside the four corners of an contract is inadmissible if the contract is unambiguous and, as a general rule, extrinsic evidence is also inadmissible to alter or add a provision to a written agreement. *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 433 (2013). Here, there is no ambiguity in the contractual language, and therefore no need to look outside of the Security Agreement and the Second Amendment to dismiss these claims.

### A. Count II should be dismissed because the Additional GBTC Shares were never pledged and thus were not "Collateral" under the terms of the Security Agreement.

29.     Section 2 of the Security Agreement states, in relevant part, that "[a]s security for . . . all liabilities and obligations of [GGC] under the Master Loan Agreements . . . [GGC] hereby pledges . . . a security interest in and to all property from time to time transferred by or on behalf of [GGC] to or for the benefit of [Gemini] and the [Earn Users], including without limitation all shares of and interest in Grayscale Bitcoin Trust credited to the GTC Account (collectively, the 'Collateral')." Compl. Ex. 1, Security Agreement § 2 (titled "The Pledge"). This clause unambiguously requires that, in order for an asset to be pledged, and therefore to become "Collateral" pursuant to the Security Agreement, it must be transferred (a) by or on behalf of GGC, and (b) to or for the benefit of Gemini and the Earn Users.

30.     Those requirements were not met. As Gemini acknowledges, the Additional GBTC Shares were never transferred by GGC to Gemini. *See* Compl. ¶ 7 ("GGC refused to then transfer

the [Additional GBTC Shares] to Gemini."). Gemini also does not allege that the Additional GBTC Shares were ever transferred "on behalf of" GGC. Nor could Gemini make such an allegation. Only one transfer the Additional GBTC Shares—from DCG to GGC—occurred. *See* Compl. ¶ 7 (noting DCG transferred the additional GBTC Shares to GGC). It would be nonsensical for Gemini to argue that DCG's transfer of such shares *to GGC* was, at the same time, a transfer "on behalf of" GGC, and Gemini does not even attempt to make such an argument. And Gemini of course admits that it never received the Collateral. The undisputed fact that the Additional GBTC Shares were never transferred by or on behalf of GGC to Gemini is fatal to Gemini's claim that such shares were ever pledged as "Collateral" in which Gemini would hold a security interest.[6] Therefore, pursuant to the Security Agreement, Gemini does not hold *any* security interest in the Additional GBTC Shares, and Count II of the Complaint should be dismissed.

31.    Gemini also appears to assert that Section 4 of the Security Agreement grants it a security interest in the Additional GBTC Shares. *See* Compl. ¶ 41 (asserting that the Second Amendment incorporates Section 4 of the Security Agreement); *id.* ¶ 7 (quoting the language of Section 4 of the Security Agreement to assert that GGC "absolute[ly] and unconditional[ly]" pledged the Additional GBTC Shares to Gemini); *id.* ¶ 72 (quoting the language of Section 4 of the Security Agreement to assert that Gemini holds an "absolute and unconditional" security interest in the Additional GBTC Shares). But the grant of an absolute and unconditional security interest under Section 4 applies *only* to "Collateral," as defined in Section 2 of the Security Agreement. *See* Compl. Ex. 1, Security Agreement, § 4 ("All rights of [Gemini] hereunder and

---

[6]    Even if the Additional GBTC Shares had been pledged (which they were not), Gemini's alleged security interest in such shares would not have been perfected, and such an unperfected security interest would have been subject to avoidance by Plaintiffs pursuant to Section 544 of the Bankruptcy Code. Here, of course, no perfection occurred (nor could it have occurred) because the shares were never transferred and thus were never pledged.

the grant of a security interest *in the Collateral* shall be absolute and unconditional . . .") (emphasis

added).  For the reasons discussed above, the Additional GBTC Shares were never pledged as

Collateral under Section 2 of the Security Agreement, and therefore never became Collateral under

the terms of the Security Agreement.  Gemini's reference to Section 4 is of no moment and Count

II should be dismissed.[7]

### B.   Count III should be dismissed because the Additional GBTC Shares are GGC's property.

32.     Pursuant to the Second Amendment, DCG was required to "assign, sell, convey,

transfer and deliver to [GGC] . . . all right, title and interest in and to [the Additional Collateral],

free and clear of all liens, claims, charges and encumbrances."  Compl. Ex. 1, Second Amendment

§ 1 (emphasis added).  This language, and its plain meaning, could not be more clear.  *Cf.

Greenfield v. Philles Recs.*, 98 N.Y.2d 562, 570-71 (2002) (holding that the unconditional transfer

of ownership rights to a work of art, unless specifically limited by the terms of the contract,

conveys complete ownership rights).  As alleged by Gemini, DCG transferred its entire ownership

interest in the Additional GBTC Shares to GGC in November 2022.  *See* Compl. ¶ 7.  Thus,

pursuant to the Second Amendment, the Additional GBTC Shares became GGC's property when

the shares were received by GGC.  *See* Compl. Ex. 1, Second Amendment § 1.  GGC never

transferred the shares to Gemini.  *See* Compl. ¶ 7 ("GGC refused to then transfer the [Additional

GBTC Shares] to Gemini.").  Gemini nevertheless asserts, incorrectly, that "none of the Debtors

have any equitable interest" in the Additional GBTC Shares.  Compl. ¶ 78.  Notably, Gemini does

not even attempt to ground this erroneous assertion in the language of the contracts—the contracts

are clear that actual ownership of the Additional GBTC Shares transferred to GGC upon its receipt

---

[7]     Section 5(a) of the Security Agreement similarly states that, "This Agreement creates a legal and valid
security interest *in the Collateral* in favor of [Gemini] . . . ."  To the extent that Gemini intends to argue that this
provision applies with respect to the Additional GBTC Shares, that argument fails for the same reasons.

of the shares from DCG.[8]

33.     The sole assertion that Gemini puts forth in support of its claim that the Additional GBTC Shares are not GGC's property is that the "purpose" animating DCG's transfer of such shares to GGC somehow nullifies GGC's legal ownership of the shares.  *See, e.g.,* Compl. ¶ 78 ("Because GGC obtained the [Additional GBTC Shares] from DCG for the sole purpose of delivering [such shares] to Gemini and possesses the [Additional GBTC Shares] solely to secure Earn User's loans, none of the Debtors have any equitable interest in the [Additional GBTC Shares].").  This argument has no grounding in the governing language of the contract.  By the Second Amendment, DCG agrees to transfer "all right, title and interest in and to [the Additional Collateral]" to GGC.  Compl. Ex. 1, Second Amendment § 1.  This language includes no conditions or qualifiers.  *See Greenfield*, 98 N.Y.2d at 570-71 (2002) (unconditional transfer of ownership rights conveys complete ownership rights).  Separately, GGC agrees to transfer such shares to a collateral account for the benefit of Gemini and the Earn Users.  There is no "purpose"-based qualifier in the relevant language, and Gemini's attempt to insert one fails because, where an agreement is "clear," courts "as a rule" will enforce the agreement according to its terms and will not imply a term where a contract is silent as to a foreseeable contingency.  *See Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 198 (2001); *see also Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 433 (2013) (explaining that, as a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement).  Thus, the Additional GBTC Shares are GGC's property and Count III should be dismissed.

---

[8]     For the reasons discussed above, the contracts are also clear that neither actual ownership nor any equitable interest in the Additional GBTC Shares would transfer to Gemini until a pledge of those shares by GGC, which pledge never took place.  *See* ¶¶ 29-31, *supra*.

**III.     Gemini fails to state a claim for constructive trust.**

34.     In the alternative to its declaratory judgment claims, Gemini seeks establishment of a constructive trust over the Additional GBTC Shares, in which it asserts that it has a security interest.  *See* Compl. ¶¶ 72, 80-85.  Under New York law, "[a] party seeking the imposition of a constructive trust generally must establish that there is clear and convincing evidence of: (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment."  *Rosen v. Chowaiki & Co. Fine Art Ltd. (In re Chowaiki & Co. Fine Art Ltd.)*, 593 B.R. 699, 718-19 (Bankr. S.D.N.Y. 2018) (internal quotations omitted).  Gemini's constructive trust claim fails as a matter of law for four reasons: (i) the existence of a contract between the parties precludes Gemini's constructive trust claim; (ii) Gemini has not alleged, and cannot allege, three of the four elements of constructive trust, namely that GGC was unjustly enriched, that the parties have a fiduciary relationship, and that a transfer of the property at issue was made in reliance on a promise; and (iii) imposition of a constructive trust is disfavored in the bankruptcy context and the allegations in this case do not warrant such relief.[9] Accordingly, Count IV of the Complaint must be dismissed.

   **A.     The existence of a contract between the parties precludes a finding of unjust enrichment and the remedy of constructive trust.**

35.     As a threshold matter, the existence of the Second Amendment fully bars Gemini's request for a constructive trust.[10]  It is well established that a finding of unjust enrichment, which

---

[9]     In addition to the substantive deficiencies of Gemini's constructive trust claim, Gemini's assertion of a *claim* for constructive trust, which is not a standalone cause of action, is itself improper.  *See Chowaiki*, 593 B.R. at 718-19 ("A constructive trust is a remedy, not a cause of action.  The proper pleading [is] a claim for unjust enrichment, with the requested relief of a constructive trust."); *see also Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 220 (S.D.N.Y. 2018) ("In any event, since courts have held that a constructive trust is a 'remedy' and not 'the basis for a separate cause of action,' this claim is dismissed without prejudice.").

[10]     The Additional GBTC Shares were commingled with GGC's other GBTC holdings at Continental such that the Additional GBTC Shares are not identifiable, further counseling against imposition of a constructive trust.  *See, e.g., In re Dreier LLP*, 429 B.R. 112, 136-38 (Bankr. S.D.N.Y. 2010).

is necessary to impose the remedy of constructive trust, is precluded when the rights of the parties are governed by a contract. *See First Central Insurance Co. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 213 (2d Cir. 2004) ("[W]e conclude that this principle—that the existence of a written agreement precludes a finding of unjust enrichment—also applies to constructive trust claims."); *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 235 (E.D.N.Y. 2013) ("It is well established that the existence of a contract precludes a claim for a constructive trust."); *Soroof Trading Dev. Co. Ltd. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 514 (S.D.N.Y. 2012) (holding that plaintiff had "no basis for relief under quasi-contractual remedies such as constructive trust" where the parties' "relationship was, at all relevant times, governed by a contract"). This is because equitable remedies, such as constructive trust, are only available where there is no adequate remedy available at law, and "where a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists." *First Cent.*, 377 F.3d at 215.

36. It is undisputed that the parties' rights and obligations with respect to the Additional GBTC Shares are governed by a valid contract—the Second Amendment—as Gemini itself acknowledges in the Complaint. *See* Compl. ¶¶ 39-42. Because the parties' rights with respect to the Additional GBTC Shares are governed by the Second Amendment, adequate remedies at law exist—namely a claim for contract damages—and Gemini's request for a constructive trust is barred.

**B.    The Debtors were not unjustly enriched.**

37. Although the existence of a governing contract alone is fatal to Gemini's request for imposition of a constructive trust, Gemini's claim also fails because it has not pleaded, and could not plead, facts to support any finding that GGC was unjustly enriched—the most important element of constructive trust. *See First Cent.*, 377 F.3d at 212 ("[Unjust enrichment] is the most

-17-

important [element] since 'the purpose of the constructive trust is prevention of unjust enrichment.'"); *Chowaiki*, 593 B.R. at 722 ("[T]he absence of unjust enrichment, standing alone, is fatal to a request for constructive trust . . . ."). A successful claim for unjust enrichment requires a plaintiff to establish the following: "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant[ ] to make restitution." *Chowaiki*, 593 B.R. at 720 (alteration in original).

38.     Here, Gemini alleges only in conclusory fashion that GGC "failed to deliver the Additional [GBTC Shares] to Gemini" and "w[as] unjustly enriched by their wrongful retention of the" Additional GBTC Shares. Compl. ¶ 84. Gemini fails to plead facts to support any inference that GGC's purported enrichment was *unjust*. *See, e.g., In re Hydrogen, LLC*, 431 B.R. 337, 359 (Bankr. S.D.N.Y. 2010) (dismissing unjust enrichment claim where the complaint "d[id] not adequately explain factually how 'equity and good conscience militate against' allowing Defendants to retain such payments"). This pleading failure alone requires dismissal of the constructive trust claim.

39.     In a broader sense, the argument that GGC was unjustly enriched here is illogical. Even if GGC had pledged the Additional GBTC Shares, transfer of the Additional GBTC Shares would have plainly been an avoidable preference under section 547 of the Bankruptcy Code, as set out in the Debtors' counterclaims filed contemporaneously herewith. GGC was not enriched by retaining the Additional GBTC Shares—which it would have been entitled to claw back pursuant to section 547 of the Bankruptcy Code even if it had transferred the shares to Gemini— and certainly not unjustly so.

40.     In any case, under well-established law in this Circuit, the fact that GGC retained the Additional GBTC Shares is not, without more, unjust. *See First Cent.*, 377 F.3d at 218 ("[T]he

law is adamant.  Enrichment alone will not suffice to invoke the remedial powers of a court of

equity." (quoting *McGrath v. Hilding*, 41 N.Y.2d 625, 629 (1977)).  Here, Gemini has alleged no

facts in support of its conclusory assertion that GGC's retention of the Additional GBTC Shares

is unjust, and courts have found that "retention by [a] bankruptcy estate of assets that, absent

bankruptcy, would go to a particular creditor is not inherently unjust."  *In re Ades & Berg Grp.*

*Inv'rs*, 550 F.3d 240, 244 (2d Cir. 2008);  *cf. In re Rickel & Assocs., Inc.*, 272 B.R. 74, 97 (Bankr.

S.D.N.Y. 2002) (declining to dismiss an unjust enrichment claim where debtor plausibly asserted

that "they were defrauded into selling to the defendants securities worth nearly $21 million for less

than $4 million").

41.    Moreover, in the bankruptcy context, there are "special considerations" with

respect to allegations of unjust enrichment that separately warrant dismissal here.  *First Cent.*, 377

F.3d at 217 (cautioning that, by "creating a separate allocation mechanism outside the scope of the

bankruptcy system, the constructive trust doctrine can wreak . . . havoc with the priority system

ordained by the Bankruptcy Code"); *see also In re Ades & Berg Grp. Invs.*, 550 F.3d at 245 ("The

reasoning of First Central is dispositive as to [a claim for] unjust enrichment.").  Thus, the third

element of unjust enrichment is typically missing in bankruptcy because, absent unique

circumstances, there is no "substantial reason" to require a debtor to make restitution of estate

property to an individual creditor.  *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,

654 B.R. 224, 237 (Bankr. S.D.N.Y. 2023) ("[C]onstructive trusts are anathema to the equities of

bankruptcy since they take from the estate, and thus directly from competing creditors, and not

from the offending debtor." (internal citation omitted)); *see also In re Dreier, LLP*, 429 B.R. 112,

137 (Bankr. S.D.N.Y. 2010) ("Because the constructive trust in bankruptcy harms other creditors

rather than the debtor, the equities will support the imposition of a constructive trust under the

common law and do not necessarily support imposition of the same constructive trust in bankruptcy.").

42.     Here, Gemini's complaint does not support an inference that "equity and good conscience" require a constructive trust to prevent unjust enrichment of the bankruptcy estate. *See, e.g., In re Hydrogen, LLC*, 431 B.R. 337, 359 (Bankr. S.D.N.Y. 2010) (dismissing unjust enrichment claim where the complaint "d[id] not adequately explain factually how 'equity and good conscience militate against' allowing [d]efendants to retain such payments").  Gemini's constructive trust claim would require GGC to relinquish property, which would otherwise be used to satisfy the claims of all unsecured creditors on a ratable basis, in favor of a single creditor. Courts applying the Second Circuit's reasoning in *First Central* have found that such circumstances do not support the remedy of constructive trust as a matter of law.  *See, e.g.*, *Chowaiki*, 593 B.R. at 720 (granting motion to dismiss constructive trust claim, finding that "there is no unjust enrichment because the estate is not 'unjustly' enriched" and "pleadings do not demonstrate a 'substantial reason' for the Court to allow him to remove the Wired Funds from the bankruptcy estate, at the expense of other creditors"); *In re Bennett Funding Grp., Inc.*, No. 6-CV-1390 (LEK), 2007 WL 2042498, at *5 (N.D.N.Y. July 11, 2007), aff'd sub nom. *In re Ades & Berg Grp. Invs.*, 550 F.3d 240 (2d Cir. 2008) (holding the third element of unjust enrichment not met because "the equities at issue are significantly different when a claimant seeks to impose a constructive trust on proceeds held by a bankruptcy trustee for distribution to all similarly situated unsecured creditors" and "[the plaintiffs] do not have a sole interest in the proceeds at issue"); *see also In re Dreier LLP*, 429 B.R. at 136-38 (denying request for constructive trust where claimant was similarly situated to other defrauded claimants).

**C.**   **There was no fiduciary or confidential relationship between Gemini and the Debtors.**

43.     The parties also did not have a fiduciary or confidential relationship sufficient to support imposition of a constructive trust.  Gemini baldly asserts that "[t]he relationship among Gemini, Earn Users, and GGC constitutes a confidential and/or fiduciary relationship," Compl. ¶ 81, but provides no detail to support that allegation.  Nor can it, because the plain language of the MLAs expressly establishes otherwise, stating clearly that "[t]he other Parties[11] are not acting as a fiduciary for or an advisor to it in respect of any Loan."  Compl. Ex. 2, MLAs § V(j).  This contractual agreement is binding on Gemini and bars allegations to the contrary.

44.     In any case, there are no other characteristics of the parties' relationship or transactions that would give rise to a fiduciary or other special relationship sufficient to warrant a constructive trust, even if the other requirements were met.  The parties had a contractual relationship under the MLAs and Second Amendment, and engaged in arms' length lending transactions, which relationship alone is insufficient to give rise to a fiduciary or confidential relationship.  *See* Compl. Ex. 2, MLAs § XXIV ("The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel"); *see also New York v. Matamoros (In re Matamoros)*, 605 B.R. 600, 608 (S.D.N.Y. 2019) ("Even supposing that a 'contractual relationship imposed a duty to act . . .' no constructive trust will be found when the relationship is 'not marked by the unique degree of trust and confidence typically characteristic of a fiduciary relationship.'"); *see also Chowaiki*, 593 B.R. at 722 ("'Generally, an arm's length business transaction, even those where one party has superior bargaining power, is not enough to give rise to a fiduciary relationship.'" (quoting

---

11      The Parties, as defined in the MLAs, includes GGC, Gemini, and an individual Earn User.

*Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009)); *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993) ("[T]he mere fact that a corporation has borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary."). The constructive trust claim must be dismissed for this independent reason. However, should the Court find that Gemini has adequately pleaded the existence of a fiduciary or confidential relationship between Gemini and the Debtors, the Debtors reserve the right to seek to avoid the pledge of the August 2022 Collateral and seek the return of the GBTC on the basis that it was a preferential transfer to an insider within one year of the Debtors' filing for bankruptcy.

### D.    There was no transfer of the property at issue in reliance on a promise.

45.    "A constructive trust is imposed on sums transferred to a fiduciary in reliance on a promise by which he or she is unjustly enriched." *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 669 (S.D.N.Y. 2007) (determining that "plaintiff [was] not entitled to a constructive trust" over funds separate from those allegedly transferred by plaintiff to defendant). Such a remedy is most appropriately requested and imposed with respect to the assets that a plaintiff transferred in reliance on defendant's promise, or with respect to property that the plaintiff's transfer of assets was ultimately used to acquire. *See, e.g., Sharp v. Kosmalski*, 351 N.E.2d 721, 722 (N.Y. 1976) (reversing lower court's dismissal of plaintiff's request for imposition of a constructive trust over "property transferred to defendant on the ground that the retention of the property . . . was in violation of a relationship of trust and constituted unjust enrichment"); *Fairfield Fin. Mortg. Group, Inc. v. Luca*, 584 F. Supp. 2d 479, 485-86 (E.D.N.Y. 2008) (declining to dismiss request for imposition of a constructive trust over property that defendant purchased using funds that the plaintiff transferred to it in reliance on defendant's promise to use the funds for a different purpose). In contrast, Gemini seeks imposition of a constructive trust over (i) assets that Gemini did not

transfer to GGC in reliance on a promise and (ii) assets that were not acquired with any property that Gemini did transfer.

## **CONCLUSION**

For the foregoing reasons, GGC respectfully request that the Court dismiss Counts II, III, and IV of the Complaint, and Holdco and GAP respectfully request that the Court dismiss the Complaint in its entirety.

Dated: November 21, 2023
      New York, New York

Respectfully submitted,

*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Defendants*