Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Defendants and
Counterclaim Plaintiffs*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>      Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL) |
| GEMINI TRUST COMPANY, LLC, for itself and as agent on behalf of the Gemini Lenders,<br><br>      Plaintiff,<br><br>      v.<br><br>GENESIS GLOBAL CAPITAL, LLC, GENESIS GLOBAL HOLDCO, LLC, and GENESIS ASIA PACIFIC PTE. LTD.,<br><br>      Defendants and<br>      Counterclaim Plaintiffs. | Adv. Proc. No. 23-01192 (SHL) |

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, 38th Floor, New York, NY 10007.

**OPPOSITION OF DEFENDANTS AND
COUNTERCLAIM PLAINTIFFS TO PLAINTIFF'S
MOTION TO DISMISS COUNTERCLAIMS I AND III IN THEIR ENTIRETY AND
COUNTERCLAIM VII INSOFAR AS IT PERTAINS TO THE AUGUST 2022 COLLATERAL**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ..................................................................................... 4

I.      The Gemini Earn Program ........................................................................ 4

II.     The Security Agreement Between GGC and Gemini .............................. 5

III.    First Amendment to the Security Agreement .......................................... 6

IV.     Purported Foreclosure of the August 2022 Collateral ........................... 7

V.      Events Following Gemini's Purported Foreclosure ................................ 8

ARGUMENT ......................................................................................................... 9

I.      GGC sufficiently pled facts to support a facially plausible claim
        that Gemini did not foreclose on the August 2022 Collateral. .............. 9

        a.      GGC's allegations are sufficient to support
                Counterclaim I. ............................................................. 9

        b.      Gemini's attempt to recast its actions as a "credit
                bid" need not be considered. ........................................ 12

        c.      Gemini's  inconsistent positions with respect to the
                substance of GGC's Counterclaim I demonstrate
                that its arguments for dismissal are meritless. ............. 14

II.     Gemini's attempts to dismiss Counterclaim III are meritless and
        should be denied. .................................................................................. 15

        a.      The First Amendment comprised an obligation
                incurred by GGC for less than reasonably
                equivalent value and is therefore subject to
                avoidance under Section 548(a)(1)(B). ......................... 16

                i.      No transfer occurred in connection with the
                        First Amendment. ................................................. 16

                ii.     If the First Amendment did not comprise the
                        incurrence of an obligation by GGC, there

**Page**

must have been a transfer in connection with
the First Amendment, and if there was a
transfer, reasonably equivalent value was
not received for such transfer. ............................................... 18

b.    The Section 546(e) safe harbor does not apply to the
First Amendment. ............................................................... 21

i.    No "transfer" occurred under Section 546(e)
in connection with the First Amendment. .......................... 21

ii.    There is insufficient evidence in the record
to dismiss any Counterclaim on Section
546(e) safe harbor grounds. ................................................ 22

III.    Gemini's motion to dismiss Counterclaim VII should be denied
because Gemini's motion to dismiss Counterclaim III fails. ................................. 24

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barnhill v. Johnson*,
    503 U.S. 393 (1992) ................................................................. 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................. 9

*Fadem v. Ford Motor Co.*,
    352 F.Supp.2d 501 (S.D.N.Y.), *aff'd* 157 F. App'x 398 (2d Cir. 2005) ...................... 12

*Feltman v. Wells Fargo Bank, N.A. (In re TS Emp., Inc.)*,
    597 B.R. 494 (Bankr. S.D.N.Y. 2019) .............................................. 19

*Howard v. Howard*,
    740 N.Y.S. 2d 71 (N.Y. App. Div. 2002) ........................................... 19

*In re Applied Theory Corp.*,
    330 B.R. 362 (S.D.N.Y. 2005) ..................................................... 17

*In re Jesup & Lamont, Inc.*,
    507 B.R. 452 (Bankr. S.D.N.Y. 2014) .............................................. 18

*In re Lehman Bros. Holdings Inc.*,
    469 B.R. 416 (Bankr. S.D.N.Y. 2012) .............................................. 16

*In re MacMenamin's Grill Ltd.*,
    450 B.R. 414 (Bankr. S.D.N.Y. 2011) ............................................. 17, 21

*In re MarketXT Holdings Corp.*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ............................................. 19

*In re Pfeifer*,
    No. 12-13852 (ALG), 2013 WL 3828509 (Bankr. S.D.N.Y. July 23, 2013) ............... 17

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005) ....................................................... 17

**Page(s)**

*In re Silverman Laces, Inc.*
No. 01 Civ.6209 (DC), 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002) ...................... 17

*In re S.W. Bach & Co.*,
435 B.R. 866 (Bankr. S.D.N.Y. 2010) ........................................................... 18

*In re Trib. Co. Fraudulent Conv. Litig.*,
No. 11-md-2296 (RJS), 2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018), *aff'd*, 10 F.4th
147 (2d Cir. 2021) ...................................................................................... 16

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
263 B.R. 406 (S.D.N.Y. 2001) ..................................................................... 21

*Leibowitz v. Parkway Bank & Tr. Co. (In re Image Worldwide, Ltd.)*,
139 F.3d 574 (7th Cir. 1998) ...................................................................... 20

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
138 S.Ct. 883 (2018) ................................................................................. 22

*Phoenix Cos., Inc. v. Concentrix Ins. Admin. Sols. Corp.*,
554 F. Supp. 3d 568 (S.D.N.Y. 2021) ........................................................... 12

*Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC)*,
445 B.R. 206 (Bankr. S.D.N.Y. 2011) ........................................................... 20

*Securitas Elec. Sec., Inc. v. DeBon*,
20-cv-5323 (CM) (KNF), 2021 WL 965382 (S.D.N.Y. Mar. 15, 2021) ................... 12

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs., Ltd.)*,
337 B.R. 791 (Bankr. S.D.N.Y. 2005) ........................................................... 20

*Solomon v. Stillwater Nat'l Bank & Tr. Co. (In re Solomon)*,
299 B.R. 626 (B.A.P. 10th Cir. 2003) ........................................................... 20

## Rules and Statutes

Fed. R. Civ. P. 12(b)(6) ................................................................... *passim*

11 U.S.C. § 548 ............................................................................. *passim*

15 U.S.C. § 78cc ........................................................................... 11

15 U.S.C. § 78o ............................................................................ 11

**Page(s)**

15 U.S.C. § 80b–3(a) ............................................................................................ 11

N.Y. UCC § 9–610................................................................................................ 7, 10, 11

N.Y. UCC § 9–611................................................................................................ 10

N.Y. UCC § 9–615(a) ......................................................................................... 5

**Other Authorities**

Bankruptcy Code Section 544 ............................................................................ 17

Bankruptcy Code Section 546 .......................................................................... *passim*

Bankruptcy Code Section 547 ............................................................................ 7

Bankruptcy Code Section 548 .......................................................................... *passim*

## PRELIMINARY STATEMENT[1]

1.      Gemini seeks to dismiss GGC's Counterclaims I and III on the grounds that Counterclaim I is supported by insufficient factual allegations, and Counterclaim III fails as a matter of law.[2]  In both cases, Gemini's arguments are belied by the pleadings themselves, which allege facts that amply support GGC's claims, which claims are sufficient as a matter of law and which require factual and expert discovery to resolve, in which discovery the parties are already actively engaged.

2.      GGC's Counterclaim I seeks a declaratory judgment that Gemini did not foreclose on the August 2022 Collateral.  This is a mirror image of Count I of Gemini's Complaint, which seeks a declaratory judgment that it is entitled to set off the proceeds of the purported foreclosure— which relief would necessarily require a finding by this Court regarding whether a foreclosure took place.  Gemini has not moved for judgment on the pleadings or any other summary disposition of Count I of its Complaint, and thus appears to concede that its parallel companion claim requires discovery.  As a result, the parties will proceed to discovery regarding whether any foreclosure took place, regardless of the Court's disposition of GGC's Counterclaim I at this stage.  In this light, much like Gemini's quixotic effort to dismiss GGC's Counterclaim IV and VI concerning the Additional GBTC Shares, the Motion with respect to Counterclaim I serves no purpose other than for Gemini to get another bite at advancing its arguments, as the Court will of necessity resolve the foreclosure question in the context of Count I of Gemini's Complaint.

---

[1]      Capitalized terms used in this Preliminary Statement shall have the meanings ascribed to them below herein.  Capitalized terms not otherwise defined in this brief  shall have the meanings ascribed to them in the *Answer, Affirmative Defenses, and Counterclaims of Genesis Global Capital, LLC, to the Complaint* (ECF No. 10) (the "GGC Answer").

[2]      Gemini also seeks to dismiss Counterclaim VII to the extent it pertains to the August 2022 Collateral, which is the subject of Counterclaim III.  To the extent Counterclaim III survives Gemini's motion to dismiss, so must Counterclaim VII.

3.      In any event, GGC's Counterclaim I is more than supported by the facts alleged.
GGC's allegation is simple:  Gemini did not foreclose on the August 2022 Collateral.  Gemini took
no actions that would have constituted a legal foreclosure, and it took no actions that would suggest
that a foreclosure took place, beyond the transmission of a cursory, after-the-fact notice to GGC.
Rather, it has simply held onto the August 2022 Collateral, just as it did before its purported
foreclosure.  These allegations are plainly sufficient to support GGC's claim for a declaratory
judgment that no foreclosure took place.  Indeed, given that GGC alleges that, as *factual* matter,
the actions constituting a foreclosure did not happen, it is difficult to imagine what further
allegations could possibly be required to support a claim that a foreclosure, as a *legal* matter, did
not occur.

4.      GGC's Counterclaim III, which seeks avoidance of the First Amendment as a
constructive fraudulent conveyance, easily survives Gemini's motion to dismiss.  In support of this
claim, GGC alleges that, by the First Amendment, GGC agreed to extend the return date of the
August 2022 Collateral indefinitely, eliminating the Security Agreement's prior unconditional
requirement that Gemini return the collateral on November 15, 2022 regardless of whether the
obligations that the August 2022 Collateral secured had been discharged.  GGC also alleges that
no consideration was given by Gemini in exchange for this agreement by GGC.  Moreover, Gemini
has admitted that GGC was insolvent as of the date of the First Amendment.

5.      At the outset, the First Amendment cannot be properly understood to have involved
a transfer by GGC in exchange for reasonably equivalent value, because the First Amendment
involved no transfer at all.  The constructive fraudulent conveyance sought to be avoided is the
agreement by GGC to continue the term of its pledge indefinitely, which was the incurrence of an
obligation, but not a transfer:  no property changed hands or was pledged as a result of the First

Amendment. Nothing at all took place that could be considered, legally or even colloquially, to be a "transfer" for purposes of Sections 546(e) and 548. Furthermore, even if GGC had made a "transfer" in connection with the First Amendment for purposes of Section 548, no consideration was received in exchange, and zero consideration is necessarily less than "reasonably equivalent value" for purposes of Section 548(a)(1)(B). To the extent Gemini contends that it agreed to a weeks' long forbearance from termination of the Gemini Earn Program and that such forbearance constituted reasonably equivalent value, the Court would require factual and expert submissions to resolve both whether any such forbearance was agreed in exchange (as the agreement conspicuously does not contain any such language) and whether it amounted to reasonably equivalent value.

6.     Finally, Gemini argues that the Section 546(e) safe harbor bars GGC's Counterclaim III. This fails on the basis of the statutory text: Section 546(e) shields only *transfers* from avoidance under section 548, and does not apply to incurrences of *obligations*, of which Section 548 expressly permits avoidance.

7.     On all of the above points, Gemini's own arguments raise points of factual dispute that underscore the need for discovery to determine the evidence and submissions relevant to both claims. For this reason, and because the facts alleged in support of GGC's Counterclaim I are clearly sufficient to support the relief sought, and GGC's Counterclaim III clearly constitutes a claim on which relief can be granted, Gemini's Motion to Dismiss should be denied and the parties should continue discovery.[3]

---

[3]     It bears noting that there will be virtually no savings or efficiency through resolution of Counterclaims I and III through Gemini's motion to dismiss, where the Scheduling Order provides for a hearing on such motion to dismiss no earlier than February 15, 2024, while fact discovery is set to close just a week later, on February 23, 2024.

## STATEMENT OF FACTS[4]

### I.   The Gemini Earn Program

8.      Gemini Earn was an investment program offered to Gemini users who custodied their digital assets on Gemini's cryptocurrency platform (the "Gemini Earn Program").  Under the Gemini Earn Program, participants (the "Earn Users") could choose to loan the digital assets they placed with Gemini to GGC in return for a fee, with Gemini acting as custodian and agent to the Earn Users in certain respects.  Certain triparty Master Loan Agreements ("MLAs") between individual Earn Users, as lenders, GGC, as the borrower, and Gemini, as custodian and authorized agent on behalf of an Earn User, in part governed this lending.  Under the Gemini Earn Program and a side letter between GGC and Gemini (the "Side Letter"), GGC periodically provided Gemini with the terms of the loans it was willing to enter into as well as a maximum amount of digital assets it was willing to borrow pursuant to those terms and had an obligation to accept loans up to that maximum amount.  Gemini would then provide such terms to Earn Users, who could make decisions about whether to enter into loans subject to those terms.

9.      Consistent with industry practice, many of these loans were open term loans, meaning that GGC could repay a loan in full or in part and the Earn Users could "call" (demand repayment) under the loans in whole or in part at any point in time.  Upon an Earn User call under a loan, GGC would have up to three business days during which to pay.

10.     Neither the MLAs, the Side Letter, nor any other organizing documents of the Gemini Earn Program required GGC to post or pledge assets as collateral to secure its obligations.

---

[4]      This Statement of Facts is substantially similar to the recitation in GGC's Answer—save for GGC's Answer's inclusion of facts regarding the Second Amendment to the Security Agreement, which is not relevant to this Motion—and has been included here for the Court's convenience.  *See* GGC Answer ¶¶ 15–43.

## II.      The Security Agreement Between GGC and Gemini

11.      In August 2022, Gemini sought collateral from GGC as security for Earn Users' loans to GGC.  On August 15, 2022, GGC entered into a Security Agreement with Gemini as agent for the Earn Users pursuant to which GGC pledged the August 2022 Collateral to Gemini for the benefit of the Earn Users to secure certain of GGC's obligations under the Gemini Earn Program (the "Security Agreement").  *See* Complaint, Ex. 1, Security Agreement.

12.      Section 2 of the Security Agreement provides that shares of GBTC are not pledged by GGC until transferred by GGC to Gemini:

> **Section 2**. The Pledge. As security for the prompt payment and performance in full when due (whether at stated maturity, by acceleration, or otherwise) of all liabilities and obligations of the Pledgor under the Master Loan Agreements, whether now existing or hereafter arising, whether or not mature or contingent (the "Secured Obligations"), the [GGC] hereby pledges, assigns, and grants to the [Gemini], for the benefit of [Gemini] and the [Earn Users], a security interest in all of the [GGC's] right, title, and interest in and to *all property from time to time transferred by or on behalf of [GGC] to or for the benefit of [Gemini] or the [Earn Users] in connection with this Agreement or any Master Loan Agreement, including without limitation all shares of and interests in Grayscale Bitcoin Trust credited to the GTC Account* (collectively, the "Collateral").

Complaint, Ex. 1, Security Agreement at 2 (emphasis added).

13.      Section 3(b) of the Security Agreement meanwhile provides how the proceeds of any collateral sold by Gemini after an event of default by GGC are to be distributed:

> The proceeds of any collection, sale, liquidation, or other realization of all or any part of the Collateral pursuant hereto shall be applied:
>
> (i)      First, to the payment of the costs and expenses of such collection, sale, or other realization, including reasonable out-of-pocket costs and expenses of [Gemini] and the reasonable fees and expenses of its agents and counsel;
>
> (ii)      Next, *to the payment and satisfaction in full of the Secured Obligations . . . .*

Complaint, Ex. 1, Security Agreement at 2–3 (emphasis added).  Section 3(b) of the Security Agreement mirrors how such proceeds are to be distributed under the N.Y. UCC.  See N.Y. UCC § 9–615(a).

-5-

14.     Finally, prior to execution of the First Amendment, Section 7(b) the Security Agreement unconditionally required Gemini to return the August 2022 Collateral to GGC on or before November 15, 2022, irrespective of whether obligations remained outstanding to Earn Users under the Earn User Program:

> **Termination**. *Upon the earlier of (i) November 15, 2022 and (ii) the date on which all Secured Obligations shall have been paid in full, this Agreement shall automatically terminate*, and [Gemini] shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of [GGC], and the security interest, lien, pledge and assignment of the Collateral hereunder, together with all rights and powers of [Gemini] hereunder, shall immediately be released and deemed to be void.

Complaint, Ex. 1, Security Agreement at 5 (emphasis added).

15.     On or about August 18, 2022, GGC transferred the August 2022 Collateral to Gemini.

### III.     First Amendment to the Security Agreement

16.     In the months following the execution of the Security Agreement, GGC faced increasing financial difficulties and demands from counterparties, including Gemini. Specifically, following extensive back and forth, on October 13, 2022, Gemini provided GGC 30 days' notice of its intention to terminate the Gemini Earn Program.

17.     Following further negotiations between GGC and Gemini, on November 7, 2022, GGC and Gemini entered into an amendment to the Security Agreement, which obligated GGC to extend its term to the indefinite date on which GGC paid what it owed under the Gemini Earn Program in full (the "First Amendment").

18.     In relevant part, the termination provision of the Security Agreement was amended and restated as follows:

**Termination**. ~~Upon the earlier of (i) November 15, 2022 and (ii) the date on which all Secured Obligations shall have been paid in full, this Agreement shall automatically terminate, an Agent~~ *Upon the date on which all Secured Obligations shall have been paid in full and the Master Loan Agreements are terminated in accordance with their terms, this Agreement shall automatically terminate,* and [Gemini] shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of [GGC], and the security interest, lien, pledge and assignment of the Collateral hereunder, together with all rights and powers of [Gemini] hereunder, shall immediately be released and deemed to be void.

Complaint, Ex. 3, First Amendment at 1 (emphasis added).

19.     The First Amendment did not alter any other relevant portions of the Security Agreement.

20.     No consideration was provided to GGC in exchange for incurring the obligation to extend the term of the Security Agreement to the indefinite date on which GGC paid what it owed under the Gemini Earn Program.

21.     GGC was insolvent at the time of its entry into the First Amendment.  Gemini also concedes GGC was "massively insolvent" at this time.  Complaint at ¶ 24.[5]

### IV.    Purported Foreclosure of the August 2022 Collateral

22.     On November 16, 2022, GGC suspended withdrawals under the Gemini Earn Program.

23.     That same day, the General Counsel of Gemini informed GGC via e-mail that it had foreclosed on the August 2022 Collateral through "a private sale to us in accordance with Section 9–610 of the Uniform Commercial Code at the market price of $9.20 per share as of 4:00 PM EST for total proceeds of $284,333,194.40" and stated that "[s]uch amount, less the cost and

---

[5]     *See* Gemini Responses and Objections to Debtors' First Requests for Admission at 7. (Gemini "[a]dmit[s] that GGC was "insolvent" between October 22, 2022 and January 20, 2023 as that term is used in Section 547(b)(3) of the Bankruptcy Code.")

expenses of foreclosure, will be applied as set forth in Section 3(b) of the Security Agreement to the Secured Obligations." Compl. ¶ 44. The plain reading of the reference to a "private sale to us" was that they were acting in their principal capacity, and never gave any indication that they were making their purchase as an agent for the Earn Users. Gemini also gave no indication that its purported sale was a credit bid on behalf of the Earn Users. *See* Gemini Mot. to Dismiss Mem. of L. ("Gemini Mem.") at 7.

24.    Gemini claims to have priced this private sale by reference to the then-OTCQX closing market price of $9.20 per share.

25.    Gemini has not distributed the August 2022 Collateral or any cash proceeds of its purported foreclosure to Earn Users, as required by Section 3(b)(ii) of the Security Agreement. Gemini also has not provided GGC with any calculation of the remaining obligations to Earn Users showing any purported application of proceeds.

26.    Instead, Gemini has simply continued to hold the August 2022 Collateral, just as it held such collateral prior to its purported foreclosure.

**V.    Events Following Gemini's Purported Foreclosure**

27.    Since November 2022, Gemini and the Debtors have been in ongoing discussions regarding potential out-of-court or in-court restructurings of the Debtors' liabilities to Earn Users.

28.    On May 22, 2023, Gemini filed the Master Claim for $1,122,467,217.65, plus certain other unliquidated amounts, asserting that it has secured party and/or setoff rights with respect to, among other things, the proceeds of foreclosure of the August 2022 Collateral and the value of the Additional GBTC Shares. The amount Gemini asserts in its Master Claim is not offset

by the proceeds of its alleged foreclosure, indicating that no application of such proceeds occurred.[6]

## ARGUMENT

**I.    GGC sufficiently pled facts to support a facially plausible claim that Gemini did not foreclose on the August 2022 Collateral.**

### a.    GGC's allegations are sufficient to support Counterclaim I.

29.    To survive a motion to dismiss, parties need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

30.    GGC's allegations in support of its first counterclaim, *see* GCC Answer ¶¶ 44–50 ("GGC's Counterclaim I") are that: (i) no private sale ever occurred, *see* GGC Answer ¶¶ 2, 3, 46–50, and (ii) Gemini took no further action in furtherance of its purported foreclosure, such as distribution of the collateral or the cash proceeds of the putative sale of the GBTC shares, that would be indicative of a valid foreclosure, *see* GCC Answer ¶¶ 44–50.  These allegations, which must be accepted as true at this stage, sufficiently support a plausible claim for relief.

31.    Gemini's sole response to GGC's allegation that no private sale ever occurred is its novel "credit bid" theory, *see* Gemini Mem. at 11,[7] which, for the reasons set forth above, should be disregarded.  And Gemini's sole response to GGC's allegation that it took no further action in furtherance of its purported foreclosure is to claim that GGC's allegations are *non sequiturs*.  *See* Gemini Mem. at 12.  But, far from being *non sequiturs*, GGC's allegations regarding Gemini's

---

[6]    Gemini's claim for the full amount of the Earn Users' outstanding loans also undermines their accusation that GGC effectively seeks to take advantage of "which way the financial wind [is] blowing" to "grab value from the Earn Users."  Gemini Mem. at 2–3.  Indeed, Gemini's filing of the full claim amount effectively constitutes an attempt to do the same thing, creating the option for Gemini to assert a greater unsecured claim if the value of the August 2022 Collateral had dropped during the Debtors' bankruptcy proceedings.

[7]    The "Gemini Memorandum" refers to the *Memorandum of Law in Support of Gemini Trust Company, LLC's Motion To Dismiss Counterclaims I and III in Their Entirety and Counterclaim VII Insofar as it Pertains to the Initial Collateral* (ECF No. 24).

inaction with respect to the putative proceeds of its purported foreclosure are highly supportive of GGC's allegation that no private sale, and thus no foreclosure, occurred. Had Gemini intended to actually foreclose on the August 2022 Collateral via private sale "to us," there are two methods by which it could have validly done so.

32.    <u>Method 1</u>:  Gemini (as seller, acting in its capacity as secured party and agent to the Earn Users) could have sold the collateral to itself (as purchaser, acting in its principal capacity). *See* Compl. ¶ 43.  This is the more natural reading of Gemini's purported statement that it engaged in a "private sale to us." Compl. ¶ 44.  In this scenario, Gemini (acting in its capacity as secured party and agent to the Earn Users) would have been required to engage in a sale process that satisfied the requirements of N.Y. UCC § 9–610 that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."  In connection with such a commercially reasonable sale process, Gemini (acting in its capacity as secured party and agent to the Earn Users) would have had to identify Gemini (acting in its principal capacity) as the purchaser of the collateral.  Then, Gemini (acting in its principal capacity) would have been required to pay the purchase price for the collateral to Gemini (in its capacity as secured party and agent to the Earn Users), which in turn would have been required, under N.Y. UCC § 9–611 and the Security Agreement, to distribute the proceeds of the sale to the Earn Users.  GGC alleges that none of these things happened, and Gemini admits that at least some of them, including the distribution of proceeds, did not occur.  Gemini offers a purported explanation (which the Debtors are entitled to explore in discovery) for *why* it did not distribute the putative proceeds, *see* Compl. ¶ 57, but this explanation smacks of after-the-fact rationalization; the fact that the proceeds of the purported private sale were never distributed strongly suggests that no sale, and therefore no foreclosure, ever occurred.  Gemini has since taken

-10-

the position that the Earn Users are entitled to the appreciation in the value of the August 2022 Collateral since the time of the alleged private sale, which is entirely inconsistent with Method 1. *See* Gemini Mem. at 2 ("[T]he Earn Users are entitled to the benefit of any post-foreclosure appreciation in the value of the Initial Collateral—just as any secured creditor would benefit from the appreciation in the value of property it owns following foreclosure.").[8]

33.  <u>Method 2</u>:  Gemini (as seller, acting in its capacity as secured party and agent to the Earn Users), alternatively could have sold the collateral to the Earn Users, with Gemini effectuating the purchase as agent for the Earn Users.  Gemini Mem. at 3.  Under this scenario, which is the "credit bid" scenario that Gemini newly asserts, *id.*, Gemini (acting in its capacity as secured party and agent to the Earn Users) again would have been required to engage in a sale process that satisfied the requirements of N.Y. UCC § 9–610.  In connection with such a commercially reasonable sale process, Gemini (acting in its capacity as secured party and agent to the Earn Users) would have had to identify the Earn Users as the purchasers of the collateral.  Then, Gemini (acting as agent for the Earn Users) would have had to agree to reduce the Earn Users' claims against GGC in exchange for the GBTC shares.  Then, Gemini would have had to distribute the August 2022 Collateral to the Earn Users.  GGC does not allege that any of this took place, nor does Gemini, because it never happened.  Had it, Gemini could have been in violation or various state or federal securities or bank regulatory laws that require registration or authorization to

---

[8]     This is also inconsistent with Gemini's attempt to seek a declaratory judgment that it is entitled to set off what it characterizes as proceeds of its purported foreclosure on the August 2022 Collateral (*i.e.* the November 16, 2022 value of the August 2022 Collateral), rather than the current, dramatically appreciated value of the collateral. *See* Compl., Count I at ¶¶ 62–67 (the "<u>Gemini Set-Off Claim</u>").

purchase securities on behalf of others and which provide for transactions in violation of such laws to be void or voidable.[9]

34.    Gemini alleged in its Complaint that it foreclosed via Method 1, *see* Compl. ¶ 5, while GGC disputes that the alleged underlying actions ever took place, such that GGC is entitled to a judgment that no foreclosure took place as a matter of law.  There are no facts properly alleged in Gemini's Complaint one way or another in support of Gemini's new contention that it foreclosed via Method 2.  Thus, taking the facts pled by GGC as true, no private sale took place, therefore no foreclosure took place, and therefore GGC is entitled to a declaratory judgment so declaring.  The factual disputes between the parties only further undercut Gemini's argument that GGC's Counterclaim can be dismissed on the sufficiency of GGC's pleading, and support GGC's view that the parties must proceed to discovery.

   **b.  Gemini's attempt to recast its actions as a "credit bid" need not be considered.**

35.    In Gemini's Motion to Dismiss Counterclaims, it seeks for the first time to recast its actions concerning the August 2022 Collateral as akin to a credit bid by Gemini in its capacity as agent for the Earn Users, rather than as a private sale to itself in its principal capacity.  *See* Gemini Mem. at 10–11 and Compl. ¶ 5.  This new argument cannot form the basis for a dismissal of GGC's Counterclaim I.  *See Phoenix Cos., Inc. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 585 (S.D.N.Y. 2021) ("A court evaluates a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) using the same standard as a motion to dismiss a complaint….[and] must accept all well-pleaded facts as true and construe the answer and counterclaims in the light most favorable to the nonmoving party." (internal quotation omitted));

---

[9]        *See, e.g.*, 15 U.S.C. § 78o (generally requiring persons acting as securities brokers to register as such); 15 U.S.C. § 78cc (providing for contracts made in violation of the Exchange Act to be void).

*Securitas Elec. Sec., Inc. v. DeBon*¸ 20-cv-5323 (CM) (KNF), 2021 WL 965382, at *1 (S.D.N.Y. Mar. 15, 2021) (refusing to consider allegations not contained in the "four corners of the complaint"). *Cf. Fadem v. Ford Motor Co.*, 352 F.Supp.2d 501, 516 (S.D.N.Y.), *aff'd* 157 F. App'x 398 (2d Cir. 2005) ("It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs.").

36.     GGC has not alleged—and Gemini did not plead—that a "credit bid" took place in connection with any purported foreclosure. On this basis alone, Gemini's new "credit bid" concept is simply not germane to the Court's considerations of whether to dismiss GGC's Counterclaim I, which must be evaluated solely on the strength of GGC's factual allegations made in its Complaint in support thereof.

37.     Furthermore, this new characterization of the purported private sale as a credit bid is inconsistent with the facts that were alleged by *Gemini*, and with Gemini's claims in the Debtors' main chapter 11 cases. In order for Gemini's actions to have constituted a credit bid, it would have had to take title to the August 2022 Collateral on behalf of the Earn Users and reduce GGC's outstanding debt to the Earn Users by the purchase price of the collateral. The reduction of outstanding debt is an essential component of a credit bid, but Gemini alleges that it did *not* effectuate any such reduction. *See* Compl. ¶ 5 (alleging Gemini was "holding $284.3 million in proceeds from that foreclosure for the benefit of Earn Users."). Indeed, in the Debtors' chapter 11 proceedings Gemini submitted a claim on behalf of the Earn Users that reflected the full amount of GGC's indebtedness without any set-off, asserting separately a set-off right for the proceeds of its ostensible foreclosure. *See* Compl. ¶ 58. If it had truly effectuated a credit bid in November 2022, one would have expected for its claim in the Debtors' chapter 11 cases to have reflected the set-off already.

38.    As such, Gemini's "credit bid" theory cannot form the basis for dismissal of GGC's Counterclaim I at this stage, both because it is not among the allegations on which this Court must rely in considering the sufficiency of GGC's pleading, and because it is inconsistent with the facts as originally alleged (which inconsistency strongly suggests that discovery on the issue is necessary).

      **c.    Gemini's inconsistent positions with respect to the substance of GGC's Counterclaim I demonstrate that its arguments for dismissal are meritless.**

39.    Lastly, it must be noted that Gemini's motion to dismiss GGC's Counterclaim I serves no purpose, and is inconsistent with its pursuit of the Gemini Set-Off Claim (*i.e.* Count I of its own Complaint).  Even if Gemini were successful in dismissing GGC's Counterclaim I, such dismissal would have no practical effect on these proceedings, because GGC's Counterclaim I is a mirror image of the Gemini Set-Off Claim.  By that claim, Gemini seeks a declaratory judgment that it is entitled to set off what it characterizes as proceeds of a purported foreclosure on the August 2022 Collateral against its Master Claim in the Debtors' main chapter 11 proceedings.  In order to grant such a judgment, this Court would necessarily need to find that Gemini performed an actual and valid foreclosure on the August 2022 Collateral.  GGC's Counterclaim I, in turn, seeks a declaratory judgment that Gemini *did not* foreclose on the August 2022 Collateral (which, if granted, would bar Gemini's claim to a set-off right).

40.    Now, Gemini seeks to dismiss GGC's Counterclaim I without having moved for judgment on the pleadings or having sought any other summary disposition of the Gemini Set-Off Claim.  By not seeking summary disposition of its own claim, Gemini effectively concedes that discovery is required to determine whether an actual and valid foreclosure occurred.  On this point, GGC agrees.  Indeed, the parties are actively engaged in such discovery, with fact discovery set to

-14-

close on February 23, 2023.  Facts relevant to both claims include, but are not limited to, the

following:

- Facts concerning the flow of funds, source of funds, and authorization or direction (if any) by the Earn Users to Gemini as agent to effectuate a private sale.

- Facts concerning where and how the August 2022 Collateral was held, and whether and how the collateral, and/or the proceeds of any sale thereof, was reflected in Earn Users' accounts.

- Facts concerning Gemini's reporting and/or communications to the Earn Users regarding (i) its (newly asserted) purported decision to credit bid the Earn Users' claims and (ii) the amount of the Earn Users' claims following the purported credit bid.

- Facts concerning whether Gemini properly determined the price at which it purportedly sold the August 2022 Collateral to itself.

- Facts concerning whether Gemini provided notice to GGC, or to any party, prior to its purported foreclosure.

41.    These and other facts, once adduced through discovery, will show whether GGC's

factual allegations are true.  But Gemini's present argument—that GGC's claim should be

dismissed, while its own mirror-image claim should proceed to discovery—is inconsistent with its

own actions in this case and should be disregarded for this reason alone.

## II.    Gemini's attempts to dismiss Counterclaim III are meritless and should be denied.

42.    GGC's third counterclaim, GGC Answer ¶¶ 59–62 ("Counterclaim III"), seeks

avoidance of the First Amendment as constructively fraudulent pursuant to Section 548(a)(1)(B)

of the Bankruptcy Code, which allows a debtor to avoid any transfer or obligation incurred for

which it received "less than reasonably equivalent value in exchange" during a time in which it

was insolvent.  Section 548(d)(2)(A) defines "value" as "property, or satisfaction or securing of a

present or antecedent debt of the debtor."

-15-

43.     Gemini asserts that (i) the First Amendment constituted a transfer for reasonably equivalent value on account of an antecedent debt, barring the application of Section 548, and (ii) the Section 546(e) safe harbor independently precludes avoidance.  These arguments fail on the plain language of the relevant sections of the Bankruptcy Code, the Security Agreement, and the First Amendment because (i) the First Amendment did not involve any transfer to secure an antecedent debt but rather the incurrence of an obligation by GGC for no consideration, and therefore less than reasonably equivalent value, (ii) Section 546(e)'s safe harbor is inapplicable where, as here, no transfer occurred, and (iii) even if a transfer had occurred (which it did not), further factual development would be necessary to determine whether the elements of the safe harbor are satisfied.  GGC's claims are therefore sufficient as a matter of law and Gemini's request to dismiss Counterclaim III should be denied.

> **a.   The First Amendment comprised an obligation incurred by GGC for less than reasonably equivalent value and is therefore subject to avoidance under Section 548(a)(1)(B).**
>
> **i.  No transfer occurred in connection with the First Amendment.**

44.     Gemini's argument that the First Amendment cannot be avoided under Section 548(a)(1)(b) because it purportedly involved a "a transfer to further secure the same antecedent debts" that were secured pursuant to the original Security Agreement, *see* Gemini Mem. at 15, contains a basic inaccuracy.  Gemini acknowledges that the First Amendment merely "extended the termination of the Security Agreement," *id.* at 13, but does not allege, or argue, that any money or property changed hands or was pledged as a result of the First Amendment, which is the essence of a "transfer."  *See Barnhill v. Johnson*, 503 U.S. 393, 400–01 (1992) (" [A] transfer ... includes "every mode ... absolute or conditional ... of disposing of or parting with property or with an interest in property." (citing 11 U.S.C. § 101(54))); *In re Lehman Bros. Holdings Inc.*, 469 B.R. 416, 444 (Bankr. S.D.N.Y. 2012) ("[T]he incurrence of an obligation by itself does not constitute

a mode of 'disposing or parting with' property." (citing 11 U.S.C. § 101(54))).  Instead, by the

First Amendment, GGC agreed that its already-pledged August 2022 Collateral would be posted

past the date previously agreed for its return—in other words, it incurred a further obligation in

connection with a transfer of collateral that had already happened.  *See In re Trib. Co. Fraudulent

Conv. Litig.*, No. 11-md-2296 (RJS), 2018 WL 6329139, at *14 (S.D.N.Y. Nov. 30, 2018), *aff'd*,

10 F.4th 147 (2d Cir. 2021) ("[F]or purposes of Section 548, an 'obligation' is incurred when a

contract or agreement is formed.").  Courts consistently recognize, as does Section 548, the

distinction between an obligation incurred and a transfer.  *See In re MacMenamin's Grill Ltd.*, 450

B.R. 414, 429 (Bankr. S.D.N.Y. 2011) (explaining that under Sections 546(e) and 548(a)(1),

"[t]here clearly is a difference between making a transfer and incurring an obligation; otherwise,

the relevant statutory provisions would not have used both terms.").

       45.     Because GGC did not "transfer[] property to secure an antecedent debt" in

connection with the First Amendment, or indeed make any transfer at all, the cases Gemini cites

in support of its argument in this regard are inapposite.  *See* Gemini Mem. at 13.  In *In re Applied

Theory Corporation*, a debtor transferred a security interest in its assets to a lender in exchange for

forbearance on existing loans and the provision of a revolving credit agreement, and the court

considered whether that *transfer* (the pledge of the security interest) was subject to avoidance

under Section 548.  330 B.R. 362, 363–64 (S.D.N.Y. 2005).  Likewise, in *In re Pfeifer,* the debtors

transferred properties to a lender to secure existing and new loans, and there, too, the court

considered whether the *transfer* of property was subject to avoidance.  No. 12-13852 (ALG), 2013

WL 3828509, at *1–3 (Bankr. S.D.N.Y. July 23, 2013) (examining claim under Section 544(b) but

reasoning "many of the principles governing fraudulent conveyance law [under Sections 544(b)

and 548] are the same").  *In re Silverman Laces, Inc.* involved the imposition of a new lien on a

-17-

debtor's assets in exchange for the extension of new loans and agreement to forebear remedies on

existing loans, and the court found that the imposition of the new lien constituted a *transfer*.  No.

01 Civ.6209 (DC), 2002 WL 31412465, at *5–6 (S.D.N.Y. Oct. 24, 2002).  Finally, *In re Sharp*

*International Corporation* involved the *transfer* of fraudulently obtained funds to a lender.  403

F.3d 43, 53–54 (2d Cir. 2005).  Gemini cites no cases in which a court determines that an

agreement by which a party merely incurs an obligation to continue the existing pledge for a longer

term than was originally agreed—an obligation that called for no property to change hands, and

where no new pledge was made—somehow constitutes a "transfer" for purposes of Section 548,

and indeed GGC is aware of no such case.

> ### ii. If the First Amendment did not comprise the incurrence of an obligation by GGC, there must have been a transfer in connection with the First Amendment, and if there was a transfer, reasonably equivalent value was not received for such transfer.

46.     Section 548 provides for two actions by debtors that can be avoided:  "a[] transfer

. . . of an interest of the debtor in property" and "an[] obligation . . . incurred by the debtor."  11

U.S.C. § 548(a)(1).  To the extent that this Court finds that no "obligation" was incurred in

connection with the First Amendment, then GGC must have effectuated a "transfer" pursuant to

the First Amendment.  Even in this scenario, GGC would not have received "reasonably equivalent

value" for purposes of Section 548 in exchange because it did not receive *any* new value pursuant

to the First Amendment.  *See In re Jesup & Lamont, Inc.*, 507 B.R. 452, 470 (Bankr. S.D.N.Y.

2014) ("Where … a debtor receives no value for an alleged conveyance, a court may find that the

transfer was fraudulent, as a matter of law, as long as the other elements in § 548 are satisfied.");

*In re S.W. Bach & Co.*, 435 B.R. 866, 876 (Bankr. S.D.N.Y. 2010) ("[A] lack of any consideration

implies that there is no material issue of fact concerning whether the Debtor received 'less than

reasonably equivalent value' under section 548(a)(1)(B) …").  This is apparent in the plain

-18-

language of the First Amendment, which contains no mention of any consideration provided by Gemini, beyond a generic reference to "mutual promises herein contained."  *See* First Amendment at 1.

47.     Gemini's assertion, which comes for the first time in a footnote in its Memorandum of Law in support of its Motion to Dismiss, is that its agreement not to terminate the Earn Program "plainly" constituted consideration for the First Amendment, and that this should be considered "reasonably equivalent value" for purposes of Section 548(a)(1)(B).  Gemini Mem. at 13 n.7, 14. At the outset, there is no language to that effect in the First Amendment, nor any allegations in Gemini's Complaint or GGC's Answer, to that effect.  *See* First Amendment at 1–3 (including no description of any obligation undertaken by Gemini to forbear from terminating the Earn Program).  Gemini suggests that this Court look beyond the four corners of the First Amendment to understand the full scope of the agreement between the parties.  Not only is this type of extrinsic evidence only appropriate where the terms of a contract are ambiguous,[10] but at minimum, it is procedurally inappropriate in the context of a motion to dismiss.

48.     Gemini's assertion that its forbearance "plainly" constituted consideration for the First Amendment also has no basis in GGC's Counterclaims.   GGC alleges, in support of its Counterclaim III, that *no consideration* was provided by Gemini in exchange for GGC's agreement to extend its pledge.  GGC Answer ¶ 60.  As alleged by GGC, Gemini's provision of *zero* value cannot possibly constitute "reasonably equivalent value."  *See In re MarketXT Holdings Corp.*, 376 B.R. 390, 421 (Bankr. S.D.N.Y. 2007) (reasoning that "[s]ince no 'value' was received, the Debtor could not have received 'reasonably equivalent value'" under Section 548).

---

[10]     *See Howard v. Howard*, 740 N.Y.S. 2d 71, 71 (N.Y. App. Div. 2002) ("It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract …").

49.     Even assuming that GGC had effectuated a transfer pursuant to the First Amendment, and even if Gemini had provided consideration for such transfer in the form of forbearance (which agreement appears nowhere in the unambiguous language of the First Amendment), courts consistently hold that forbearance does not constitute reasonably equivalent value under Section 548.  *See Feltman v. Wells Fargo Bank, N.A. (In re TS Emp., Inc.)*, 597 B.R. 494, 528–30 (Bankr. S.D.N.Y. 2019) (holding that a debtor did not receive reasonably equivalent value from a bank in exchange for its payment of $4.1 million in credit facilities payments, even where such payments allowed the debtor to continue to borrow from the bank, where the bank retained the ability to terminate those facilities on 30 days' notice); *Solomon v. Stillwater Nat'l Bank & Tr. Co. (In re Solomon)*, 299 B.R. 626, 638 (B.A.P. 10th Cir. 2003) (holding that a bank's forbearance did not constitute reasonably equivalent value where no new funds were advanced in exchange for "a mortgage to the bank on all of the [debtor's] Commercial Property" and there was no change in the debtor's total liability to the bank); *Leibowitz v. Parkway Bank & Tr. Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 580 (7th Cir. 1998) ("[R]easonably equivalent value is something more than consideration to support a contract … and in the absence of countervailing factors, [an agreement to forbear] would not likely meet the higher standard." (citations omitted)).

50.     Finally, even if Gemini's purported consideration in the form of forbearance were to constitute "value" for purposes of Section 548, and was actually the bargained-for exchange (which is not apparent anywhere in the text of the First Amendment), the quantum of such value, and therefore the question of whether it was reasonably equivalent to the value provided by GGC (the quantum of which also would need to be fixed), both constitute factual questions that require fact and likely expert discovery.  *See Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005) ("[T]he question of 'reasonably equivalent value'

-20-

and 'fair equivalent' [under Section 548(a)(1)(B)] is fact intensive, and usually cannot be determined on the pleadings.").

51.      GGC's claim under Section 548 therefore does not "fail as a matter of law," and Gemini's motion to dismiss Counterclaim III should be denied.  *See Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 227 (Bankr. S.D.N.Y. 2011) (holding "the Trustee has adequately pled a lack of reasonably equivalent value with regard to both principal and fictitious profits for purposes of section 548(a)(1)(B) of the Code," noting "the Court need not make a finding as to the merits of these issues, as they are inappropriate for a motion to dismiss." (citations omitted)).

### b.   The Section 546(e) safe harbor does not apply to the First Amendment.

#### i.   No "transfer" occurred under Section 546(e) in connection with the First Amendment.

52.      While Section 548(a) allows a debtor to avoid "any transfer" *or* "any obligation . . . incurred by the debtor," the safe harbor to such avoidance actions articulated in Section 546(e) provides that a debtor "may not avoid a *transfer* made by or to (or for the benefit of)" a covered party in connection with a covered contract, omitting from the safe harbor all "obligations" that may be incurred and avoided under Section 548.  *See In re MacMenamin's Grill Ltd.*, 450 B.R. at 428–29 ("[Section 546(e)] does not, by its plain terms, extend the safe harbor to the trustee's avoidance of the incurrence of an obligation.").  This asymmetry is consistent with the objectives of the safe harbor, given that unwound transfers of covered financial instruments to or from covered institutions may create ripple effects in the financial system—the harm that the safe harbor seeks to avoid—where avoided obligations do not.  *See Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 477 (S.D.N.Y. 2001) ("[With Section 546(e)] Congress sought to prevent the ripple effect created by the insolvency of one commodity or security firm from

-21-

spreading to other firms and possibly threatening the collapse of the affected industry." (internal

quotations omitted) (citation omitted)).

53.     Section 546(e)'s applicability only to transfers, and not obligations, makes it wholly

unavailable here.  In its brief, Gemini conspicuously elides the fundamental question of whether

there was a transfer in connection with the First Amendment at all.  *See* Gemini Mem. at 15

("Insofar as the extension of the Security Agreement's termination provision is properly

understood to be a transfer at all . . ." ).  As discussed in ¶¶ 44–45 *supra*, no "transfer" took place,

GGC instead incurred an *obligation* to continue to post the August 2022 Collateral.  It is that

*obligation* that GGC seeks to avoid by its Counterclaim III, GGC Answer ¶ 60, and accordingly it

is that *obligation* the Court must focus on for purposes of determining whether the safe harbor

applies.  *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S.Ct. 883, 895–96 (2018) ("[T]he

focus of the [Section 546(e)] inquiry is on the transfer that the trustee seeks to avoid.").

54.     Given that the avoidance claim concerns an obligation, not a transfer, and the

Section 546(e) safe harbor by its plain terms applies only to transfers and not to obligations, the

Section 546(e) safe harbor is plainly inapplicable and Gemini's motion to dismiss on this basis

should be denied.

### ii.  There is insufficient evidence in the record to dismiss any Counterclaim on Section 546(e) safe harbor grounds.

55.     As an initial matter, in support of its argument that Section 546(e)'s safe harbor

precludes Counterclaim III, Gemini effectively repeats the argument made in its *Memorandum of

Law in Support of Gemini Trust Company, LLC's Motion to Dismiss Counterclaims IV and VI in

Their Entirety and Counterclaim VII Insofar as it Pertains to the Additional Collateral* (ECF No.

16).  GGC accordingly incorporates by reference herein its responsive arguments in its

*Consolidated (I) Reply Memorandum of Law in Support of Defendants' Motion To Dismiss and*

*(II) Opposition To The Plaintiff's Motion To Dismiss Counterclaims IV and VI in Their Entirety and Counterclaim VII Insofar as it Pertains to the Additional GBTC Shares* (ECF No. 22) (the "Consolidated Reply & Opposition"), except as otherwise noted and/or supplemented below.

56.     As GGC noted previously, the Section 546(e) safe harbor is a fact-driven affirmative defense and, as such, a motion to dismiss on this basis may only be granted if facts supporting the defense appear on the face of the complaint (which is Gemini's burden). Consolidated Reply & Opposition ¶ 56.    The Court heard argument on the Debtors' *Motion to Dismiss Counts II, III, and IV of the Complaint as to Genesis Global Capital, LLC and All Counts as to Genesis Global Holdco, LLC and Genesis Asia Pacific Pte. Ltd.* (ECF No. 9) and Gemini's *Motion to Dismiss Counterclaims IV and VI in their Entirety and Counterclaim VII insofar as it Pertains to the Additional Collateral* (ECF No. 15) on January 18, 2024, and (correctly) expressed skepticism that Gemini has met this burden.  *In re Genesis Global Holdco, LLC*, Case No. 23-10063, Jan. 18, 2024 Hr'g Tr. at 157:15–20 ("But for this, on a motion to dismiss…I take the allegations as true, but to rely on the safe harbors, I need to meet certain requirements, and this can get very tricky.  I've had to do this in other cases in a very thorny record.").  Plainly, Gemini did not meet its burden—not least because, as GGC previously argued, there are a plethora of unknown facts, which must be adduced through discovery, that will be critical to GGC's opposition to Gemini's anticipated Section 546(e) defense.  Consolidated Reply & Opposition ¶ 59.

57.     Further, as GGC has previously argued, Gemini's reference to prior arguments made in objection to the proof of claim filed by the Joint Liquidators of Three Arrows Capital, Ltd. is of no moment here.  Consolidated Reply & Opposition ¶ 57.  As the Court (correctly) noted, Gemini has identified no legal doctrine under which prior submissions on the Section 546(e) safe

harbor can be said to bind GGC in this adversary proceeding. Hr'g Tr. at 155:17–25 ("So, if you're not relying on judicial estoppel, what are you relying on? There's the classic you've said this before and you can't escape your earlier position. There's res judicata. [T]here's collateral estoppel. There's judicial estoppel, and there's law of the case. So—or maybe there's something else. So, what's the legal doctrine under which, in your view, I can rely on those pleadings?"). Regardless of whether the prior submissions were made by GGC or a different Debtor (GAP), they cannot bind or estop GGC where they were never adopted or ruled upon by the Court. Hr'g Tr. at 83:2–4 ("There hasn't been a finding by a Court, so it's really not res judicata or collateral estoppel."); *see also* Consolidated Reply & Opposition ¶ 57 (citing *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014)).

58.     Finally, again, the parties had the opportunity to adduce evidence, including expert reports, in the context of the Three Arrows Capital claim, an opportunity GGC has not had here. Consolidated Reply & Opposition ¶ 58. GGC should have the opportunity to develop the record so it may adequately address Gemini's affirmative defenses relating to the Section 546(e) safe harbor. Hr'g Tr. at 161:16–162:2 ("Well, but you still have to…the two-day requirement and things like that, you still have to establish them. And so, that's—and that's what I think the argument is, that you can't on this factual record…"). At minimum, because the pleadings only contain the bare terms of the MLAs, but not any allegations (much less evidence) as to what alleged commodities or securities were actually borrowed pursuant to the MLAs, and what the terms of those loans were, the Court lacks a sufficient basis to apply the safe harbors at this pleading stage.

## III.   Gemini's motion to dismiss Counterclaim VII should be denied because Gemini's motion to dismiss Counterclaim III fails.

59.     GGC's Counterclaim VII seeks recovery of the August 2022 Collateral, which Gemini retained solely as a result of the First Amendment's elimination of GGC's right to the

return of that collateral on November 15, 2022.  *See* GGC Answer ¶ 60; Gemini Mem. at 21. Consequently, GGC's Counterclaim VII is contingent on GGC's Counterclaim III, which seeks avoidance of the First Amendment.  *See* GGC Answer ¶ 86; Gemini Mem. at 21.  Gemini's motion to dismiss GGC's Counterclaim III fails for the reasons set forth above.  *See supra* ¶¶ 42–58. Because Gemini's motion to dismiss GGC's Counterclaim III must be denied, so too must Gemini's motion to dismiss GGC's Counterclaim VII be denied insofar as it pertains to the August 2022 Collateral.

## **CONCLUSION**

60.     For the foregoing reasons, the Debtors respectfully request that the Court deny Gemini's Motion to Dismiss Counterclaims.

-25-

Dated: January 25, 2024
   New York, New York

         Respectfully submitted,

         */s/ Luke A. Barefoot*
         Sean A. O'Neal
         Luke A. Barefoot
         Jane VanLare
         Thomas S. Kessler
         Andrew Weaver
         CLEARY GOTTLIEB STEEN & HAMILTON LLP
         One Liberty Plaza
         New York, New York 10006
         Telephone: 212-225-2000
         Facsimile: 212-225-3999

         *Counsel to the Defendants and Counterclaim Plaintiffs*