**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re

GENESIS GLOBAL HOLDCO, LLC, *et al.*

                                        Debtors.

------------------------------------------------------------------x

GEMINI TRUST COMPANY, LLC, for itself and
as agent on behalf of the Gemini Lenders,

                    Plaintiff,

          vs.

GENESIS GLOBAL CAPITAL, LLC,
GENESIS GLOBAL HOLDCO, LLC, and
GENESIS ASIA PACIFIC PTE. LTD.,

                    Defendants.

------------------------------------------------------------------x

<u>FOR PUBLICATION</u>

Chapter 11

Case No. 23-10063 (SHL)

(Jointly Administered)

Adv. Pro. No. 23-01192 (SHL)


<u>**MEMORANDUM OF DECISION**</u>[1]

**A P P E A R A N C E S :**

**HUGHES HUBBARD & REED LLP**
*Counsel for Gemini Trust Company, LLC*
  By:  Anson B. Frelinghuysen, Esq.
        Marc A. Weinstein, Esq.
        Dustin P. Smith, Esq.
One Battery Park Plaza
New York, New York 10004

**WILLKIE FARR & GALLAGHER LLP**
*Counsel for Gemini Trust Company, LLC*
  By:  Donald Burke, Esq.
787 Seventh Avenue
New York, New York 10019

---

[1]      Unless otherwise noted, all Case Management/Electronic Case Filing ("ECF") references are to Adv. Pro.
No. 23-01192.

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
*Counsel for Genesis Global Capital, LLC, Genesis Global Holdco, LLC and
Genesis Asia Pacific PTE. LTD.*
  By:  Sean A. O'Neal, Esq.
          Luke A. Barefoot, Esq.
          Jane VanLare, Esq.
          Andrew Weaver, Esq.
One Liberty Plaza
New York, New York 10006

**WHITE & CASE LLP**
*Counsel for the Official Committee of Unsecured Creditors*
  By:  J. Christopher Shore, Esq.
          Colin T. West, Esq.
1221 Avenue of the Americas
New York, New York 10020

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

      Before the Court are cross-motions to dismiss filed in the above-captioned adversary

proceeding.  Defendants Genesis Global Capital, LLC ("GGC"), Genesis Global Holdco, LLC

("Holdco") and Genesis Asia Pacific PTE. Ltd. ("GAP," and together with GGC and GGH, the

"Debtors") have moved to dismiss Counts II, III and IV of the complaint [ECF No. 1] (the

"Complaint") filed by Plaintiff Gemini Trust Company, LLC's ("Gemini"),[2] and to dismiss the

Complaint in its entirety against Holdco and GAP.  Gemini opposes the Debtors' MTD[3] and has,

in turn, moved to dismiss Counterclaims IV, VI and VII asserted by the Debtors against Gemini

in the Debtors' answer to the Complaint.[4]  *See Answer, Affirmative Defenses, and Countercl. of*

---

[2]      *See Mem. of Law in Supp. of Defs.' Mot. to Dismiss Counts II, III, and IV of the Compl. as to Genesis Global Capital, LLC and All Counts as to Genesis Global Holdco, LLC, and Genesis Asia Pacific PTE. Ltd.* [ECF No. 9] (the "Debtors' MTD").

[3]      *See Gemini Trust Co., LLC's Mem. of Law in Opp. to the Debtors' Mot. to Dismiss* [ECF No. 14] (the "Genesis Opposition").

[4]      *See Mem. of Law in Supp. of Gemini Trust Co., LLC's Mot. to Dismiss Countercl. IV and VI in their Entirety and Countercl. VII Insofar as it Pertains to the Add'l Collateral* [ECF No. 16] (the "Gemini MTD").

*Genesis Global Capital, LLC, to the Compl.* [ECF No. 10] ("GGC's Answer").  The Official Committee of Unsecured Creditors appointed in the Debtors' bankruptcy cases (the "UCC") has also intervened.  *See Stip. and Agreed Order Auth. Intervention* [ECF No. 20].  While the UCC did not file responsive papers, it did participate in the oral argument on these motions that was held on January 18, 2024 (the "Hearing").  *See* Hr'g Tr. 93:22-102:5 (Jan. 18, 2024) [ECF No. 31].

The dispute between Gemini and the Debtors centers on certain shares of the Grayscale Bitcoin Trust ("GBTC").[5]  One tranche of disputed GBTC shares constitutes collateral that was transferred by the Debtors to Gemini and upon which Gemini purports to have foreclosed (the "August 2022 Collateral").  A second tranche relates to GBTC shares that are still held by Debtor GGC, but in which Gemini claims to hold a security interest (the "Additional GBTC Shares").  Today's dispute concerns this second tranche of Additional GBTC Shares, which is the subject of three counts of the Complaint.[6]  In Count II, Gemini seeks a declaratory judgment that it holds a security interest in the Additional GBTC Shares currently held by GGC.  *See* Compl. ¶¶ 68-75.  Count III of the Complaint seeks a declaratory judgment that the Additional GBTC Shares do not constitute property of the Debtors' estates.  *See* Compl. ¶¶ 76-79.  Count IV

---

[5]      The parties' papers do not provide a description of GBTC.  GBTC's website describes it as follows: "GBTC is one of the first spot Bitcoin [Exchange-Traded Fund] in the US.  A spot Bitcoin [Exchange-Traded Fund] is solely and passively invested in Bitcoin, whose shares are designed to reflect the value of BTC held by the Trust, determined by reference to the Index Price, less the Trust's expenses and other liabilities.  GBTC allows investors to gain exposure to Bitcoin through a familiar investment vehicle, without the need to set up an account or wallet on a cryptocurrency trading platform."  https://etfs.grayscale.com/gbtc (last visited February 7, 2024).

[6]      The Complaint asserts claims related to both the August 2022 Collateral and the Additional GBTC Shares.  At the urging of the Debtors, the Court has expedited consideration of the issues relating to the Additional GBTC Shares addressed in Counts II, III and IV of the Complaint and Counterclaims IV, VI and VII.  *See generally Letter of Luke A. Barefoot, dated Dec. 12, 2023* [ECF No. 11]; *Scheduling and Pre-Trial Order* ¶ 2 [ECF No. 13]; Hr'g Tr. 28:21-42:5 (Dec. 13, 2023) [ECF No. 18].  These claims have a more direct bearing on creditor recoveries under the Debtors' plan of reorganization, which is currently scheduled for a confirmation hearing beginning on February 14, 2024.  *See id.*

of the Complaint seeks to impose a constructive trust on the Additional GBTC Shares for the

benefit of Gemini and certain of its customers. *See* Compl. ¶¶ 80-85.

The Debtors disagree with Gemini and seek dismissal of Counts II, III and IV. The

Debtors argue that, under the clear terms of the parties' agreements, Gemini lacks a security

interest in the Additional GBTC Shares and that there is no basis to impose a constructive trust

as to these Additional GBTC Shares. *See* Debtors' MTD ¶¶ 27-45 (seeking dismissal of Counts

II-IV); GGC's Answer at GGC's Countercl. ¶¶ 63-67 (seeking a grant of Counterclaim IV). In

the alternative, the Debtors have asserted counterclaims alleging that any GGC pledge of the

Additional GBTC Shares to Gemini as security would constitute an avoidable preferential

transfer that is recoverable for the benefit of the estate under Sections 547(b) and 550(a) of the

Bankruptcy Code. *See* GGC's Answer at GGC's Countercl. ¶¶ 75-84, ¶¶ 85-88 (setting forth

Counterclaims VI and VII). Lastly, the Debtors seek to dismiss the Complaint in its entirety as

to two Debtor entities—Holdco and GAP—arguing that Gemini has failed to plead any facts that

link Holdco and GAP to the substantive allegations of the Complaint. *See* Debtors' MTD ¶ 26.

Gemini opposes the Debtors' MTD and seeks dismissal of GGC's Counterclaims IV and

VI in their entirety and Counterclaim VII as it relates to the Additional GBTC Shares. In its

papers, Gemini relies heavily upon the parties' intent in arguing that it holds a valid security

interest in the Additional GBTC Shares and that there is a constructive trust for its benefit as to

the Additional GBTC Shares. To the extent that the Court reaches the Debtors' preference

counterclaims, Gemini contends these counterclaims are barred by the safe harbor provisions of

Section 546(e) of the Bankruptcy Code. As for Holdco and GAP, Gemini asserts that they are

proper Defendants here because there are sufficient facts in the Complaint to state a claim

against them.

For the reasons set forth below, the Court concludes that the contractual terms here are unambiguous and clearly require a transfer of the Additional GBTC Shares by or on behalf of GGC to or for the benefit of Gemini in order for them to be pledged as collateral. As this transfer did not take place, Gemini does not have a security interest in the Additional GBTC Shares. The Court also concludes that the Complaint does not state a claim to impose a constructive trust on the Additional GBTC Shares on behalf of Gemini. Therefore, the Debtors' MTD is granted with respect to Counts II, III and IV as against all Defendants. Based on the same logic, Gemini's MTD is denied as to Counterclaim IV, which seeks a declaratory judgment that Gemini does not have a security interest in the Additional GBTC Shares. As Debtors' Counterclaims VI and VII were plead as an alternative basis for relief should Debtors' MTD be unsuccessful in dismissing the security interest and constructive trust counts, the Court need not address Debtors' Counterclaims VI and VII as to the Additional GBTC Shares as these Counterclaims are moot.[7] Lastly, the Debtors' MTD is granted without prejudice as to Holdco and GAP as Gemini has not plead enough to survive dismissal of these two Defendants.

## BACKGROUND[8]

The Debtors are among several companies owned by Digital Currency Group, Inc. ("DCG"). *See* Compl. ¶ 20. Prior to its bankruptcy filing, GGC provided lending and borrowing services for digital assets and fiat currency, primarily to and from institutional and high net worth individual customers. *See* Compl. ¶¶ 17, 20. GGC obtained capital for its lending services by

---

[7]     While Counterclaim VI relates only to the Additional GBTC Shares, Counterclaim VII seeks relief as to both the Additional GBTC Shares and the August 2022 Collateral. Today's decision does not affect Counterclaim VII as to the August 2022 Collateral.

[8]     The Court takes all facts in the Complaint as true for purposes of the Debtors' MTD. *See Nielsen Co. (US), LLC v. Success Sys., Inc.*, 2013 WL 1197857, at *1 (S.D.N.Y. Mar. 19, 2013) ("For the purpose of deciding the parties' cross-motions to dismiss, the Court takes as true the facts alleged in the pleadings and draws all reasonable inferences in favor of the non-movant.").

borrowing from lenders through loans denominated in cryptocurrency assets or U.S. Dollars. *See* Compl. ¶ 21. GAP offered a single point of access for digital asset trading, derivatives, borrowing, lending and prime brokerage services. *See* Compl. ¶ 19. Both GGC and GAP are owned by Holdco. *See* Compl. ¶¶ 17-19. Holdco, in turn, provided lending and borrowing, spot trading, derivative and custody services for digital assets and fiat currency and is entirely owned by DCG. *See* Compl. ¶ 18. Holdco's lending and borrowing services were primarily offered through GGC and GAP to serve customers located around the world. *See* Compl. ¶ 18.

Gemini operates a cryptocurrency platform that enables its users to buy, sell, and store cryptocurrency. *See* Compl. ¶ 16. Gemini acts as custodian and authorized agent on behalf of the Gemini users. *See* Compl. ¶ 16; GGC's Answer at GGC's Countercl. ¶ 14. In February 2021, Gemini began offering a new program through its cryptocurrency platform called Gemini Earn (the "Gemini Earn Program"). *See* Compl. ¶ 22. Under the Gemini Earn Program, certain Gemini users (the "Earn Users") could choose to loan their digital assets to GGC. *See* Compl. ¶ 22. These transactions were each governed by individual contracts referred to as master loan agreements (the "MLAs"),[9] which were executed by three parties: (i) an individual Earn User; (ii) GGC as borrower; and (iii) Gemini as custodian and authorized agent on behalf of an Earn User. *See* Compl. ¶ 22. Under the terms of the MLAs, GGC would periodically provide Gemini with the terms for loans that GGC was willing to enter into along with the maximum amount of digital assets it was willing to borrow under those terms; GGC then had an obligation to accept loans up to that maximum amount. *See* MLA § II. Under the terms of the MLAs, each Earn

---

[9]     A representative sample of the MLAs is attached as Exhibit 2 to the Complaint. The Court notes that "[i]n ruling on a motion to dismiss under Rule 12(b)(6), the Court may . . . consider 'documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.'" *Macquarie Rotorcraft Leasing Holdings Ltd. v. LCI Helicopters (Ir.) Ltd. (In re Waypoint Leasing Holdings Ltd.)*, 607 B.R. 143, 153 (Bankr. S.D.N.Y. 2019) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

User was entitled to the return of the digital assets they had loaned to GGC upon request or at the expiration of a specified period.  Compl. ¶ 22.  The MLAs did not require GGC to post or pledge assets as collateral to secure its obligations.  *See generally* MLA.

In August 2022, following broad cryptocurrency market turmoil, Gemini made numerous inquiries to GGC and DCG regarding GGC's financial condition.[10]  *See* Compl. ¶¶ 24-26; GGC's Answer at GGC's Countercl. ¶ 19.  In response, DCG and GGC provided information that Gemini asserts was false and misleading.  *See* Compl. ¶¶ 24-25.  At this time, Gemini also sought collateral from GGC as security for the Earn Users' loans.  *See* Compl. ¶ 26.  On August 15, 2022, Gemini, as agent on behalf of the Earn Users, entered into an agreement with GGC (the "Security Agreement") under which GGC pledged the August 2022 Collateral in the amount of 30,905,782 shares of GBTC to secure its obligations under the MLAs.[11]  *See* Compl. ¶ 27. Section 2 of the Security Agreement provided:

> **Section 2. The Pledge.**  As security for the prompt payment and performance in full when due (whether at stated maturity, by acceleration, or otherwise) of all liabilities and obligations of [GGC] under the [MLAs], whether now existing or hereafter arising, whether or not mature or contingent (the "Secured Obligations"), [GGC] hereby pledges, assigns, and grants to [Gemini], for the benefit of [Gemini] and the [Earn Users], a security interest in all of [GGC's] right, title, and interest in and to all property from time to time transferred by or on behalf of [GGC] to or for the benefit of [Gemini] or the [Earn Users] in connection with this Agreement or any [MLA], including without limitation all shares of and interests in [GBTC] credited to the GTC Account (collectively, the "Collateral").

Security Agreement § 2.

---

[10]    In the spring of 2022, Three Arrows Capital Ltd. ("3AC") collapsed and subsequently entered into liquidation proceedings.  *See* Compl. ¶ 23.  Gemini asserts that, at that time, GGC had $2.3 billion in outstanding loans to 3AC.  *See* Compl. ¶ 23.

[11]    A copy of the Security Agreement is attached as Exhibit 1 to the Complaint.

Section 1 of the Security Agreement—titled "Transfer of Collateral"—laid out the

mechanics of the transfers contemplated by the Security Agreement.  *See* Security Agreement §

1.  It stated:

> As promptly as practicable after the execution of this Agreement, [GGC] shall
> transfer or cause to be transferred 30,905,782 shares of [GBTC] to the account
> held in the name of [Gemini] "for the benefit of" ("<u>FBO</u>") the Principal Lenders
> at Morgan Stanley Smith Barney LLC with account number ending in -6250 (the
> "<u>GTC Account</u>"); <u>provided that</u>, for the avoidance of doubt, [GGC] shall have no
> obligation to transfer, cause to be transferred or otherwise deposit additional
> shares of [GBTC] or any other shares into the GTC Account after such date
> except as required under and in accordance with Section 6(b) of this Agreement.

Security Agreement § 1.  Section 7(b) the Security Agreement required Gemini to return the

August 2022 Collateral to GGC on or before November 15, 2022.  *See* Security Agreement §

7(b).

On October 13, 2022, Gemini provided GGC with 30 days' notice of its intent to

terminate the Gemini Earn Program.  *See* Compl. ¶ 36.  After further discussions, Gemini agreed

to extend the termination date of the Gemini Earn Program to November 22, 2022.  *See* Compl. ¶

37.[12]  On November 7, 2022, GGC and Gemini entered into an amendment to the Security

Agreement extending its term to track the new termination date of the Gemini Earn Program (the

"First Amendment").[13]  *See* Compl. ¶ 38; First Amendment § B(1).

Gemini subsequently requested that GGC pledge additional collateral to further secure

GGC's obligations under the Gemini Earn Program.  *See* Compl. ¶ 39.  On November 10, 2022,

GGC, Gemini and DCG entered into a second amendment to the Security Agreement (the

"Second Amendment").[14]  *See* Compl. ¶ 39.  The Second Amendment required that parent DCG

---

[12]     Gemini asserts that during these discussions, GGC again made false statements regarding its financial
health and stability.  *See* Compl. ¶ 37.

[13]     A copy of the First Amendment is attached as Exhibit 3 to the Complaint.

[14]     A copy of the Second Amendment is attached as Exhibit 4 to the Complaint.

deliver to Debtor GGC the Additional GBTC Shares, in the amount of 31,180,804 shares.  *See*

Second Amendment § 1; *see also* Compl. ¶ 39.  GGC was then to transfer the Additional GBTC

Shares to Gemini for the benefit of Earn Users to secure GGC's obligations under the Gemini

Earn Program.  *See* Second Amendment § 1.  The Second Amendment sets this out as follows:

> **Amendment to Collateral Amount.**  Section 1 of the Security Agreement shall be
> amended and restated in its entirety as follows . . . .  As promptly as practicable after the
> execution of this Second Amendment, [DCG] shall assign, sell, convey, transfer, and
> deliver to [GGC], or a controlled subsidiary of [GGC], all right, title and interest in and to
> **31,180,804** shares of [GBTC], free and clear of all liens, claims, charges and
> encumbrances.  As promptly as practicable after such assignment, conveyance, transfer,
> and delivery, [GGC] shall transfer or cause to be transferred such **31,180,804** shares of
> [GBTC] to the GTC Account; <u>provided</u>, that, for the avoidance of doubt, [GGC] shall
> have no obligation to transfer, cause to be transferred or otherwise deposit additional
> shares of [GBTC] or any other shares into the GTC Account after such date except as
> required under and in accordance with Section 6(b) of this Agreement.[15]

Second Amendment § 1 (emphasis in original); *see* Compl. ¶ 39.  DCG subsequently transferred

the Additional GBTC Shares to GGC.  *See* Compl. ¶ 47.  Gemini made numerous inquiries with

GGC seeking confirmation that GGC would be transferring the Additional GBTC Shares to

Gemini, but GGC either didn't respond or stated that it was working to understand the

complexity of transferring the shares.  *See* Compl. ¶¶ 48-53.  In the end, however, GGC never

delivered the Additional GBTC Shares to Gemini.  *See* Compl. ¶ 53.

On November 16, 2022, GGC suspended redemptions by Earn Users under the Gemini

Earn Program.  *See* Compl. ¶ 43.  On the same day, Gemini purported to foreclose on the August

2022 Collateral in a private sale to itself for total proceeds of $284,333,194.40.  *See* Compl. ¶ 43.

In January 2023, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code

(the "Petition Date").  *See* Compl. ¶ 13.  In October 2023, Gemini filed the Complaint that

---

[15]     The "GTC Account" referenced in the Second Amendment was an account at a financial institution that
was held in Gemini's name for the benefit of the Earn Users.  Gemini had previously received the August 2022
Collateral from the Debtors into the GTC Account.  *See* Compl. ¶ 40 n.9 (citing Second Amendment § 1).

asserts, among other things, that it has a security interest in the Additional GBTC Shares, that the shares are not property of the Debtors' estates, and, in the alternative, that the Debtors hold the Additional GBTC Shares in constructive trust for the benefit of Gemini and the Earn Users. *See* Compl. ¶ 10. GGC subsequently filed its Answer, which also asserted counterclaims against Gemini. *See* GGC's Answer at GGC's Countercl. ¶¶ 44-88.

## DISCUSSION

### A. Legal Standards

#### 1. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6), made applicable by Bankruptcy Rule 7012, provides that a complaint must be dismissed if it fails to state a claim upon which relief can be granted. In analyzing a motion to dismiss under Rule 12(b)(6), a court looks to whether a plaintiff has pleaded "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Additionally, Federal Rule of Civil Procedure 8 requires "at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001) (internal citation and quotation omitted). The court must determine "whether the well-pleaded factual allegations, assumed to be true, plausibly give rise to an entitlement to relief." *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir. 2010) (citing *Iqbal,* 556 U.S. at 679). A court must proceed "on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555. The court must also draw all reasonable

inferences in favor of the non-moving party.  *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161
(2d Cir. 2000).

But "[a] complaint that pleads only facts that are 'merely consistent with' a defendant's
liability does not meet the plausibility requirement" *Weisfelner v. Fund 1 (In re Lyondell Chem.
Co.)*, 554 B.R. 655, 673 (Bankr. S.D.N.Y. 2016) (quoting *Iqbal*, 556 U.S. at 678).  "A pleading
that offers labels and conclusions or a formulaic recitation of the elements of a cause of action
will not do."  *Id.* (internal citations and quotations omitted).  "Threadbare recitals of the elements
of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Rather,
"'[t]he pleadings must create the possibility of a right to relief that is more than
speculative.'"  *Id.* (quoting *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d
Cir. 2008)).

2.  <u>Contract Interpretation Under New York Law</u>

The contracts at issue are governed by New York law.  *See* MLA § X (stating that
agreement is governed by New York law); Security Agreement § 7(c) (same).  "Under New
York law, written agreements are construed in accordance with the parties' intent and [t]he best
evidence of what parties to a written agreement intend is what they say in their writing."  *Schron
v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) (internal citation and quotation
omitted).  "[W]hen parties set down their agreement in a clear, complete document, their writing
should as a rule be enforced according to its terms.  Evidence outside the four corners of the
document as to what was really intended but unstated or misstated is generally inadmissible to
add to or vary the writing."  *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).

The plain meaning of terms in a written agreement is given considerable weight.  "[A]
written agreement that is complete, clear and unambiguous on its face must be enforced

11

according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). A contract provision is ambiguous if it is "susceptible to more than one reasonable interpretation." *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts . . . . It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Giancontieri*, 77 N.Y.2d at 162-63 (internal citations and quotations omitted). Furthermore, "[p]arties cannot create ambiguity from whole cloth where none exists, because [contract] provisions are not ambiguous merely because the parties interpret them differently." *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 25 N.Y.3d 675, 680 (2015) (internal citation and quotation omitted). "It is too well settled for citation that, if a written agreement contains no obvious or latent ambiguities, neither the parties nor their privies may testify to what the parties meant but failed to state." *Oxford Commercial Corp. v. Landau*, 12 N.Y.2d 362, 365 (1963).

"A contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases . . . . Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Consedine v. Portville Cent. Sch. Dist.*, 12 N.Y.3d 286, 293 (2009) (internal citations and quotations omitted). "[S]pecific clauses of a contract are to be read consistently with the overall manifest purpose of the parties' agreement. Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms." *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (App. Div. 3d Dep't 1989) (internal citations and quotations omitted). But specific terms in a contract will override the general. *See Bowmer v. Bowmer*, 50 N.Y.2d 288, 294 (1980); *John Hancock Mut. Life Ins. Co. v. Carolina Power &*

*Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary."); Restatement (Second) of Contracts § 203 (2023) ("In the interpretation of a promise or agreement or a term thereof . . . specific terms and exact terms are given greater weight than general language."). "In short, the proper aim of the court is to arrive at a construction which will give fair meaning to *all* of the language employed by the parties, and to reach a practical interpretation of the expressions of the parties to the end that there will be a realization of [their] reasonable expectations." *Tantleff v. Truscelli*, 493 N.Y.S.2d 979, 983 (App. Div. 2d Dep't 1985) (emphasis in original) (internal citations and quotations omitted); *see also Nomura Home Equity Loan, Inc., v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581 (2017) ("[C]ourts should read a contract as a harmonious and integrated whole to determine and give effect to its purpose and intent.") (internal citations and quotations omitted).

## B. Interpretation of the Contracts

### 1. Plain Language of the Contracts

Section 2 of the Security Agreement—entitled "The Pledge"—grants Gemini a security interest in certain "Collateral." The plain, unambiguous language of this provision requires that for an asset to be pledged as "Collateral" under the Security Agreement, there must be: (a) a transfer, (b) by or on behalf of GGC, (b) to or for the benefit of Gemini or the Earn Users. *See* Security Agreement § 2. It states, in relevant part, that:

> [a]s security for the prompt payment and performance . . . of all liabilities and obligations of [GGC] under the Master Loan Agreements . . . [GGC] hereby pledges . . . a security interest in all of [GGC's] right, title, and interest in and to all property from time to time *transferred by or on behalf of [GGC] to or for the benefit of [Gemini] or the [Earn Users]* in connection with this Agreement or any [MLA], including without limitation all shares of and interests in [GBTC] credited to the GTC Account (collectively, the "Collateral").

13

*Id.* (emphasis added).  The allegations of the Complaint make clear that GGC never transferred the Additional GBTC Shares to Gemini or to the Earn Users.  Instead, GGC refused to transfer the Additional GBTC Shares to Gemini, a fact that Gemini itself acknowledged in the Complaint.  *See* Compl. ¶ 7 ("GGC refused to then transfer the [Additional GBTC Shares] to Gemini.").

The lack of a security interest is further supported by the plain language of Section 1 of the Second Amendment, which is entitled "Amendment of Collateral Amount" and sets forth a two-step mechanism for the transfer of the Additional GBTC Shares.  The two-step process requires first a transfer of the Additional GBTC Shares from the Debtors' parent DCG to Debtor GGC and then a second transfer from GGC to Gemini.  As to the first step, Section 1 provides that:

> As promptly as practicable after the execution of this Second Amendment, [DCG] shall assign, sell, convey, transfer, and deliver to [GGC], or a controlled subsidiary of [GGC], all right, title and interest in and to [the Additional GBTC Shares], free and clear of all liens, claims, charges and encumbrances.

Second Amendment § 1.  As to the second step, Section 1 provides that: "[a]s promptly as practicable after such assignment, conveyance, transfer, and delivery, [GGC] shall transfer or cause to be transferred such [Additional GBTC Shares] to the GTC Account . . . ."  *Id.* According to the clear language of the Second Amendment, therefore, there are two steps necessary to create a security interest in the Additional GBTC Shares: (1) a transfer from DCG to GGC, and (2) a transfer from GGC to the GTC Account of Gemini that takes place after the initial transfer.  *See id.*

2.   Gemini's Interpretation of the Contracts

Gemini asserts that the Additional GBTC Shares were pledged to it under the terms of the

agreements, despite these shares never having been transferred to Gemini.  Gemini believes that

its alleged security interest in the Additional GBTC Shares became effective upon the transfer of

the shares from DCG to GGC.  Gemini Opp. at 2, 10.  It asserts that this interpretation is

reflected in the plain language of the agreements and is in keeping with the parties' intent in

entering the agreements.

But a closer examination of Gemini's logic reveals its flaws.  For instance, Gemini points

to Section 4 of the Security Agreement, which states that it grants Gemini an "absolute and

unconditional" security interest in the Additional GBTC Shares.  But Section 4 specifically relies

on the defined term "Collateral," stating that "the grant of a security interest in the *Collateral*

shall be absolute and unconditional . . . ."  Security Agreement § 4 (emphasis added); *see also*

Security Agreement § 5(a) ("This Agreement creates a legal and valid security interest in the

*Collateral* in favor of [Gemini] . . . .") (emphasis added).  As discussed above, under the clear

and unambiguous language of the Security Agreement, an asset does not constitute "Collateral"

until it has been actually transferred "to or for the benefit of" Gemini.

Other language cited by Gemini is similarly reliant upon the defined term "Collateral."

Gemini cites to Section 5 of the Security Agreement, in which GGC represents that, "as of the

date hereof and on each day that any Loan remains outstanding[,]" GGC "is the sole owner of the

Collateral or otherwise has the right to transfer the Collateral, free and clear of any security

interest, lien, encumbrance, or other restrictions . . . ."  Security Agreement § 5(b).  Gemini

argues that GGC would not have been able to represent or warrant that it was the "sole owner of

the Collateral" or that it had the "right to transfer the Collateral, free . . . of . . . restriction" if the

15

Additional GBTC Shares only became "Collateral" after GGC transferred them to Gemini.  *See*

Gemini Opp. at 12.  Gemini argues that Section 5 only makes sense under Gemini's

interpretation.  But that is not true.  Section 5 embodies a common sentiment found in security

agreements that the party pledging collateral actually owns the collateral before the transfer, a

representation designed to put the secured party at ease.  But GGC did not obtain ownership of

the Additional GBTC Shares until those shares were transferred to it by parent DCG.  And the

shares did not become collateral unless they were transferred to Gemini.  Additionally, the

representation in Section 5 of the Security Agreement occurred well before the parties ever

entered the Second Amendment, which addresses the specific transfer of the Additional GBTC

Shares at issue here.  The more specific provisions of the Second Amendment about the steps

needed to perfect the security interest take precedent over these more general provisions of the

earlier Security Agreement.  *See John Hancock Mut. Life Ins. Co.*, 717 F.2d at 669 n.8 (applying

New York law) ("[D]efinitive, particularized contract language takes precedence over

expressions of intent that are general, summary, or preliminary.").

Gemini also points to language defining GGC as the "Pledgor" in the Security Agreement

and certain "whereas" clauses in the Security Agreement and the Second Amendment.  These

clauses state that "[GGC] has agreed to pledge to [Gemini] . . . certain collateral to secure

[GGC's] obligations under the Master Loan Agreements . . . .").  Security Agreement at 1;

Second Amendment at 1.  Gemini believes these provisions reflect the parties' intention for GGC

to pledge the Additional GBTC Shares in its possession upon its execution of the Security

Agreement and receipt of the Additional GBTC Shares from DCG.  *See* Gemini Opp. at 12.  But

while GGC did agree to be the "Pledgor" of certain assets, once again those assets were limited

to those that met the definition of "Collateral" under the Security Agreement.  The same is true

for the "whereas" clauses. So while all these provisions may support a claim that GGC breached the parties' agreement by failing to transfer the Additional GBTC Shares, they do not support Gemini's argument that a valid security interest was created absent a transfer of these shares.[16]

Gemini complains that the Debtors' position "myopically" focuses on Section 2 of the Security Agreement to the exclusion of these other provisions in the agreements. Gemini argues that "courts read contracts as a whole to give each clause its intended purpose." Gemini Opp. at 11 (citing *Williams Press, Inc. v. State of New York*, 37 N.Y.2d 434, 440 (1975) (the "meaning of a writing may be distorted where undue force is given to single words or phrases"). But this argument ignores that Section 2 is the key provision that defines the scope of the property in which Gemini has a security interest. The defined term "Collateral" in Section 2 is used throughout the Security Agreement, including in the terms cited by Gemini. The term is also incorporated into and used in the Second Amendment:

> This Second Amendment forms a part of, incorporates by reference, and is subject to the terms and conditions in the Security Agreement and except as set forth in this Second Amendment, the Security Agreement shall continue in full force and effect in accordance with its terms. *Capitalized terms used in this Second Amendment but not otherwise defined herein shall have the same meanings as in the Security Agreement.*

Second Amendment at 1 (emphasis added). Gemini's argument also ignores the well-established principle that "definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary." *John Hancock Mut. Life Ins. Co.*, 717 F.2d at 669 n.8 (applying New York law); *see also Bowmer*, 50 N.Y.2d at 294; *Paneccasio v. Unisource*

---

[16] In a similar vein, Gemini notes that Section 1 of the Security Agreement is entitled the "Transfer *of* Collateral," as opposed to the transfer of assets to become Collateral upon transfer. Gemini Opp. at 12. Genesis believes this confirms the parties' understanding that the Additional GBTC Shares were already Collateral at the time they were transferred to Gemini. *See id.* But once again, Gemini ignores that two transfers were required before the Additional GBTC Shares would become "Collateral" under Section 2 of the Security Agreement. It is only logical that the parties would include Section 1 of the Security Agreement to address the specifics on how the transfer and pledge should take place.

*Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008) ("The rules of contract construction require us

to adopt an interpretation which gives meaning to every provision of the contract[,]" and

"specific language in a contract will prevail over general language where there is an

inconsistency between two provisions."); Restatement (Second) of Contracts § 203 (2023) ("In

the interpretation of a promise or agreement or a term thereof . . . specific terms and exact terms

are given greater weight than general language.").

Gemini posits that the language in Section 2 of the Security Agreement defining

"Collateral" contemplates only the possibility that Gemini might return a portion of the

Collateral pursuant to a "Collateral Return Request" or that GGC might provide additional

collateral through a "Collateral Top-Up Request" as discussed in Section 6 of the Security

Agreement and Section 3 of the Second Amendment.  But Section 2 of the Security Agreement

does not specifically reference either of these provisions.  Indeed, nothing in Section 2 indicates

that it is limited to these two situations.  Nor is there anything in Section 6 of the Security

Agreement or Section 3 of the Second Amendment to support this reading.[17]  "[C]ourts may not

---

[17]    Both of these sections address issues other than the method to perfect Gemini's security interest.  Section 6
of the Security Agreement is entitled "Adjustment of Collateral" and provides:

(a) <u>Collateral Release</u>.  During the term of this Agreement, if the aggregate value of the Collateral
(as calculated based on the price reported on the OTCQX exchange at 4pm New York time on a
day the OTCQX market is open for trading (such aggregate value, the "<u>Collateral Value</u>"))
exceeds 32.5% of the notional USD value of the aggregate loaned amounts (the "<u>Loaned Assets</u>")
under the [MLAs] (as calculated based on the price reported on the [Gemini's] cryptocurrency
exchange, the Gemini exchange, for the relevant Loaned Asset at 4pm New York time (the
"<u>Gemini Closing Price</u>")), then [Gemini] shall, upon [GGC's] written request (which may be by e-
mail or other electronic transmission) (such request, a "<u>Collateral Return Request</u>"), be required to
return an amount of Collateral such that the remaining Collateral Value is no greater than 30.0%
of the notional USD value of the Loaned Assets (such amount, the "<u>Collateral Return Amount</u>").
[Gemini] shall deliver the Collateral Return Amount to [GGC's] brokerage account at such
account as [GGC] may direct in writing no later than two (2) business days after the date of the
Collateral Return Request.

(b) <u>Collateral Posting</u>.  During the term of this Agreement, if the Collateral Value falls below
27.5% of the notional USD value of the aggregate Loaned Assets under the [MLAs] (as calculated
based on the Gemini Closing Price) then [GGC] shall, upon [Gemini's] written request (which
may be by e-mail or other electronic transmission) (such request, a "<u>Collateral Top-Up Request</u>"),

by construction add or excise terms, nor distort the meaning of those used and thereby make a

new contract for the parties under the guise of interpreting the writing."  *Reiss v. Fin.*

*Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (internal citations and quotations omitted).  Nor

does interpreting the language of the agreements to require a transfer of the shares by GGC to

Gemini render the Second Amendment meaningless, as suggested by Gemini.  Rather, by failing

to transfer the shares, GGC failed to satisfy a necessary condition to the effectiveness of the

---

be required to post an amount of Collateral to the GTC Account such that the Collateral Value in
the GTC Account is no less than 30.0% of the notional USD value of the Loaned Assets under the
[MLAs] (such amount, the "<u>Collateral Top-Up Amount</u>"); <u>provided that</u>, notwithstanding the
foregoing, in no event shall the aggregate number of shares of [GBTC] in the GTC Account be
required to exceed 30,905,782 shares at any time.  [GGC] shall deliver the Collateral Top-Up
Amount to the GTC Account no later than two (2) business days after the date of the Collateral
Top-Up Request.

Security Agreement § 6 (emphasis in original).  Section 3 of the Second Amendment is entitled "Amendment to
Adjustment of Collateral" and provides:

Section 6 of the Security Agreement shall be amended and restated in its entirety as follows:

"(a) Collateral Release.  During the term of this Agreement, if the aggregate value of the Collateral
(as calculated based on the price reported on the OTCQX exchange at 4pm New York time on a
day the OTCQX market is open for trading (such aggregate value, the "Collateral Value"))
exceeds 120% of the notional USD value of the aggregate loaned amounts (the "Loaned Assets")
under the [MLAs] (as calculated based on the price reported on [Gemini's] cryptocurrency
exchange, the Gemini exchange, for the relevant Loaned Asset at 4pm New York time (the
"Gemini Closing Price")), then [Gemini] shall, upon [GGC's] written request (which may be by e-
mail or other electronic transmission) (such request, a "Collateral Return Request"), be required to
return an amount of Collateral such that the remaining Collateral Value is no greater than 110% of
the notional USD value of the Loaned Assets (such amount, the "Collateral Return Amount").
[Gemini] shall deliver the Collateral Return Amount to [GGC's] brokerage account at such
account as [GGC] may direct in writing no later than two (2) business days after the date of the
Collateral Return Request.

(b) Collateral Posting.  During the term of this Agreement, if the Collateral Value falls below 30%
of the notional USD value of the aggregate Loaned Assets under the [MLAs] (as calculated based
on the Gemini Closing Price) then [GGC] shall, upon [Gemini's] written request (which may be
by e-mail or other electronic transmission) (such request, a "Collateral Top-Up Request"), be
required to post an amount of Collateral to the GTC Account such that the Collateral Value in the
GTC Account is no less than 35% of the notional USD value of the Loaned Assets under the
Master Loan Agreements (such amount, the "Collateral Top-Up Amount"); provided, that,
notwithstanding the foregoing, in no event shall the aggregate number of shares of [GBTC] in the
GTC Account be required to exceed **62,086,586** shares at any time.  [GGC] shall deliver the
Collateral Top-Up Amount to the GTC Account no later than two (2) business days after the date
of the Collateral Top-Up Request."

Second Amendment § 3 (emphasis in original).

Second Amendment's security provision.  Again, failure to transfer the Additional GBTC Shares may be a breach of the agreement, but it does not magically excuse the contractual requirements as to security for which the parties bargained.

In conclusion, the Court finds that there is no language in the Security Agreement or the Second Amendment supporting Gemini's argument that a pledge of these Additional GBTC Shares could have occurred without a transfer from GGC to Gemini.  The clear language of the contracts states otherwise.  Were Gemini's interpretation the true intent of the parties, they could have easily drafted the contracts to provide as much.  *See In re Allegiance Telecom, Inc.*, 356 B.R. 93, 99 (Bankr. S.D.N.Y. 2006) ("Courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.  Hence, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (internal citation omitted); *Kaplin v. Buendia*, 2021 WL 1405517, at *5 (S.D.N.Y. Apr. 14, 2021) ("[T]he court may not construe the language to add, subtract, or redefine terms; to do so would effectively write a new contract."); *see, e.g., U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 101(2d Cir. 2013) ("[U]nder New York law, [t]he parties to a loan agreement are free to include provisions directing what will happen in the event of default . . . of the debt, supplying specific terms that super[s]ede other provisions in the contract if those events occur.") (internal citations and quotations omitted).

3.  <u>The Contractual Terms are Not Ambiguous</u>

Gemini argues, in the alternative, that the language of the contracts is ambiguous and the parties' intent cannot be understood from that language, which would preclude dismissal of the relevant counts of the Complaint.  A contract provision is ambiguous if it is "susceptible to more

than one reasonable interpretation." *Brad H.*, 17 N.Y.3d at 186; *see also Vintage, LLC v. Laws Constr. Corp.*, 13 N.Y.3d 847, 849 (2009) (contract is not ambiguous unless there is a "reasonable basis for a difference of opinion" regarding the meaning of its language). Gemini believes there is a reasonable basis for differing opinions regarding whether the Security Agreement and the Second Amendment required that GGC specifically transfer the Additional GBTC Shares to Gemini in order for Gemini's security interest to become effective. But the Court disagrees, having already found that the language of the Security Agreement and the Second Amendment is crystal clear regarding the steps that must be taken for the Additional GBTC Shares to be pledged as Collateral. "Parties cannot create ambiguity from whole cloth where none exists, because [contract] provisions are not ambiguous merely because the parties interpret them differently." *Universal Am. Corp.*, 25 N.Y.3d at 680 (internal citation and quotation omitted); *see also Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."). Moreover, "[t]he court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would "strain[] the contract language beyond its reasonable and ordinary meaning." *RJR Nabisco*, 906 F.2d at 889 (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)).

4.   GGC's Interest in the Collateral

In a related argument, Gemini asserts that "none of the Debtors have any equitable interest" in the Additional GBTC Shares "[b]ecause GGC obtained the [Additional GBTC Shares] from DCG for the sole purpose of delivering the [Additional GBTC Shares] to Gemini and possesses the [Additional GBTC Shares] solely to secure Earn Users' loans . . . ." Compl. ¶

78.  But the Court finds that under the plain and unambiguous language of the agreements,

DCG's full right, title and interest in the Additional GBTC Shares was transferred to GGC and

the Additional GBTC Shares remain the property of GGC's bankruptcy estate.

This conclusion is consistent with the plain language of the Second Amendment, which

provides that GGC acquired title to the Additional GBTC Shares following the transfer from

DCG.  *See* Second Amendment § 1 (requiring DCG to "assign, sell, convey, transfer, and

deliver to [GGC] . . . all right, title and interest in and to [the Additional GBTC Shares], free and

clear of all liens, claims, charges and encumbrances.").  The transfer language in Section 1 of the

Second Amendment is clear, unconditional and unqualified.[18]  *See Philles Records*, 98 N.Y.2d at

570-71 (holding that unconditional transfer of ownership rights in the context of a work of art,

unless limited by the terms of the contract, conveyed complete ownership rights); *Rhythm &

Hues, Inc. v. Terminal Mktg. Co.,* 2004 U.S. Dist. LEXIS 7625, at *28 (S.D.N.Y. May 4, 2004)

("Under New York law, 'an assignment is a transfer or setting over of property, or of some right

or interest therein, from one person to another, and unless in some way qualified, it is properly

the transfer of one whole interest in an estate, or chattel, or other thing.'") (quoting *In re Stralem,*

758 N.Y.S.2d 345, 347 (App. Div. 2d. Dep't 2003)); *see also Giancontieri*, 77 N.Y.2d at 162

("[W]hen parties set down their agreement in a clear, complete document, their writing should as

a rule be enforced according to its terms.").  "It is too well settled for citation that, if a written

agreement contains no obvious or latent ambiguities, neither the parties nor their privies may

testify to what the parties meant but failed to state."  *Landau*, 12 N.Y.2d at 365; *see Reiss v. Fin.*

---

[18]      Gemini cites the prefatory language in the Second Amendment stating that the transfer from GGC to
Gemini take place "as promptly as practicable" after GGC's receipt of the shares from DCG; Gemini contends this
language acts to "expressly" limit GGC's interest in those shares.  *See* Second Amendment § 1; Gemini Opp. at 16-
17.  But the Court wholeheartedly disagrees.  By explicitly recognizing and separating out the two transfers, this
language only confirms the two-step transfer requirement for perfecting the security interest here.

*Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (a court "will not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms.") (internal citations and quotations omitted).

Moreover, the purpose behind the language in the Second Amendment does not comport with Gemini's reading. If GGC did not have title to the Additional GBTC Shares, it would not be able to pledge those shares to Gemini. *See* Security Agreement § 5(b) (GGC representing and warranting to Gemini "as of the date hereof and on each day that any Loan remains outstanding" that it was "the sole owner of the Collateral or otherwise has the right to transfer the Collateral, free and clear of any security interest, lien, encumbrance or other restrictions . . . ."); *In re Emergency Beacon Corp.*, 665 F.2d 36, 40 (2d Cir. 1981) ("Notwithstanding any agreement between the debtor and the creditor, if the debtor has no rights in the collateral, no security interest in that collateral comes into existence."). The plain language of the Security Agreement defines Collateral as shares of GBTC that are transferred to Gemini, as contemplated in the two-step transfer requirement contained in the Second Amendment. While the Debtors clearly undertook a contractual obligation to pledge the Additional GBTC Shares to Gemini—and appear to concede that they breached their contract by failing to actually transfer the shares—it is clear from the language of the agreements that Gemini has no security interest in the shares, which remain property of GGC's estate.

Gemini cites to Section 541 of the Bankruptcy Code, which states that assets become property of the estate "only to the extent of a debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). Gemini cites to *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983) for the

proposition that "property of others in which the debtor ha[s] some minor interest such as a lien or bare legal title" does not constitute property of the estate. *Id.* at 204 n.8. In *Whiting Pools*, the Supreme Court found that property seized by a secured creditor enforcing a lien prior to bankruptcy constituted property of the estate under Section 541. *See id.* at 209. But this holding is unhelpful to Gemini here. Under the Supreme Court's reasoning, property subject to a purported lien that was not granted under the contractual terms of the parties' agreement, nor enforced upon, constitutes property of a debtor's estate. This would clearly apply to the Additional GBTC Shares, which were never properly pledged, much less enforced upon. Nor does the case of *Musso v. N.Y. State Higher Educ. Servs. Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R. 932 (Bankr. E.D.N.Y 1993), support Gemini's position. Gemini cites to its holding that an escrow account was not property of a debtor's estate where the debtor possessed "only a contingent interest" in the account. *See id.* at 939-42. But that holding is based on the terms of the parties' agreement in that case; by contrast, the agreements here clearly do not grant Gemini a security interest in these shares.[19]

---

[19]    Gemini makes a passing reference to the "mere conduit" test, which determines whether an entity is an initial transferee for purposes of Section 550 of the Bankruptcy Code. *See* Gemini Opp. at 16–17 (asserting that "the Second Amendment required that GGC serve as a mere conduit for" the Additional GBTC Shares). But the "mere conduit" test is a judicially created defense to actions under Section 550 to recover transfers of property that originated with the debtor from the transferee for the benefit of the debtor's estate. *See 5 Collier on Bankruptcy ¶ 550.02[2] (16th ed. 2024); Harrah's Atl. City Operating Co., LLC v. Lamonica (In re JVJ Pharm. Inc.)*, 630 B.R. 388, 408 (S.D.N.Y. 2021) ("While the Bankruptcy Code does not define 'transferee' or 'initial transferee' for purposes of [S]ection 550, a body of case law has developed that distinguishes the initial recipient—that is, the first entity to touch the disputed funds—[from] the initial transferee . . . . .") (internal citations and quotations omitted); *cf. Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 473 (Bankr. S.D.N.Y. 2015) ("To plead the subsequent transfer prong, the complaint must allege facts that support the inference that the *funds at issue originated with the debtor*, and contain the necessary vital statistics—the who, when, and how much of the purported transfers to establish an entity as a subsequent transferee of the funds.") (emphasis added) (internal quotation marks and citations omitted). Gemini does not explain how this doctrine would apply here to somehow grant Gemini a security interest in these shares. Indeed, the Court does not believe the doctrine has any application here given that GGC had "dominion and control" over the Additional GBTC Shares, which remain property of the estate. *See In re JVJ Pharm. Inc.*, 630 B.R. at 408 ("[T]he relevant inquiry in this Circuit is whether an entity exercised dominion and control over a debtor's funds.").

5.   "Transfer" of the Shares

In a minor variation on its previous arguments, Gemini argues that the transfer of the Additional GBTC Shares from DCG to GGC was in fact a transfer "on behalf of" GGC and was "for the benefit of" Gemini and the Earn Users.  *See* Compl. ¶¶ 39, 47.  In urging this construction, Gemini relies upon the fact that the sole purpose of DCG's transfer was to provide the Additional GBTC Shares as security to Gemini.  *See* Compl. ¶ 39.  But the Complaint does not, in fact, plead this construction of the Second Amendment other than a bare quotation of the contractual language that DCG was transferring the Additional GBTC Shares to GGC "on behalf of" GGC.  *See Fadem v. Ford Motor Co.*, 352 F.Supp.2d 501, 516 (S.D.N.Y.) ("It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs."); *see also O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.").

In any event, Gemini's reading of the contractual language once again is flawed.  Under the plain language here, a transfer made "on behalf of" an entity plainly means a transfer made by a third-party that is acting as a proxy for that entity.  In short, the "on behalf of" language contemplates that the entity making the transfer is a third party.  It cannot be then that a transfer from DCG to GGC constitutes a transfer made "on behalf of" GGC.  Gemini's contention essentially would make the transferor and transferee the same party, which is a nonsensical reading of the text.  Gemini's reading is particularly problematic given that these shares were property of DCG until the first transfer.  Nor is Gemini's reading compatible with the language of the Second Amendment, which makes no mention of transfers "on behalf of" GGC and instead clearly requires a two-step process: (1) a transfer from DCG to GGC, and (2) a transfer

from GGC to the GTC Account of Gemini.  *See* Second Amendment § 1.  It is a strained reading

indeed to view the first step—the required transfer from DCG to GGC—as a transfer "on behalf

of" GGC when the very next provision requires the second step of transferring the shares from

GGC to Gemini.  There is no need for someone to "act on behalf" of GGC with respect to the

transfer to Gemini because the Second Amendment contemplates that GGC itself will transfer

the shares directly to Gemini.  Moreover, if the first step were to accomplish the entirety of the

process, there would be no need for the second step, and the language setting forth this second

transfer would be rendered entirely superfluous to the contract.  This would be "a result contrary

to a bedrock principle of contract interpretation, that every word and clause in the contract

should be given meaning."  *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 298

(2023); *see also Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (App. Div. 3d Dep't

1989) ("[C]ontracts are . . . to be interpreted to avoid inconsistencies and to give meaning to all

of its terms.") (internal citations cand quotations omitted); *Consedine*, 12 N.Y.3d at 293 ("Courts

may not by construction add or excise terms, nor distort the meaning of those used and thereby

make a new contract for the parties under the guise of interpreting the writing.") (internal

citations and quotations omitted).

　　　　Finally, Gemini's reading also raises a policy concern about the creation of a "secret

lien."  *See* Hr'g Tr. 98:4-15 (Jan. 18, 2024) [ECF No. 31] ("secret lien" concern raised by

counsel to UCC).  "Generally, security interests are perfected by the filing of financing

statements."  *In re O.P.M. Leasing Servs., Inc.*, 23 B.R. 104, 116-117 (Bankr. S.D.N.Y. 1982)

(citing N.Y. U.C.C. §§ 9-302 and 9-305 (McKinney Supp. 1982)).  But "[p]ossession operates as

[another] method of perfection in those situations where, like a financing statement, it gives

notice to third parties that the property at issue is encumbered."  *Id.* at 117 (citing *Allegaert v.*

26

*Chem. Bank,* 657 F.2d 495, 506 (2d Cir. 1980); J. White & R. Summers, *Handbook of the Law*

*Under the Uniform Commercial Code* at 934-35 (2d ed. 1980)); *see also In re O.P.M. Leasing*

*Servs., Inc.*, 23 B.R. at 116 ("Possession of collateral is sometimes a proper alternate method of

perfecting a security interest.").  Notice by filing or by possession is designed to prevent secret

liens—that is, a lien of which the world at large has no notice.  *See id.* at 117 (citing *United*

*States v. Speers,* 382 U.S. 266, 275 (1965)).  Applying these concepts here, the perfection of a

lien on the collateral here would occur through some clear transfer of the Additional GBTC

Shares off the books of GCG's assets and onto the books of Gemini; perfection by possession is

the method here because the parties did not provide for perfection by filing.  *See* Hr'g Tr. 98:16-

24 (Jan. 18, 2024).  If the Court were to allow a security interest in the Additional GBTC Shares

based on Gemini's reading—that is, without the second transfer out of the hands of GCG and

into the hands of Gemini—Gemini would have a security interest in collateral even though the

collateral remained with GGC.  Without Gemini's possession of the collateral to perfect the lien,

Gemini's security interest would be tantamount to a secret lien.  As explained by one bankruptcy

court,

> [t]here is always a way to make a lien valid against anyone in the world.  It is
> called 'perfection' of the lien.  It is an unfortunate word because it implies being
> 'perfect.'  In fact it simply means telling the rest of the world that you have the
> lien; it is no longer a "secret lien" between the lender and the borrower.  When a
> borrower ends up in a bankruptcy court, a trustee is bound by law to represent the
> debtor's creditors—the unpaid people, banks and landlords, etc., who never knew
> about the 'secret lien.'

*Horwitz v. Rote (In re Moorhouse)*, 487 B.R. 151, 152 (Bankr. W.D.N.Y. 2013).

Not surprisingly, there is a policy against the concept of secret liens, codified in the

Bankruptcy Code at Section 544 (providing that a trustee has the right to void the transfer of

property of the debtor, or any obligation by the debtor that is voidable, under various

circumstances).  But this policy concern existed in the law well before the current Bankruptcy

Code.  "From its inception in 1910, the express purpose of the trustee's 'strong-arm' powers [in

bankruptcy] has been to enable the trustee to strike down 'evil' secret liens and other transfers

that had evaded the assault of the trustee's other avoidance powers."  *In re Euro-Swiss Int'l*

*Corp.*, 33 B.R. 872, 879 (Bankr. S.D.N.Y, 1983) (citing 45 Cong. Rec. 2277 (1910); 4B Collier

on Bankruptcy ¶ 70.45, n.8 and cases cited therein (14th ed. 1978)).  "Exercise of those strong-

arm powers allows the trustee to increase the amount of the potential assets of the debtor's estate

thereby providing for a more equitable distribution of the debtor's estate to his creditors."  *Id.*

(citing *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941)).

## C. Constructive Trust

As an alternative to the declaratory relief sought in Counts II and III, Count IV seeks to

impose a constructive trust on the Additional GBTC Shares for the benefit of Gemini and the

Earn Users.  A constructive trust is an equitable remedy that is meant to avoid unjust enrichment.

*See Rosen v. Chowaiki & Co. Fine Art Ltd. (In re Chowaiki & Co. Fine Art Ltd.)*, 593 B.R. 699,

718 (Bankr. S.D.N.Y. 2018).  "When property has been acquired in such circumstances that the

holder of the legal title may not in good conscience retain the beneficial interest, equity converts

him into a trustee."  *Simonds v. Simonds*, 45 N.Y.2d 233, 241 (1978).  A party seeking to impose

a constructive trust under New York law must generally establish four elements by clear and

convincing evidence: "(1) a confidential or fiduciary relationship; (2) a promise, express or

implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust

enrichment."  *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 212 (2d

Cir. 2004) (internal citations and quotations omitted); *see also In re Chowaiki*, 593 B.R. at 718-

19.  The fourth element is commonly viewed as the most important, "since the purpose of the

constructive trust is prevention of unjust enrichment." *In re First Cent. Fin.*, 377 F.3d at 212

(internal citations and quotations omitted).

Gemini asserts that (i) GGC and Gemini had a confidential and fiduciary relationship, (ii)

DCG transferred the Additional GBTC Shares to GGC for Gemini's benefit in reliance on

GGC's promise to further transfer the shares to Gemini, and (iii) the Debtors' wrongful

prepetition conduct resulted in unjust enrichment.  The Debtors counter that the existence of a

contract between the parties precludes a constructive trust claim, that the imposition of a

constructive trust is disfavored in bankruptcy under these circumstances, and that the Complaint

fails to meet at least three of the factors for imposition of a constructive trust.  For the reasons

discussed below, the Court finds that  the constructive trust count must be dismissed.[20]

1.  <u>Unjust Enrichment</u>

"Unjust enrichment exists where the acts of the parties or others have placed in the

possession of [the defendant] money, or its equivalent, under such circumstances that in equity

and good conscience he ought not to retain it."  *In re Chowaiki*, 593 B.R. at 720 (internal

citations and quotations omitted).  "To prevail on a claim for unjust enrichment in New York, a

plaintiff must establish: (1) defendant was enriched; (2) the enrichment was at plaintiff's

expense; and (3) the circumstances were such that equity and good conscience require defendant[

] to make restitution."  *Id.* (internal citations and quotations omitted).  "Furthermore . . . the

---

[20]    Gemini urges the Court to recognize that the four-part test is flexible, and that many courts have imposed a
constructive trust in the absence of one or more factors.  *See Simonds*, 45 N.Y.2d at 241 ("Although the factors are
useful in many cases constructive trust doctrine is not rigidly limited."); *Barnard v. Kumar (In re Verma),* 2007 WL
2713017, at *6 (Bankr. E.D.N.Y. Sept. 14, 2007) ("[T]he four elements [of constructive trust] are not conclusive and
courts have imposed constructive trusts in the absence of a confidential relationship, unjust enrichment or a
promise.").  While it is true that the imposition of a constructive trust is an equitable remedy and discretion exists in
its application, the Court finds the remedy to be clearly unavailable here for the reasons set forth above.

absence of unjust enrichment, standing alone, is fatal to a request for a constructive trust . . . ."
*Id.* at 722.

In the Complaint, Gemini asserts that "GGC obtained the [Additional GBTC Shares] from its parent, DCG, for the sole purpose of delivering the [Additional GBTC Shares] to Gemini for the benefit of Earn Users, but GGC failed to deliver the Additional Collateral to Gemini." Compl. ¶ 84. Gemini concludes that "[a]s a result, the Debtors were unjustly enriched by their wrongful retention of the [Additional GBTC Shares]." *Id.* But it is well established that, as a threshold matter, unjust enrichment is unavailable where—as here—the rights of the parties are governed by a contract. *See In re First Cent. Fin.*, 377 F.3d at 213 ("[W]e conclude that this principle—that the existence of a written agreement precludes a finding of unjust enrichment— also applies to constructive trust claims."); *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 235 (E.D.N.Y. 2013) ("It is well established that the existence of a contract precludes a claim for a constructive trust."); *Soroof Trading Dev. Co. Ltd. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 514-15 (S.D.N.Y. 2012) (holding movant had "no basis for relief under quasi-contractual remedies such as constructive trust" where the parties' "relationship was, at all relevant times, governed by a contract."). This is because "where a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists" and there is no need for an equitable remedy unless it can be demonstrated that the available legal remedy is inadequate. *In re First Cent. Fin. Corp.*, 377 F.3d at 215. The Court agrees and holds that Gemini cannot show unjust enrichment in the face of the written agreements between the parties.

Indeed, Gemini concedes that "constructive trust claims are equitable in nature and generally not permitted where a valid, written agreement exists . . . ." Gemini Opp. at 18. But

Gemini argues that it "may plead a constructive trust claim in the alternative because the Debtors have challenged the validity of the Second Amendment." *Id*. But that is incorrect. In fact, the Debtors are not challenging the validity and enforceability of the Second Amendment. By contrast, the Debtors explicitly state, "[i]t is undisputed that the parties' rights and obligations with respect to the Additional GBTC Shares are governed by a *valid* contract—the Second Amendment." Debtors' MTD ¶ 36 (emphasis added). In any event, the Debtors' MTD seeks dismissal of the Complaint, in which Gemini seeks relief explicitly based on its contractual rights under the Second Amendment and the Security Agreement. *See* Compl. ¶ 7 (asserting right to 31,108,804 shares of GBTC in which Gemini had no prior interest until entry of the Second Amendment); *see* Second Amendment § 1 (pledging 31,180,804 shares in GBTC); *see also* Gemini Opp. at 22 (noting "GGC's flagrant breach of the Second Amendment by refusing to transfer the [Additional GBTC Shares] to Gemini as required."); *cf. In re Enron Corp.*, 2004 WL 726088, at *3 (S.D.N.Y. Apr. 2, 2004) (noting that movant could not establish that it had a property interest sufficient to impose a constructive trust on debtors without relying on void agreements). And the Court agrees with both parties that the question of whether a security interest exists here is—in fact—explicitly governed by the language of the Second Amendment.

Gemini next argues that even if a valid contract exists, the Court should grant its constructive trust claim because "Gemini does not have an adequate remedy at law, such as if an action for breach of the Second Amendment would render Gemini and the Earn Users materially worse off as general, unsecured creditors of the estate." Gemini Opp. at 18–19. Gemini relies on *Simonds v. Simonds*, 45 N.Y.2d 233 (1978), which held that a constructive trust remedy was available where a breach of contract action existed against a decedent's estate, but the estate's insolvency "would make such an action fruitless" and "worthless." *Id.* at 238, 240.

31

But Gemini's remedy for a breach of contract here is far from worthless.  If it prevails on a

breach of contract claim, Gemini would be entitled to recover as a general unsecured creditor and

share ratably with other general unsecured creditors.  *See In re First Cent. Fin.*, 377 F.3d at 216

("We concede that [the movant], like many other creditors, will not, in all probability, be made

whole in the proceedings; but that does not mean its remedy is legally inadequate, simply that it

is imperfect."); *see also Amended Disclosure Statement with Respect to the Amended Joint Plan

of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* at § III.E [Case

No. 23-10063, ECF No. 1031] (noting likely anticipated recovery of anywhere from 61% to

100% for unsecured creditors of GGC).

　　Additionally, Gemini's allegations in the Complaint do not meet the third requirement for

unjust enrichment, because they do not demonstrate a "special reason" why a constructive trust

claim should be imposed in favor of a single creditor, at the expense of other creditors in these

bankruptcies.  Granting relief to Gemini here would result in the GGC estate relinquishing

property that would otherwise go to satisfying the claims of all unsecured creditors on an equal

basis.  *See In re Chowaiki*, 593 B.R. at 721 (dismissing constructive trust claim where the

movant's "pleadings do not demonstrate a 'substantial reason' for the Court to allow him to

remove the . . . [f]unds from the bankruptcy estate, at the expense of other creditors.")

　　Indeed, even if Gemini was correct that GGC engaged in "unjust, pre-petition conduct

culminating in GGC wrongfully obtaining and retaining the [Additional GBTC Shares]," Gemini

Opp. at 21, that alone does not justify a constructive trust in these bankruptcy cases.  Courts

recognize that by "creating a separate allocation mechanism outside the scope of the bankruptcy

system, the constructive trust doctrine can wreak . . . havoc with the priority system ordained by

the Bankruptcy Code." *In re First Cent. Fin.,* 377 F.3d at 217.  So while bankruptcy law does

not trump state constructive trust law, that "does not diminish the need to act very cautiously to minimize conflict with the goals of the Bankruptcy Code.  In light of the fact that these goals can be compromised by the imposition of a constructive trust, bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so."  *Id.* at 217-18; *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 654 B.R. 224, 237 (Bankr. S.D.N.Y. 2023) ("[C]onstructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, and not from the offending debtor.") (internal citations and quotations omitted); *In re Dreier, LLP*, 429 B.R. 112, 137 (Bankr. S.D.N.Y. 2010) ("Because the constructive trust in bankruptcy harms other creditors rather than the debtor, the equities that will support the imposition of a constructive trust under the common law do not necessarily support imposition of the same constructive trust in bankruptcy."); *In re Chowaiki*, 593 B.R. at 720 ("In the context of bankruptcy, where . . . liabilities generally outweigh assets, a court must consider the equities of all creditors in determining whether there was unjust enrichment.") (internal citations and quotations omitted).[21]

Not surprisingly then, bankruptcy courts generally have held that wrongful prepetition conduct will not justify the imposition of a constructive trust where it would favor one creditor over others.  *See, e.g., In re Chowaiki*, 593 B.R. at 721 ("No equities would be served here by allowing Plaintiff to satisfy his losses while similarly situated creditors, many of whom hold similar causes of action against the Debtor for fraud and fraudulent inducement, wait for *pro rata* distribution."); *In re Ades & Berg Grp. Inv'rs*, 550 F.3d 240, 245 (2d Cir. 2008) ("There is no

---

[21]    The Debtors have asserted that the transfer of the Additional GBTC Shares as contemplated under the Second Amendment would constitute a preferential transfer under Section 547 of the Bankruptcy Code.  *See* GGC's Answer at GGC's Countercl. ¶¶ 75-84.  If that was the case, GGC would not be unjustly enriched by its retention of the shares because the Debtors' estates would be entitled to a claw back of the shares from Gemini.  Given the Court's decision today, however, it does not reach that issue or Gemini's related safe harbor defenses.

inequity in treating [the creditor-plaintiff] in the same manner as any other depositor/creditor who was unfortunate enough to have placed its money with the [debtor].”); *In re Dreier LLP*, 2016 WL 3920358, at *7 (S.D.N.Y. July 15, 2016) (“Equity is not served by disadvantaging one set of victims in order to restore another, where the only source of assets is limited to a common pool.”); *In re Dreier LLP*, 429 B.R. at 134 (“The right of a Ponzi scheme victim . . . to gain priority over other victims, is severely limited.”); *cf. In re Ades*, 550 F.3d at 244 (“[R]etention by [a] bankruptcy estate of assets that, absent bankruptcy, would go to a particular creditor is not inherently unjust.”).[22]

2. Confidential or Fiduciary Relationship

“A fiduciary relationship arises ‘between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.’” *Genger v. Genger (In re Genger)*, 2021 WL 3574034, at *20 (Bankr. S.D.N.Y. Aug. 12, 2021) (quoting *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848 (2011)). “‘[A]t the heart of the fiduciary relationship’ lies ‘reliance, and de facto control and dominance.’” *Id.* (quoting *United States v. Chestman*, 947 F.2d 551, 568-69 (2d Cir. 1991)). In the Complaint, Gemini states that “[t]he relationship among Gemini, Earn Users, and GGC constitutes a confidential and/or fiduciary relationship.” Compl. ¶ 81. But the Court disagrees.

The plain language of the contract between the parties is fatal to Gemini’s argument. Specifically, the parties to the MLAs represent and warrant that “[t]he other Parties are *not acting as a fiduciary* for or an advisor to it in respect of any Loan.” MLA § V(j) (emphasis

---

[22] As counsel to the Debtors noted at the hearing on these motions, almost the entirety of the  unsecured creditor body had contracts with the Debtors in which the Debtors were required to return cash or cryptocurrency, but did not. *See* Hr’g Tr. 99:24-100:3 (Jan. 18, 2024). Thus, the wrongdoing alleged by Gemini—that the Debtors failed to provide Gemini with assets they were owed under a contract—is not so distinct from that experienced by the Debtors’ other creditors.

34

added).  The "Parties" are defined in the MLAs as including GGC, Gemini and an individual

Earn User.  *See* MLA at 1.  Gemini reasons that the MLAs are irrelevant in these circumstances

because they govern the parties' relationship "in respect of any Loan," and the relationship that

Gemini alleges between the parties here "arose out of the negotiation of the Security Agreement

and Second Amendment, neither of which contained any such disclaimer."  Gemini Opp. at 25-

26.  But the Security Agreement was intertwined with, and intended to supplement, the MLAs.

The Security Agreement explicitly incorporates the MLAs' defined terms and expressly states

that the transactions contemplated therein were "in consideration of the outstanding and future

transactions under the [MLAs]."[23]  *See* Security Agreement at 1.  Section 2 of the Security

Agreement similarly references the MLAs when discussing the security interest to be granted to

Gemini:

> As security for the prompt payment and performance in full when due . . . of all
> liabilities and obligations of [GGC] under the [MLAs], whether now existing or
> hereafter arising . . . [GGC] hereby pledges, assigns, and grants to [Gemini], for
> the benefit of [Gemini] and the [Earn Users], a security interest in all of [GGC's]
> right, title, and interest in and to all property from time to time transferred by or
> on behalf of [GGC] to or for the benefit of [Gemini] or the [Earn Users] in
> connection with this Agreement or any [MLA] . . . .

*Id.* at § 2.  Moreover, the remedies set forth in the Security Agreement were available to Gemini,

among other circumstances, "[u]pon an event of default (or similar term) under any MLA . . . ."

*Id.* at § 3(a).  That the Security Agreement and its amendments did not restate each element of

the MLAs—such as the disclaimer of a fiduciary relationship—does not create a fiduciary

relationship where one did not previously exist.[24]

---

[23]      The Security Agreement states that "[a]ll capitalized terms not otherwise defined herein shall have the
respective meanings assigned to them in the Master Loan Agreements."  Security Agreement at 1.

[24]      Even if one were to conclude that the disclaimer in the MLAs was not dispositive, it would be a powerful
indication of the arms' length relationship between these parties and the notion that, if they wanted to establish a
fiduciary relationship, they would explicitly do so.

As against this language that disavows a confidential relationship, Gemini's Complaint provides no basis to impose one. There is nothing to indicate that the parties' relationship or the transactions at issue created the fiduciary or special relationship that is required to impose a constructive trust. "Even supposing that a contractual relationship imposed a duty to act . . . no constructive trust will be found when the relationship is not marked by the unique degree of trust and confidence typically characteristic of a fiduciary relationship." *New York v. Matamoros (In re Matamoros)*, 605 B.R. 600, 608 (Bankr. S.D.N.Y. 2019) (internal citations and quotations omitted). Here, the parties had a contractual relationship under the MLAs, the Security Agreement and the Second Amendment, all of which demonstrate arms' length business transactions between the parties. *See, e.g.,* MLA § XXIII ("The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel. . ."); *see also In re Chowaiki*, 593 B.R. at 722 ("Generally, an arm's length business transaction, even those where one party has superior bargaining power, is not enough to give rise to a fiduciary relationship."); *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993) ("[T]he mere fact that a corporation has borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary.").

Gemini suggests that a fiduciary or confidential relationship somehow began when Gemini requested information from GGC regarding GGC's financial condition and continued when GGC promised to transfer the Additional GBTC Shares and Gemini relied on that promise. *See* Gemini Opp. at 24-25. Gemini cites to *A. Brod, Inc. v. SK&I Co., L.L.C.*, 998 F. Supp. 314 (S.D.N.Y. 1998), for the proposition that a confidential or fiduciary relationship will arise "out of a close and intimate association which creates and inspires trust and confidence between the

36

parties." *Id*. at 327 (internal citations and quotations omitted).  But the facts of the *A. Brod* case

are far different.  It involved parties that were represented by the same counsel entering into an

agreement in which a copyright was assigned from one party to the other so that the assignee

could bring a copyright infringement claim on the assignor's behalf.  *See id*. at 327-28.  In

holding that the relationship was one of trust and confidence, the court specifically found that the

assignor "could be viewed as having placed its trust in [the assignee] to protect its . . . interests."

*Id*. at 327-28.  In addition, the fact that they shared an attorney "underscore[d] their unity of

interests and the absence of arms-length bargaining."  *Id*. at 328.  No analogous facts are plead

here that would indicate that kind of close relationship of trust and confidence between GGC and

Gemini given their arms-length relationship.

   3.   <u>Transfer of Value</u>

        "A constructive trust is imposed on sums transferred to a fiduciary in reliance on a

promise by which he or she is unjustly enriched." *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d

655, 669 (S.D.N.Y. 2007) (holding that "plaintiff [was] not entitled to a constructive trust" over

funds separate from those allegedly transferred by plaintiff to defendant).  A constructive trust is

most often imposed for assets that a plaintiff has transferred in reliance on defendant's promise,

or for property that the plaintiff's transfer of assets was ultimately used to acquire.  *See, e.g.,*

*Sharp v. Kosmalski*, 351 N.E.2d 721, 722 (N.Y. 1976) (reversing lower court's dismissal of

plaintiff's request for imposition of a constructive trust over "property transferred to defendant

on the ground that the retention of the property . . . was in violation of a relationship of trust and

constituted unjust enrichment"); *Fairfield Fin. Mortg. Grp., Inc. v. Luca*, 584 F. Supp. 2d 479,

485-86 (E.D.N.Y. 2008) (declining to dismiss request for imposition of a constructive trust over

property that defendant purchased using funds that the plaintiff transferred to it in reliance on

defendant's promise to use the funds for a different purpose).  By contrast, Gemini here seeks a constructive trust over assets that Gemini did not transfer to GGC in reliance on a promise.  Nor were the assets acquired with any property that Gemini transferred.  As the Additional GBTC Shares flowed from third party DCG to the Defendant GGC, Gemini never had an interest in the Additional GBTC Shares.  *See Bontecou v. Goldman*, 477 N.Y.S.2d 192, 195 (App. Div. 2d Dep't 1984) ("In order to establish that there was a transfer in reliance on [a] promise, it must be shown that the party seeking to impose the constructive trust had some interest in the property prior to obtaining the promise that the property would be conveyed, and that this interest was parted with in reliance on the promise."); *Walker v. Babalola*, 2019 WL 1526950, at *4 (N.Y. Sup. Ct. Mar. 27, 2019) ("No constructive trust will be imposed by one who has no interest in the property prior to obtaining a promise that such interest will be given to him."); *see also Mance v. Mance*, 513 N.Y.S.2d 141, 141 (App. Div. 1st Dep't 1987) (plaintiff seeking constructive trust over a company's equity failed to establish transfer in reliance of a promise because he "possessed no prior interest in the company which he relinquished in reliance on the alleged promise").[25]

### D.  Holdco and GAP

In addition to seeking to dismiss Counts II, III, and IV of the Complaint, the Debtors move to dismiss the entirety of the Complaint as to GAP and Holdco.  *See generally* Debtor's MTD.  The Debtors assert that Gemini fails to state a plausible claim for relief as to GAP and Holdco because the Complaint lacks facts that might establish any basis for liability against GAP or Holdco.  *Id.* at ¶ 26.

---

[25]     A stereotypical fact pattern is seen in *Fairfield Fin. Mortg. Grp.*, 584 F. Supp. 2d at 486, in which a plaintiff transferred $30,000 in reliance on the defendants' promise to use the funds to further plaintiffs' business interests, which defendant then improperly used to purchase an interest in property for his own benefit.

It is well settled that a complaint is insufficient "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Of the eighty-five paragraphs in the Complaint, only three paragraphs refer to GAP and Holdco; those references come in the context of identifying the parties to the Complaint.  *See* Compl. ¶¶ 17-19.  Neither Holdco nor GAP were parties to the MLA, the Security Agreement, the First Amendment, or the Second Amendment.  The Complaint does not contain any allegations that Holdco or GAP were involved in the lending relationship with the Earn Users or connected with the current dispute regarding the August 2022 Collateral or the Additional GBTC Shares.

Gemini nonetheless asserts that GAP and Holdco are appropriate defendants in this matter because "Gemini does not have complete knowledge and information as to the corporate relationship among Defendants [GGC], [Holdco], and [GAP], including which entity may actually be holding the [Additional GBTC Shares], and which entity or entities were responsible for the decision to not transfer the [Additional GBTC Shares] to Gemini."  Compl. ¶ 17, n.8; *see also* Gemini Opp. at 9.  Gemini nonetheless summarily concludes that "Holdco and GAP were important players in the events giving rise to Gemini's claims" and that Genesis—defined to include Holdco and GAP—was responsible for asserting that Gemini's foreclosure of the August 2022 Collateral did not satisfy applicable law.  Gemini Opp. at 8-9.

But this speculation is not connected to any factual allegations in the Complaint.  The Complaint itself does not state what actual actions these two Defendants took or what their "important" role was.  Gemini's general suspicions about these Defendants and the August 2022 Collateral is insufficient to constitute "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  Further, Gemini cannot cure the Complaint's deficiency

by now generally asserting in its motion papers that GAP and Holdco might be holding the

Additional GBTC Shares.  *See* Gemini Opp. at 9.  "[I]t is axiomatic that the Complaint cannot be

amended by the briefs in opposition to a motion to dismiss."  *O'Brien*, 719 F. Supp. at 229.  Of

course, there may be good reasons why Gemini does not know whether these two Defendants

were involved—or to what extent—in the events alleged in the Complaint.  But that fact cannot

remedy the lack of allegations about their actual involvement.  For all these reasons, the Court

will dismiss these two Defendants without prejudice, recognizing that Gemini may later learn

information to flesh out its understanding and improve its ability to adequately plead a cause of

action against GAP and Holdco.

## **CONCLUSION**

For the reasons stated above, the Debtors' MTD is granted for Counts II, III and IV as

against all Defendants and granted without prejudice for all Counts against Holdco and GAP.

Gemini's MTD is denied as to Counterclaim IV and is denied as moot as to Counterclaims VI

and VII as to the Additional GBTC Shares.  The Debtors should settle an order on three days'

notice.  The proposed order must be submitted by filing a notice of the proposed order on the

Case Management/Electronic Case Files docket, with a copy of the proposed order attached as an

exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel

to Gemini.

Dated: White Plains, New York
      February 7, 2024

                                ***/s/ Sean H. Lane***_____
                                UNITED STATES BANKRUPTCY JUDGE